**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

EDWARD P. HAGEN, D.O.,

               Plaintiff,

vs.

SIOUXLAND OBSTETRICS &
GYNECOLOGY, P.C., an IOWA
CORPORATION, PAUL J. EASTMAN,
M.D., TAUHNI T. HUNT, M.D.,
ANGELA J. ALDRICH, M.D., and
KIMBERLY A. LIEF,

               Defendants.

No. C 11-4047-MWB


**MEMORANDUM OPINION AND
ORDER REGARDING DEFENDANTS'
MOTION FOR PARTIAL SUMMARY
JUDGMENT AND MOTION TO
STRIKE**

_____

**TABLE OF CONTENTS**

I.     **INTRODUCTION**............................................................................3
    A.    *Factual Background* ..............................................................3
         *1.*    *Siouxland* .................................................................4
         *2.*    *Expansion of Siouxland*............................................5
              *a.*    *South Dakota* .............................................5
              *b.*    *Minnesota* .................................................6
         *3.*    *Hagen's behavior*......................................................7
              *a.*    *Prior behavior concerns* ...........................7
              *b.*    *Hagen's behavior at Siouxland and St. Luke's* ..............8
         *4.*    *Applications for medical licensure* ......................................9
              *a.*    *Wisconsin application* ...........................11
              *b.*    *Minnesota application* ...........................12
         *5.*    *Hospital Incident on November 5, 2009* .............................15
         *6.*    *Termination* .............................................................17
    B.    *Procedural Background* ........................................................22

II.    **MOTION TO STRIKE**................................................................23
    A.    *Standards For Motion To Strike* ............................................23

1

  **B.**  *Analysis*.................................................................... 25
**III.** ***MOTION FOR PARTIAL SUMMARY JUDGMENT*............................ 26**
  **A.** *Summary Judgment Standards*.................................... 26
  **B.** *The Licensure Application Claims* ............................. 28
    **1.** *Whether Siouxland, Eastman, Hunt, and Aldrich ratified Lief's actions in completing Hagen's licensure applications*..... 28
      *a.* *Arguments of the parties* ............................. 28
      *b.* *Analysis* .................................................. 29
    **2.** *Fraudulent misrepresentation*.................................. 30
      *a.* *Arguments of the parties* ............................. 30
      *b.* *Analysis* .................................................. 30
    **3.** *Conspiracy to defraud* ......................................... 32
      *a.* *Arguments of the parties* ............................. 32
      *b.* *Analysis* .................................................. 32
    **4.** *Forgery* .......................................................... 33
      *a.* *Arguments of the parties* ............................. 33
      *b.* *Analysis* .................................................. 34
    **5.** *Promissory estoppel* ........................................... 34
      *a.* *Arguments of the parties* ............................. 35
      *b.* *Analysis* .................................................. 35
    **6.** *Tortious interference with prospective business advantage*....... 36
      *a.* *Arguments of the parties* ............................. 36
      *b.* *Analysis* .................................................. 37
  **C.** *The Termination Claims* ......................................... 38
    **1.** *Retaliatory discharge* .......................................... 39
      *a.* *Arguments of the parties* ............................. 39
      *b.* *Analysis* .................................................. 41
    **2.** *Fiduciary duty*.................................................. 42
      *a.* *Arguments of the parties* ............................. 42
      *b.* *Analysis* .................................................. 42
    **3.** *Breach of contract* ............................................ 43
      *a.* *Arguments of the parties* ............................. 43
      *b.* *Analysis* .................................................. 44
    **4.** *Tortious interference with business relationships*................. 44
      *a.* *Arguments of the parties* ............................. 45
      *b.* *Analysis* .................................................. 45
  **D.** *Punitive Damages* ............................................... 46
**IV.** ***CONCLUSION*................................................................ 47**

2

# I.    INTRODUCTION

This case, a dispute regarding employment termination between plaintiff Edward P. Hagen, D.O. ("Hagen") and defendants Siouxland Obstetrics & Gynecology, P.C. ("Siouxland"), Paul J. Eastman, M.D. ("Eastman"), Tauhni T. Hunt, M.D. ("Hunt"), Angela J. Aldrich, M.D. ("Aldrich"), and Kimberly A. Lief ("Lief"), (collectively "defendants"), is before me on Defendants' Siouxland Obstetrics & Gynecology, P.C., Paul J. Eastman, M.D., Tauhni T. Hunt, M.D., Angela J. Aldrich, M.D., And Kimberly Lief's Memorandum Of Law In Support Of Their Motion For Summary Partial Judgment (docket no. 27) ("Motion For Partial Summary Judgment") and Defendants' Motion To Strike Certain Portions Of Plaintiff's Statement Of Additional Facts In Support Of Resistance To Defendants' Motion For Partial Summary Judgment And Portions Of Plaintiff's Appendix (docket no. 59) ("Motion To Strike").  I must determine whether a genuine issue of material fact exists regarding Hagen's claims.

## A.    Factual Background

I set forth here only those facts, disputed and undisputed, sufficient to put in context the parties' arguments concerning the defendants' Motion For Partial Summary Judgment and Motion To Strike.  Unless otherwise indicated, the facts recited here are undisputed, at least for purposes of summary judgment.

This case arises from two distinct sets of events that occurred in 2009.  First, in July 2009, Hagen alleges that he requested that the defendants, including Siouxland office manager Lief, complete his applications for medical licensure in the states of Minnesota and Wisconsin.  Second, in November 2009, Hagen was terminated from his employment at Siouxland by Eastman, Hunt, and Aldrich.

### 1. *Siouxland*

Siouxland, an Iowa professional corporation, is located in Sioux City, Iowa and provides obstetric and gynecologic services to patients. Siouxland expanded into the area of cosmetic surgery and related services, including the development of The Rejuvenation Centre, which provided client services such as Botox treatment, Juviderm treatment, hair removal, liposuction, massage therapy, and weight loss consultation.

Siouxland was formed and organized by three physicians, including Hagen's father, in 1975. At the time of Hagen's termination, in November 2009, the doctors with an interest in Siouxland were Hagen, Eastman, Hunt, and Aldrich.

Hagen is a doctor of obstetrics and gynecology, presently licensed to practice medicine in the states of Iowa, South Dakota, and Wisconsin. On January 1, 1993, Hagen entered into an employment agreement with Siouxland. Hagen has been an equity owner, president, and director at Siouxland. At the time of his termination, Hagen was the president of Siouxland. Hagen believed he was the decision maker for Siouxland because Eastman and Aldrich did not want to make decisions that angered people.

Hagen was actively involved in hiring Eastman, Hunt, and Aldrich. Eastman became an equity owner of Siouxland on or about July 27, 1994, and he has been an equity owner, officer, and director since. Hunt became an equity owner on or about July 29, 1997, and she has been an equity owner, officer, and director of Siouxland since. Hunt was the first female doctor of obstetrics and gynecology in Sioux City. Hagen believed that hiring a female would be good for the practice because it would bring in more patients who prefer seeing a female physician. After Hunt joined Siouxland, she became busier while and Hagen and Eastman saw fewer patients. According to Eastman, Hunt and Aldridge had more patients because female patients generally prefer female doctors of obstetrics and gynecology. Yet, Hagen's workload

4

increased when Hunt was hired because he had to train and assist her in surgeries. Aldrich became an equity owner of Siouxland on or about August 2000, and has been an equity owner, officer, and director of Siouxland since.

When the doctors joined Siouxland, they agreed not to "engage in the practice of medicine except as an employee of the CORPORATION unless otherwise authorized by the Board of Directors." Article III(a). App. 71. The employment agreement states all income generated "for services as a doctor and all activities relating thereto, such as lecturing, writing articles and consulting work, shall belong to the CORPORATION . . . ." Article IV. App. 72. A doctor could be terminated by delivering a written notice of cancellation at least 90 days prior to the effective date of cancellation or "discharged by the CORPORATION in the event of embezzlement or other theft; willful contravention of professional ethics; substantial and willful violation of any other terms or conditions of this employment agreement, all subject to determination by the Board of Directors of the CORPORATION." Article XI(a)(5)-(6). App. 75.

### 2. *Expansion of Siouxland*

Revenue generation became an increasing source of dispute between Hagen and the other Siouxland doctors, particularly regarding profits derived from non-Siouxland activities. Hagen and Eastman, Hunt, and Aldrich disagreed on whether they should participate in the profits of the Dakota Dunes Surgery Center and the Pierce Street Surgery Center. Also, Hagen sought opportunities to expand Siouxland to Sioux Falls, South Dakota and the Twin Cities area, which defendants opposed.

### a. *South Dakota*

Hagen engaged in efforts to expand Siouxland to Sioux Falls, South Dakota, yet defendants were unwilling to expand Siouxland's business there. Defendants allege that when Hagen proposed the idea of expanding Siouxland business efforts outside the state of Iowa, they informed Hagen such expansion would violate his contract. Defendants

5

allege that despite their unwillingness to assist in developing Siouxland in Sioux Falls, Eastman, Hunt, and Aldrich were not opposed if Hagen was willing to share with them the profits derived from Hagen's efforts. Defendants allege that when Hagen saw patients in Sioux Falls, his activities generated revenue of approximately $1,800 and he kept the money. Hagen denies defendants' recollection of these events, including the discussion of Hagen's contract, his refusal to share profits, and whether he kept the money earned from his single visit with Sioux Falls patients.

### b. Minnesota

After Hagen purchased a vacation home in Wisconsin and began spending increasing amounts of time in Wisconsin and the Twin Cities area, he considered starting a weight loss clinic in Minnesota. He discussed it with his fiancé, Denise Watson ("Watson"), over the Fourth of July in 2009. Watson worked as a dental hygienist and was interested in changing careers. In July 2009, Hagen announced to Eastman, Hunt, and Aldrich his aspirations to open a diet clinic in Minnesota called Vivify HCG Weight Loss ("Vivify"). At this time when Hagen started planning for Vivify in Minnesota, he did not look at the Siouxland bylaws. The other doctors informed Hagen of their expectation that Hagen would share the Minnesota profits. Hagen informed the other doctors that "he would be happy to allow them to participate in the Minnesota business efforts, and share in the profits realized therefrom in proportion to their respective capital and labor inputs." Complaint ¶ 25.

However, Eastman, Hunt, and Aldrich were not interested in investing time or capital in developing business in Minnesota. Defendants allege that Eastman, Hunt, and Aldrich reminded Hagen that his employment agreement required proceeds go to Siouxland. Hagen informed others that Eastman, Hunt, and Aldrich were opposed to his efforts to open up another diet clinic because they did not want him to make revenue

without them being able to make revenue. Hagen alleges that he discussed this new venture with Eastman, Hunt, and Aldrich, who all agreed it would not be a problem.

Hagen did not actively pursue Vivify until after his termination in November 2009. Prior to his termination, Hagen had been bringing diet medication from Siouxland, which was taken by Watson and Watson's friend, in preparation to open Vivify. During the time Lief was sending out applications to the Minnesota Board and the Wisconsin Board, Hagen employed a Minnesota attorney, David Wandling ("Wandling"), to incorporate Vivify. Hagen filed for the incorporation of Vivify in the state of Minnesota on November 16, 2009. He located office space in early December 2009 and Vivify opened in January 2010.

### 3. Hagen's behavior

Defendants allege that Hagen's behavior has been an issue in the past. Defendants allege that Hagen's behavior at Siouxland and St. Luke's was unprofessional.

#### a. Prior behavior concerns

Prior to his termination, Hagen was aware that Eastman, Hunt, and Aldrich had complaints about his behavior dating back to 2000 or 2002. At that time, Eastman, Hunt, and Aldrich had a meeting with Hagen and counsel, Jeff Garreans, and the other doctors gave Hagen a second chance. Defendants contend concerns leveled at the meeting included Hagen's anger, alcohol use while on call, and poor behavior towards staff. Hagen denies these concerns were addressed and stated that he does not have a drinking problem. Hagen's ex-wife, Kelly Hagen, also stated that Hagen does not have a problem with alcohol.

In 2000 or 2001, Hagen had an extramarital affair with a 22-year-old St. Luke's labor and delivery nurse, Melissa Gordon, with whom he worked. Hagen did not try to hide the affair and knew that the employees at Siouxland were aware of the affair. The

staff at St. Luke's hospital was aware of the affair and witnessed intimate behavior like hugging and tickling on hospital premises. Eastman, Hunt, and Aldrich knew about Hagen's affair with Gordon, but never discussed it with Hagen.

### b. *Hagen's behavior at Siouxland and St. Luke's*

Hagen alleges that his relationship with the nursing staff at Siouxland was good. Hagen contends that he never yelled or screamed at the Siouxland staff, but might have raised his voice when things did not get done properly. Hagen also alleges that he never hollered or cursed at Eastman, Hunt, Aldrich, or Lief. Defendants disagree with Hagen's assessment of his behavior at Siouxland. Defendants allege that Hagen's business at Siouxland had slowed and he periodically would not see any patients on Mondays, Fridays, and some Wednesdays.

Tracy Lynn Miller, R.N., ("Miller") worked at St. Luke's with Hagen in the labor and delivery department off and on from 1995 through 2007. Defendants allege that Hagen yelled at staff while at St. Luke's, belittled nurses, and threatened to fire nurses. Defendants allege Miller received complaints from other nurses regarding Hagen being rude. Defendants allege there was an event when Hagen threw a Mityvac across the C-section room, splattering blood all over. Defendants allege that Hagen threw a prescription pad at Miller and said, "Thanks a fucking lot for rounding with me." App. 196.

Peggy Mace, R.N. ("Mace") has been a nurse at St. Luke's since 1977, twenty-eight years as a staff nurse and seven years as management in the labor and delivery department, working with Hagen on many occasions. Defendants contend that Mace witnessed unprofessional behavior by Hagen, including threatening nurses' jobs, calling nurses stupid, throwing a bloody surgical instrument across the room, and kicking things at the hospital. Defendants allege that Mace and other nurses were scared of Hagen. Hagen used the nickname "Allbitch" for Dr. Aldrich, which was heard by

8

nursing staff, including Mace and Miller. Mace felt that Hagen was hurting Siouxland because "there were doctors that were not referring to their group. . . . He had very, very few patients in the last months that he was there." App. 210. Family practitioner Merle H. Muller, M.D., who often worked at St. Luke's and Mercy hospitals with Hagen, found Hagen to be confrontational during their interactions and referred far less obstetrics and gynecology patients to him than he otherwise would have. Defendants allege that the St. Luke's nursing staff would refuse to take Hagen's patients. However, Hagen alleges that his relationship with the St. Luke's nursing staff was good and they respected him.

### 4.    *Applications for medical licensure*

In July 2009, Hagen asked Lief to start his application process for licensure in Minnesota and Wisconsin. Hagen's conversation with Lief was under five minutes and he told her "to start filling out [his] applications for Minnesota and Wisconsin. Really just Minnesota . . . might as well get Wisconsin too." Hagen's Deposition 102:1-8. Lief had the authority to fill out licensing forms and it was her office duty to do so. Hagen did not ask Eastman, Hunt, or Aldrich to fill out his applications, and it was not their duty to fill out medical applications. Hagen did not ask Lief if she knew how to fill out the applications during their conversation, and Lief never told Hagen she did not know how to fill out the applications. Hagen could not recall whether or not he told Lief the reasons why he requested she fill out the applications, and Lief did not remember Hagen telling her what future service he would perform in Minnesota and Wisconsin. Hagen did not provide Lief any materials when he requested she complete the applications. Hagen did not investigate how long the licensing application processes would take, and he did not tell Lief there was any rush.

Hagen believes that Lief would normally complete an assignment from Hagen in a short amount of time because she was on thin ice after Hagen told her he did not think

9

she was performing well. Lief was fired from her previous job at Burgess Health Center in Mapleton, Iowa, because she charged a personal item on a company credit card. Lief cannot recall whether she disclosed this transgression when she applied for her job at Siouxland. Lief was often angry at Hagen.

Watson continually asked Hagen to check on the licensure applications, which prompted him to follow up with Lief in September. Lief told Hagen she was in the process of filling the applications out. Hagen never asked to see the actual copies of his applications between July and October. The first time Hagen contacted either the Minnesota Board of Medical Examiners ("Minnesota Board") or the Wisconsin Board of Medicine ("Wisconsin Board") was approximately October 1, 2009.

On October 8, 2009, Lief received a call from Hagen while she was at the hospital with her dying father, stating that she needed to get to the office to finish completing the applications. Defendants allege Hagen threatened Lief's job during this call. When Lief went to the office that afternoon, Hagen, Eastman, Hunt, and Aldrich were not at the office. Defendants allege that Lief felt that her job was in danger if she did not complete the applications. Hagen denies Lief's recollection of their communications on October 8, 2009, noting that he did not know her father was dying and that he would never threaten her job.

Lief completed the applications for Minnesota and Wisconsin and mailed them on October 8 and 9, 2009. The Minnesota Board received Hagen's application on October 9, 2009. At the latest, the Wisconsin Board received Hagen's application by October 20, 2009. Lief admits that Hagen did not read or sign the Minnesota or Wisconsin applications. Lief was aware when she sent the applications that she had notarized signatures that were not Hagen's. Lief admits that she doesn't remember who signed Hagen's name on the applications; it was either her or someone helping her fill the applications out in the Siouxland office. Lief admits that she notarized Hagen's

10

signature knowing that it was against the law to do so. Defendants allege that Lief knew at the time that she should not have notarized Hagen's signature, but she thought her job was in jeopardy. Lief also had someone sign the names of Eastman and Hunt on the Minnesota application to verify that the photograph of Hagen was recent and his likeness. Defendants allege that Lief answered the application questions regarding Hagen's malpractice claims history incorrectly, but innocently, even though the correct information was in the office file.

Hagen did not tell Eastman, Hunt, or Aldrich that he had asked Lief to complete his Minnesota and Wisconsin applications. Eastman knew that Hagen had asked Lief to fill out the Minnesota and Wisconsin applications prior to Hagen's termination because Lief told Eastman that Hagen asked her to fill out the applications. Defendants allege that Hunt and Aldrich were not aware of the applications at the time Lief mailed them. Defendants allege that at the time she completed the applications, Lief did not give Eastman, Hunt, or Aldrich the information about the inaccurate signatures nor did she ever show them the applications. Lief was paid a $5,000 bonus "for the EP [Hagen] handling" by Eastman, Hunt, and Aldrich, as stated in an email from Hunt to Lief on April 14, 2010. Pl. App. 132.

### a. *Wisconsin application*

As of December 11, 2009, Hagen had not met various requirements of his Wisconsin license application, including providing a medical educational verification form, providing a hospital verification of privileges form, providing a complete National Practitioner Databank self-query, and completing his oral examination. On December 11, 2009, the Wisconsin Board informed Hagen that he had failed a necessary written examination and would require retesting. Hagen retook the examination on February 25, 2010. Defendants allege that the Wisconsin Board considered concerns expressed in November 2005 and June 2009 about Hagen's

11

professional behavior. Defendants allege that as a result of Hagen's previous malpractice action and suspension, Hagen's file was sent to a Wisconsin Board member acting as a credentialing liaison who requested that Hagen pass an oral examination to explain his past behavior and suspension. On May 19, 2010, Hagen completed the oral examination requirement. The Wisconsin Board allowed Hagen to correct the inaccuracies on his application. In June 2010, Hagen received his Wisconsin license and accepted employment with Health Partners in Amery, Wisconsin.

###### b.      *Minnesota application*

On October 15, 2009, Wendy Boswell ("Boswell"), a licensure specialist at the Minnesota Board, sent Hagen a letter requesting an explanation as to why he had answered "No" to Questions 9 and 10. Question 9 on the Minnesota application states: "Have you ever been notified of any investigations by any state medical board, medical society, or any hospital of any complaints against you relative to the practice of medicine, or have you been reprimanded or censured by any medical society or licensing board? If so, give particulars." App. 313. Question 10 on the Minnesota application states: "Have you ever been a defendant in any medical malpractice lawsuits, had any malpractice settlement, or have any pending? If so, give a detailed clinical explanation of each case as well as documentation of outcome (insurance papers or court documents)." App. 313. The true answer to each of these questions was easily ascertainable by the Minnesota Board through the National Practitioner Data Bank, which supplies a list of hospital privileges, malpractice suits, licenses modified in some way or revoked or suspended to the Minnesota Board.

Hagen alleges that he did not get the letter from Boswell because it was sent to his office at Siouxland and Lief responded to it without consulting him. Hagen alleges that Lief told the Minnesota Board that he interpreted the questions to only ask for the last five years and she signed his name without his knowledge. In defendants' version

of these events, Lief received a letter indicating there was an error on Hagen's application, she handed it to Hagen, they discussed materials in his file, and Hagen requested that Lief send the materials to the Minnesota Board. Defendants allege that Lief learned of Hagen's previous lawsuits only after she was notified by the Minnesota Board that there was a question answered incorrectly in Hagen's Minnesota application, and Lief told the Minnesota Board that she "did not know he had any lawsuits." App. 246-47, 169.

After learning of the incorrect answers on his application on December 9, 2009, Hagen responded to Boswell on December 11, 2009:

> All I can say is that I am sorry that I did not read all the questions and answers. I had my office manager Kim Lief fill out the form and I trusted her that it was filled out correctly. I did not mean to deceive the board. Kim was not with us when the law suite [sic] occurred and was unaware of it.

App. 316. Hagen believed that Lief was aware of the previous lawsuit, but he was determined to tell Boswell that Lief was unaware of it because he wanted to get his Minnesota license. Although Lief was not with Siouxland at the time of his lawsuit, Hagen believe that she should have been aware of it because she had access to the folder of information on the lawsuit. In the December 11, 2009 letter to the Minnesota Board, Hagen responded to other inquiries unrelated to Question 10. Hagen also sent a follow-up letter to Boswell regarding his 10-day suspension at St. Luke's, which was considered by the Minnesota Board. App. 317. In a subsequent letter to Boswell, Hagen also recounted an incident involving himself in which the Iowa Board of Medicine ("Iowa Board") thoroughly investigated an incident involving intoxication and also discussed with Boswell interference with an emergency room doctor. Hagen has not made any allegations in his complaint nor deposition that these two incidents

13

discussed with Boswell were overlooked by Lief or misreported on his application by Lief.

After Hagen's December 11, 2009, letter, Ruth Martinez, the supervisor of the complaint review unit of the Minnesota Board, received a complaint on February 24, 2010, that Hagen was practicing medicine without a license, stemming from his Vivify business. Since Hagen had a pending application to their licensure unit, she referred the matter to the licensure committee of the Minnesota Board. As a result, on March 11, 2010, Hagen received a letter from Helen Patrikus at the Minnesota Board, requesting information about whether he was practicing medicine in Minnesota without a license. On March 26, 2010, Wandling responded to the Minnesota Board, explaining that "Hagen purchases HCG through his weight loss business located in South Dakota. While Dr. Hagen has never purchased HCG in Minnesota, he has provided HCG to a handful of weight loss patients in relation to Vivify's business efforts." App. 320-23. On November 9, 2010, Wandling confirmed to the Minnesota Board that "Dr. Hagen briefly engaged in the practice of medicine in Minnesota, it appears that while Dr. Hagen did not intentionally engage in the practice of medicine, he did provide a small number of clients with HCG that was purchased and delivered outside of Minnesota . . ." App 302-304.

The Minnesota Board sent a notice and order for a prehearing conference and hearing on April 4, 2011. The licensure committee raised the following issues: Question 9, Question 10, false representation on the Vivify website that Hagen was authorized to treat patients in Minnesota, and the February 2010 complaint that Hagen was practicing without a license. On May 9, 2011, following this notice and order for prehearing conference, Hagen withdrew his application for medical licensure with the state of Minnesota. Wandling, on Hagen's behalf, agreed to withdraw Hagen's pending license application with the Minnesota Board, with the understanding that the

14

Minnesota Board would make a final determination after resolution of Hagen's claims in this case. Subsequently, Hagen obtained new Minnesota counsel on the licensure application issue, reapplied for a Minnesota license, and is awaiting the Minnesota Board's decision.

Hagen alleges that his Wisconsin application was delayed and his Minnesota application was denied because both applications contained inaccurate and inadequate information. Although Hagen takes full responsibility for his decision to practice medicine in Minnesota without a license, he believes that he would have received a medical license in the state of Minnesota if Lief would have filled out his application correctly. Hagen believes he was denied his Minnesota medical license because Lief forged and notarized his name and sent in an incomplete application. Hagen believes Eastman, Hunt, and Aldrich all took part in delaying the applications as long as possible and filling them out incorrectly. Hunt admitted that Siouxland has done nothing to correct the information with the Minnesota Board or to investigate Hagen's allegations regarding Lief's actions.

### 5. *Hospital Incident on November 5, 2009*

On November 5, 2009, at approximately 12:50 pm, a female patient was admitted to St. Luke's. Eastman was the patient's consulting physician and obstetrician and he was contacted during the day. In the patient's medical records, Eastman is listed as the primary physician. Another physician, Dr. Gary Hattan, was in charge of the patient's care at the hospital and the patient received bedside monitoring by Hattan's partner, Dr. Kristi Walz. Eastman was paged at approximately 4:55 pm. Eastman was talking on the phone with Hagen when the page came in and Hagen told Eastman, "I'll take care of it." As is customary, Hagen took over the call from Eastman at 5:00 pm and responded to the hospital's page by providing verbal orders for the patient at 5:00 pm.

15

Defendants allege that at 5:03 pm and 5:15 pm, the nurses checked the patient and determined that the fetus was still viable, noting heart tones and fetal movement noticed by the patient. Mace called Hagen at 5:22 pm and told him the St. Luke's staff was having difficulty keeping track of the fetal heart tones. Mace had not asked Eastman to come in prior to 5:00 pm because she felt they had adequate care, a doctor bedside, and the patient was receiving the best care they could provide. Defendants allege that Hagen responded by ordering the patient be monitored by Doppler and transferred to the Intensive Care Unit ("ICU"), but Hagen did not come in and they called him again about 40 minutes later, which Hagen denies. At 5:57 pm, the patient indicated that she felt dizzy, nauseated, and lightheaded, and the RN recorded blood pressure at 45/31, pulse 138 beats per minute, and Doppler fetal heart tones. At 6:00 pm, a bedside ultrasound showed no fetal heart rate. Hagen arrived at the ICU to see the patient at approximately 6:15 pm, and he did not know when the fetal heart tones had declined.

Hagen reacted to the incident by yelling and shouting in the hallway of St. Luke's that "it's your fault. You let this baby die. You killed this baby." Defendants allege that he yelled repeatedly and in the presence of nursing staff, guests, and patients. Hagen yelled there is a "dead fucking baby" in front of doctors, nurses and hospital staff. Eastman recommended to St. Luke's to give Hagen some form of discipline for his behavior in the ICU on November 5, 2009, but not a suspension. On approximately November 11, 2009, Hagen received a 10-day suspension from St. Luke's. Hagen understood that the language he used and the way he yelled was inappropriate. During the week of November 9, 2009, Lief received Hagen's suspension papers from St. Luke's at the Siouxland office. Eastman, Hunt, and Aldrich were aware of Hagen's suspension and the reasons for it.

16

Hagen alleges that he talked to Eastman sometime after Hagen performed a C-section on Eastman's patient and told Eastman he had committed malpractice. Hagen alleges that he advised Eastman that he had an obligation as a physician to turn Eastman in to the Iowa Board. According to Eastman, Hagen talked to him regarding the death of the baby and Hagen seemed agitated, but not towards Eastman.

Hagen discussed the malpractice that he believe occurred on November 5, 2009 with Mike Ellwanger, an attorney for St. Luke's, as well as attorneys Mo Sadden and Lief Erickson. Hagen told Eastman that he talked to attorneys. Hagen alleges that he told Hunt and Aldrich that he might turn Eastman in for malpractice. Defendants allege that Hagen told Eastman that he was going to sue St. Luke's for suspending him, but he wouldn't bring Eastman into it. Eastman, Hunt, and Aldrich were upset when a lawyer called the Siouxland office for Hagen, asking about his intentions to sue St. Luke's. After the lawyer called for Hagen, Aldrich, Hunt, and Lief called Siouxland's attorney, Dan Dykstra ("Dykstra"). Aldrich told Dykstra that Hagen had been suspended and that he had made threats to sue St. Luke's. Aldrich did not remember Dykstra advising defendants about their fiduciary duties. Lief believed that Eastman, Hunt, and Aldrich were very supportive of St. Luke's and did not want to provoke litigation.

### 6. Termination

Hagen left Sioux City on Friday, November 13, 2009, for Minnesota and Oklahoma and returned on Monday, November 16, 2009. Hagen alleges that the last thing he said to Hunt when leaving the office on November 13, 2009 was that he was going to think about reporting Eastman over the weekend. Defendants allege that when Hagen left town after stating he was going to sue the hospital or contact patients to sue the hospital, Aldrich told Hunt that she could take it no longer and that she was going to leave the practice. Defendants allege that when Aldrich indicated her intentions to

17

leave Siouxland, Hunt decided that she would leave with Aldrich. Hunt and Aldrich approached Eastman and they contacted Dykstra.

On November 13, 2009, a meeting took place with Eastman, Hunt, Aldrich, Lief, and Dykstra. Defendants allege that the meeting was called because Eastman, Hunt, and Aldrich were concerned with Hagen's belligerent behavior and to discuss the suspension. Dykstra was acting as the attorney for Siouxland and its shareholders, but Hagen was not present. Dykstra never advised Hunt that there was a conflict of interest in giving advice without all partners present. Defendants allege that Eastman, Hunt, and Aldrich all had their list of reasons for wanting to cease working with Hagen. Defendants allege that Hunt had previously considered leaving Siouxland and requested a copy of her contract before 2004. Defendants allege that Hunt had complaints about Hagen, including refusing to see her patients, changing and moving her patients, making office staff fearful for their jobs, and yelling and screaming at staff, and creating a tense work environment. Defendants allege that they reviewed Hagen's transgressions through the years to the recent events. Defendants allege that they had specific concerns regarding the way Hagen has treated them in the past and they wanted to know what their options were.

Defendants allege that when Eastman, Hunt, and Aldrich determined that they would all be separating, Dykstra advised them that it would make better business sense if the majority stayed and Hagen departed. The group determined that it would be in Siouxland's best interest to terminate Hagen than for them to split up. Defendants allege that the foremost reason for terminating Hagen, according to Aldrich, was his recent behavior at the hospital that resulted in a suspension, preventing him from practicing. Aldrich was concerned that Hagen's intention to sue St. Luke's would put herself and her partners "at odds with the main hospital where we take care of our

18

patients." App. 259. Aldrich was also concerned that Hagen was focusing all his time and energy at the Rejuvenation Centre, instead of practicing medicine.

A meeting was scheduled for November 16, 2009, and Hagen was invited. Dykstra confirmed that 48 hours' notice was received pursuant to the bylaws although Hagen contends that he did not receive proper notice. Hagen alleges that he discovered he was being terminated when Jody Brazzell, a friend and employee of the Rejuvenation Centre, called Hagen and told him the locks were changed at the Rejuvenation Centre. Hagen alleges that he called Aldrich about the change of locks and Aldrich told him she couldn't talk to him and that he should call Dykstra. Hagen alleges that Dykstra called him and told him they were having a meeting on Monday night about his termination.

Eastman, Aldrich, Hunt, Hagen, Dykstra, and John Mayne, Hagen's counsel, attended the meeting on November 16, 2009. Defendants contend the decision to terminate Hagen was made by a vote of 3-1. Eastman, Hunt, and Aldrich stated they wanted Hagen to resign, but if Hagen was unwilling to do that they were going to terminate him for cause and continue to pay him pursuant to the employment agreement for another 90 days until March 1. A mutual agreement to terminate could not be reached and Hagen continued to receive salary and payment pursuant to his employment agreement until March, 1, 2010, including a $17,000 monthly salary, a bonus of $130,405.10, continued payment of health insurance, and $15,191 for Hagen's shares. Eastman, Hunt, and Aldrich offered Hagen the opportunity to sell his Siouxland interest in exchange for monetary consideration in accordance with the corporate bylaws.

Pursuant to the Siouxland corporate bylaws, another meeting was scheduled for November 30, 2009, to remove Hagen as a director of Siouxland. Defendants provided the following reasons for Hagen's termination: (a) he jeopardized Siouxland's

19

relationship with St. Luke's by threatening to sue them, (b) he expanded Rejuvenation Centre business in Sioux Falls without Siouxland's consent, (c) he violated ethics through disruptive behavior leading to a suspension from St. Luke's, and (d) he is unable to perform the terms of his employment agreement due to the suspension. Dykstra advised Eastman, Hunt, and Aldrich that Hagen's conduct at St. Luke's could be considered disruptive behavior and against professional ethics, according to the employment agreement and American Medical Association opinions on ethics. Hagen denies that he willfully contravened ethics or that this is the reason he was fired.

Prior to his conversation with Dykstra, Hagen had no inclination that he would be terminated. Hagen believes that Eastman, Hunt and Aldrich didn't have valid reasons for termination and that his suspension from St. Luke's is not a valid reason. Defendants allege that Hagen was terminated for ethical violations and substantial noncompliance with his employment agreement. Hagen has not spoken with Eastman, Aldrich, or Hunt after the meeting regarding the reasons for terminating him.

Hagen believes he was terminated because he wanted to turn Eastman into the Iowa Board and wanted to sue St. Luke's. In Hagen's professional opinion, the "practice of obstetrics is the total care of a pregnant mother and her unborn child." Hagen Depo. 187. In Hagen's professional opinion, he believed Eastman did not satisfy the standard of care for the patient. Hagen believed St. Luke's and Eastman were liable for the baby's death. Hagen believes that it is not common practice for a 34-week baby to die in labor and delivery. In 29 years of obstetrics, Hagen had never seen a mother come into the hospital with a live baby and have the baby die while being monitored and never seen by an obstetrician.

Defendants allege that Hagen has no written documentation or witnesses to support his assertion that he spoke with Eastman, Hunt, or Aldrich about his consideration to report Eastman to the Iowa Board, which Hagen denies because

20

Eastman, Hunt, and Aldrich are witnesses. Defendants allege that Eastman, Hunt, and Aldrich were not aware that Hagen was considering reporting Eastman prior to Hagen's termination. Neither Hagen nor his counsel indicated that Hagen was terminated in retaliation for threatening to report Eastman to the Iowa Board at the November 16, 2009 meeting. Defendants allege that, on November 16, 2009, Hagen admitted he had promoted business in Sioux Falls without Siouxland's consent and would get help for his behavior. Just prior to termination, Hagen asked that Eastman, Hunt, and Aldrich reconsider and told them "[he] would do anything it takes to make it work." Hagen Depo. 164. Defendants allege that Eastman, Hunt, and Aldrich did not give him a second chance because they had had a similar meeting in the past and it did not stick.

Hagen filed a complaint with the Iowa Board on approximately November 17, 2009, reporting Eastman and St. Luke's. Hagen emailed the reports to the Iowa Board regarding Eastman and St. Luke's and does not have a copy of the email nor has one been produced in the litigation.

In November 2009, Hagen began the process of relocating to the Minnesota/Wisconsin area. Defendants allege that Hagen still could have practiced in Sioux City. Hagen never sought a recruiter or a new partner in Sioux City after he was terminated. Hagen never applied for loans to start a new business in Sioux City after he was terminated. Hagen believes that he lost all former Sioux City patients as a result of his termination and all potential patients not seen at Vivify since he does not have his Minnesota License. After his termination, Hagen sought to buy out the Rejuvenation Centre, but the request was denied. In order to start his own practice in Sioux City, Hagen believes he would need backup and financial resources. Hagen believes he was unable to practice in Sioux City because both obstetrics and gynecology groups were unwilling to do back up for him. Thus, his decided to pursue his options in Amery, Wisconsin.

21

## B.    Procedural Background

On or about August 10, 2010, Hagen filed suit in the Fourth Judicial District of Minnesota, alleging nine counts with similar operative facts to the Complaint in this case.  On December 13, 2010, the Minnesota complaint was dismissed for lack of personal jurisdiction by the Honorable Regina M. Chu of the State of Minnesota, County of Hennepin, Fourth Judicial District.

Hagen brought this action against defendants, on May 19, 2011, alleging fraudulent misrepresentation (Count One), conspiracy to defraud (Count Two), forgery (Count Three), retaliatory discharge in violation of public policy (Count Four), negligence (Count Five), breach of fiduciary duty (Count Six), breach of contract (Count Seven), promissory estoppel (Count Eight), unjust enrichment (Count Nine), tortious interference with business relationships (Count Ten), tortious interference with prospective business advantage (Count Eleven), intentional infliction of emotional distress (Count Twelve), and a claim for punitive damages (Count Thirteen). Defendants filed their Amended Answer, Affirmative Defenses And Jury Demand on July 26, 2011 (docket no. 9).

On September 21, 2012, defendants filed a Motion For Partial Summary Judgment (docket no. 27), [1] as to fraudulent misrepresentation (Count One), conspiracy to defraud (Count Two), forgery (Count Three), retaliatory discharge in violation of public policy (Count Four), breach of fiduciary duty (Count Six), breach of contract (Count Seven), promissory estoppel (Count Eight), unjust enrichment (Count Nine), tortious interference with business relationships (Count Ten), tortious interference with prospective business advantage (Count Eleven), and punitive damages (Count Thirteen).

---

[1] I deny Defendants' request for oral argument, as it would not assist my resolution of this motion.

22

Hagen had previously withdrawn Count Twelve for intentional infliction of emotional distress. Defendants do not seek summary judgment as to Count Five for negligence.

On November 2, 2012, Hagen filed a Resistance To Defendants' Motion For Partial Summary Judgment (docket no. 55). Hagen withdrew Count Nine for unjust enrichment based on the existence of an express contract.

On November 9, 2012, Defendants filed a Reply Brief In Support Of Motion For Partial Summary Judgment (docket nos. 57) and Reply To Plaintiff's Statement Of Additional Facts In Support Of His Resistance To Defendants' Motion For Partial Summary Judgment (docket no. 58). On November 9, 2012, Defendants also filed a Motion To Strike (docket no. 59) in which they seek to strike portions of Hagen's Affidavit, the March 26, 2010, Wandling Letter, and Hagen's Statement of Additional Facts.

## II. *MOTION TO STRIKE*

Before I can consider the merits of defendants' Motion For Partial Summary Judgment, I must first consider defendants' Motion to Strike. This motion goes to what record I can consider in resolving defendants' Motion For Partial Summary Judgment.

### A. *Standards For Motion To Strike*

Rule 12 of the Federal Rules of Civil Procedure provides for a motion to strike, as follows:

> (f) Motion to Strike. The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:
>
> (1) on its own; or
>
> (2) on motion made by a party either before responding to the pleading or, if a response is not

23

> allowed, within 21 days after being served with the
> pleading.

Fed. R. Civ. P. 12(f).[2]

In ruling on a Rule 12(f) motion, the court "enjoy[s] liberal discretion," and its ruling is reviewed only for abuse of that discretion. *See BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007); *Nationwide Ins. Co. v. Central Missouri Elec. Coop., Inc.*, 278 F.3d 742, 748 (8th Cir. 2001); *Stanbury Law Firm v. IRS*, 221 F.3d 1059, 1063 (8th Cir. 2000); *Chock v. Northwest Airlines, Inc.*, 113 F.3d 861, 863–64 n. 3 (8th Cir. 1997). The rule embodies this discretion, because it is cast in permissive terms ("the court may act …") rather than mandatory terms. Fed. R. Civ. P. 12(f); *see also Stanbury*, 221 F.3d at 1063 ("Because the rule is stated in the permissive, however, it has always been understood that the district court enjoys 'liberal discretion' thereunder."). The Eighth Circuit Court of Appeals has also recognized that, "[d]espite this broad discretion … striking a party's pleadings is an extreme measure, and, as a result, we have previously held that '[m]otions to strike under Fed. R. Civ. P. 12(f) are viewed with disfavor and are infrequently granted.'" *Stanbury*, 221 F.3d at 1063 (quoting *Lunsford v. United States*, 570 F.2d 221, 229 (8th Cir. 1977), in turn citing 5 Wright & Miller, Federal Practice and Procedure: Civil § 1380 at 783 (1969)); *accord BJC Health Sys.*, 478 F.3d at 917 (citing *Stanbury*). Applying these standards, the Eighth Circuit Court of Appeals has ruled that even matters that are not "strictly relevant" to the principal claim at issue should not necessarily be stricken, if they provide "important context and background" to claims asserted or are relevant to some object of the pleader's suit. *Id.*

---

[2] The language of Rule 12(f) was "restyled" by the 2007 Amendments, but the changes were intended to be stylistic only. Fed. R. Civ. P. 12, advisory committee's note.

## B.    Analysis

Defendants request that I strike portions of Hagen's Affidavit, the March 26, 2010 Wandling Letter, and portions of Hagen's Statement of Additional Facts in support of Hagen's Resistance to Defendants' Motion For Partial Summary Judgment. Under Rule 12(f) of the Federal Rules of Civil Procedure, a court may strike from a *pleading* an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.    Under Rule 7(a) of the Federal Rules of Civil Procedure, "pleadings" are: "a complaint; an answer to a complaint; an answer to a counterclaim designated as a counterclaim; an answer to a crossclaim; a third-party complaint; an answer to a third-party complaint; and, if the court orders one, a reply to an answer." *Id.*  Here, Defendants are not seeking to strike matter from a pleading, but, instead, attempt to strike Hagen's Appendix and Statement of Additional Facts offered in opposition to the defendants' Motion For Partial Summary Judgment.  As a result, the defendants' Motion to Strike is improper under Rule 12(f) of the Federal Rules of Civil Procedure, and, consequently, denied.

Nevertheless, Rule 56 of the Federal Rules of Civil Procedure requires that affidavits supporting or opposing a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).[3]   As I previously observed:

> "In evaluating evidence related to possible summary
> judgment, a court may not consider affidavits that do not
> satisfy the requirements of Fed. R. Civ. P. 56(e)."  *Aucutt*

---

[3] On December 1, 2010, amendments to the Rules became effective, including Rule 56.  "As part of the amendments, Rule 56(e)(1) was renumbered as Rule 56(c)(4) and the language of the rule was slightly modified, but no pertinent substantive changes were made to the rule."  *Sperry v. Werholtz*, 413 Fed. App'x 31, 33 n.2 (10th Cir. 2011).

> v. Six Flags Over Mid-America, Inc., 85 F.3d 1311, 1317
> (8th Cir. 1996). In short, inadmissible material is not
> "properly available to defeat or support the [summary
> judgment] motion." Firemen's Fund Ins. Co. v. Thien, 8
> F.3d 1307, 1310 (8th Cir. 1993); accord Duluth News-
> Tribune v. Mesabi Publ'g Co., 84 F.3d 1093, 1098 (8th Cir.
> 1996) ("[I]n evaluating the evidence at the summary
> judgment stage, we consider only those responses that are
> supported by admissible evidence."). Moreover,
> "[a]ffidavits asserting personal knowledge must include
> enough factual support to show that the affiant possesses that
> knowledge." El Deeb v. University of Minn., 60 F.3d 423,
> 428 (8th Cir. 1995). An affirmation on "information and
> belief is insufficient." Camfield Tires, Inc. v. Michelin Tire
> Corp., 719 F.2d 1361, 1367 (8th Cir. 1983).

Helm Fin. Corp. v. Iowa N. Ry. Co., 214 F. Supp.2d 934, 953 (N.D. Iowa 2002).

Therefore, to the extent there is improper material in Hagen's affidavit, the Wandling

letter, and additional facts, I will not consider it for the Motion For Partial Summary

Judgment.

### III.   MOTION FOR PARTIAL SUMMARY JUDGMENT

#### A.   Summary Judgment Standards

Motions for summary judgment "isolate and dispose of factually unsupported

claims or defenses." See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment is only appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there

is no genuine issue of material fact and that the moving party is entitled to a judgment

as a matter of law." FED. R. CIV. P. 56(c) (emphasis added); see Woods v.

DaimlerChrysler Corp., 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is

appropriate if viewing the record in the light most favorable to the nonmoving party,

there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). As the Eighth Circuit Court of Appeals has explained,

> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, –––U.S. ––––, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 129 S. Ct. at 2677, quoting *Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348.

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-43 (8th Cir. 2011) (*en banc*). Summary judgment is particularly appropriate when only questions of law are involved, rather than factual issues that may or may not be subject to genuine dispute. *See, e.g., Cremona v. R.S. Bacon Veneer Co.*, 433 F.3d 617, 620 (8th Cir. 2006).

## B. The Licensure Application Claims

Hagen's claims for fraudulent misrepresentation (Count One), conspiracy to defraud (Count Two), forgery (Count Three), promissory estoppel (Count Eight), and tortious interference with prospective business advantage (Count Eleven) pertain to the licensure application issue.

### 1. Whether Siouxland, Eastman, Hunt, and Aldrich ratified Lief's actions in completing Hagen's licensure applications

#### a. Arguments of the parties

In support of this part of their Motion For Summary Judgment, the defendants assert that Hagen has no evidence that Eastman, Hunt, or Aldrich were involved in the licensure application issue and cannot be held liable for the claims of fraudulent misrepresentation, conspiracy to defraud, forgery, promissory estoppel, and tortious interference.

In response, Hagen contends that Eastman, Hunt, and Aldrich are principals and that Lief was their agent. Hagen argues that there is sufficient evidence in the record for a reasonable jury to find that Siouxland, Eastman, Hunt, and Aldrich ratified Lief's statements that she made in the application through their course of conduct. Hagen points to direct evidence of their knowledge and affirmation in an, April 14, 2010, email from Hunt to Lief, indicating that Lief was paid a $5,000 bonus "For the EP [Hagen] handling" by Eastman, Hunt, and Aldrich. Pl. App. 132. From his experience working at Siouxland, Hagen also identifies the close working relationship between defendants, which could lead the fact finder to infer knowledge. Finally, Hagen argues that the defendants affirmed or ratified Lief's actions by failing to correct the false notarization and other inaccuracies after learning of the situation.

In reply, Defendants argue that Lief was acting as Hagen's agent when she was completing the applications. In response to their failure to correct the false

notarization, defendants contend that Hagen failed to withdraw his applications after learning of the alleged fraudulent behavior. Defendants argue that Hagen, himself, endorsed Lief's conduct by excusing her mistake in his communications with the Minnesota Board. Defendants argue that Hagen's theory to claim Eastman, Hunt, and Aldrich were involved in Lief's efforts with the applications is merely speculative.

### b. Analysis

A principal may be liable under the doctrine of ratification if "he knowingly accepts the benefits of a transaction entered into by one of his agents." *Frontier Leasing Corp. v. Link Engineering, L.L.C.*, 781 N.W.2d 772, 777 (Iowa 2010). The basic elements of ratification are (1) the existence of a principal; (2) an act conducted by an agent; (3) knowledge of material facts by the principal, either actual or inferred; and (4) the principal's intent, either express or implied, to ratify the agent's act. *Abodeely v. Cavras*, 221 N.W.2d 494, 503 (Iowa 1974). The failure to repudiate an unauthorized action within a reasonable time after learning of the transaction is a ratification or affirmance. *Id.*

The elements on the issue of ratification involve a determination of numerous factual issues that are disputed. The fact finder will need to determine the existence of issues such as whether a principle-agent relationship existed, whether defendants had knowledge of Lief's agreement to work on Hagen's applications, whether defendants had knowledge of Lief's unlawful notarization on the applications, the significance of Lief's bonus, and the impact of defendants' treatment of the situation after learning of it. Thus, I find that Hagen has pointed to record evidence generating genuine issues of material fact from which a rational juror could find that defendants ratified Lief's actions.

## 2. *Fraudulent misrepresentation*

In Count One, Hagen sets forth a claim of fraudulent misrepresentation against all the defendants regarding the licensure application issue.

### a. *Arguments of the parties*

Defendants contend that since there were no representations made by Eastman, Hunt, and Aldrich regarding the licensure applications, Hagen cannot hold Eastman, Hunt, and Aldrich liable. Defendants maintain that Hagen cannot prove that Lief intended to deceive or that Hagen justifiably relied on a misrepresentation made by Lief. Defendants point to the brief conversation Hagen had with Lief. They also point to the communications Hagen made with the Minnesota Board, excusing Lief's actions. Finally, defendants argue that Hagen cannot prove that a misrepresentation made by Lief was the cause of his damages since there were other factors involved in the application process.

In response, Hagen argues that defendants ratified Lief's false representation through their principal-agent relationship as discussed above. Hagen argues that Lief's intent may be inferred from her conduct, particularly her repeated failure to attempt performance after Hagen's inquiries and the evidence of how she submitted the application by forging Hagen's signature. In addition, Hagen maintains that he justifiably relied on Lief's representation because it was her job to fill out the applications and she had access to all the necessary materials. Regarding damages, Hagen asserts that Lief's actions raised red flags, which caused his applications to be denied.

### b. *Analysis*

To support a claim for fraudulent misrepresentation, Hagen must prove the following:

> (1) [the] defendant made a representation to the plaintiff, (2)
> the representation was false, (3) the representation was
> material, (4) the defendant knew the representation was
> false, (5) the defendant intended to deceive the plaintiff, (6)
> the plaintiff acted in [justifiable] reliance on the truth of the
> representation …, (7) the representation was a proximate
> cause of [the] plaintiff's damages, and (8) the amount of
> damages.

*Spreitzer v. Hawkeye State Bank,* 779 N.W.2d 726, 735 (Iowa 2009) (quoting *Gibson v. ITT Hartford Ins. Co.,* 621 N.W.2d 388, 400 (Iowa 2001)). *See also Clark v. McDaniel,* 546 N.W.2d 590 (Iowa 1996) ("A representation need not be an affirmative misstatement; the concealment of or failure to disclose a material fact can constitute fraud.").

Lief made a representation to Hagen when she agreed to assist him with the applications. The repeated delays and the circumstances in which Lief forged and sent the applications raise many issues of material fact. I find that summary judgment is inappropriate because a reasonable juror could conclude that Lief and the defendants had an intent to deceive Hagen. Further, a reasonable juror could conclude that Hagen justifiably relied on Lief to complete a task that was part of her duties at Siouxland. Although defendants argue that Lief does not know for sure the exact reasons the applications were denied, a reasonable jury could find that Lief, acting as an agent for Siouxland, triggered the applications to be denied by her actions. Questions of proximate cause are generally fact questions to be decided by the jury. *N/S Corp. v. Car Wash Consultants, Inc.*, 817 N.W.2d 31, *6 (Iowa 2012).

Therefore, defendants' Motion For Partial Summary Judgment on the fraudulent misrepresentation claim is denied.

### 3.    *Conspiracy to defraud*

In Count Two, Hagen asserts a conspiracy to defraud claim against all of the defendants.

#### a.    *Arguments of the parties*

Defendants argue that there is no evidence to support a claim that Eastman, Hunt, or Aldrich engaged in a conspiracy to defraud.  Defendants rely on Hagen's testimony that he had a "hunch" that everybody in the office knew about the licensure application issue as pure conjecture.  Defendants maintain that Eastman, Hunt, and Aldrich were not involved in the task of completing the applications and conspiracy cannot be maintained against Lief alone.

In response, Hagen sets forth the same evidence as in the fraudulent misrepresentation claim. In particular, Hagen emphasizes the close working ties of defendants, the $5,000 bonus paid to Lief for dealing with Hagen's applications despite the forgery and false information they included, and defendants' failure to rectify the situation after they learned of it.  Hagen also discusses the importance of indirect and circumstantial evidence in conspiracy cases, since co-conspirators rarely make explicit agreements.

#### b.    *Analysis*

Under Iowa law, "[a] conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish by unlawful means some purpose not in itself unlawful." *Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 171 (Iowa 2002) (quoting *Basic Chems., Inc. v. Benson*, 251 N.W.2d 220, 232 (Iowa 1977)).

I adopt my analysis from above and defendants' Motion For Partial Summary Judgment on the conspiracy to defraud claim is denied for the same reasoning as the fraudulent misrepresentation claim.

32

### 4. Forgery

In Count Three, Hagen asserts a claim for forgery against all of the defendants.

### a. Arguments of the parties

Defendants argue that Hagen does not have sufficient evidence to prove the elements of a forgery claim. First, they contend that there is no evidence to support a claim that Eastman, Hunt, or Aldrich engaged in forgery. Next, defendants contend that Lief did not have an intent to defraud or injure when she executed invalid signatures on the applications. Defendants argue that Hagen's communications with the Minnesota Board excusing Lief's errors contradict his allegations. Defendants contend that Lief was under duress because her father was dying and she was concerned about losing her job, which ultimately resulted in hasty work on the applications.

Regarding the liability of Eastman, Hunt, and Aldrich, Hagen argues, as above, that Eastman, Hunt, and Aldrich are liable for ratifying Lief's actions. Hagen contends defendants had knowledge that the applications had been forged, particularly because of the close working relationship between Lief and Hunt, the bonus awarded to Lief, defendants' failure to repudiate Lief for her actions, and defendants' failure to rectify the harm caused by the incorrect applications. Next, Hagen argues that the intent to defraud may be inferred from the circumstances of the offense. *State v. Johnson*, 196 N.W.2d 563, 567 (Iowa 1972) (citing *State v. Lansman*, 245 Iowa 102, 107, 60 N.W.2d 815, 818 (1953)). Hagen points to the fraudulent act of submitting the forged, notarized signature on the applications, with the knowledge that the signature and notarization were invalid. Hagen contends that his request to Lief to prepare the license applications did not give her the authority to forge and fraudulently notarize his signature. Moreover, Hagen explains that Lief was given directions to work on the applications, but Hagen did not direct her to submit the applications without his review or signature.

### b.    Analysis

Under Iowa law, a claim for forgery requires that:

> A person is guilty of forgery if, with intent to defraud or
> injure anyone, or with knowledge that the person is
> facilitating a fraud or injury to be perpetrated by anyone, the
> person does any of the following:
>
> (a) Alters a writing of another without the other's
>     permission.
>
> (b) Makes, completes, executes, authenticates, issues, or
>     transfers a writing so that it purports to be the act of
>     another who did not authorize that act, or so that it
>     purports to have been executed at a time or place or in a
>     numbered sequence other than was in fact the case, or so
>     that it purports to be a copy of an original when no such
>     original existed.
>
> (c) Utters a writing which the person knows to be forged in
>     a manner specified in paragraphs (a) or (b).
>
> (d) Possesses a writing which the person knows to be forged
>     in a manner specified in paragraph (a) or (b).

Iowa Code § 715A.2(1).

As analyzed above, a reasonable juror could find that Eastman, Hunt, and
Aldrich ratified Lief's act of forging Hagen's signature.  Summary judgment is
inappropriate because a reasonable juror could infer an intent to deceive from the
circumstances.  Therefore, defendants' Motion For Partial Summary Judgment is
denied as to the forgery claim.

### 5.    Promissory estoppel

In Count Eight, Hagen asserts a claim for promissory estoppel against all of the
defendants.

### a. Arguments of the parties

Defendants argue that Hagen misinterprets the cause of action by requesting damages for an equitable remedy. Again, defendants argue that Eastman, Hunt, and Aldrich are not liable because they did not fill out the applications. Defendants contend that Hagen's oral agreement with Lief was not sufficiently clear and definite to meet the first element of a promissory estoppel claim. Moreover, defendants argue that completion and timeliness was not discussed.

In response, Hagen correctly argues that he properly pled a cause of action for damages under promissory estoppel theory. *See Kolkman v. Roth*, 656 N.W.2d 148, 155 n.3 (Iowa 2003) (noting the distinction between equitable estoppel and promissory estoppel). Hagen contends that there is sufficient evidence for a jury to find that Eastman, Hunt, and Aldrich ratified Lief's action, as set forth in the discussion above. Hagen maintains that Lief clearly agreed to fill out the applications. He also contends that he told Lief the applications needed to be submitted by September 2009.

### b. Analysis

The doctrine of promissory estoppel requires the plaintiff to prove:

> (1) a clear and definite promise; (2) the promise was made with the promissor's clear understanding that the promisee was seeking assurance upon which the promisee could rely and without which he would not act; (3) the promisee acted to his or her substantial detriment in reasonable reliance on the promise; and (4) injustice can be avoided only by enforcement of the promise.

*Kolkman v. Roth*, 656 N.W.2d 148, 155 (Iowa 2003). The facts supporting Hagen's claim for promissory estoppel present genuine issues of material fact. A reasonable juror could conclude that Lief made "a clear and definite promise" to work on the applications and with the understanding that Hagen was relying on her. As analyzed above, a rational trier of fact could find that Eastman, Hunt, and Aldrich ratified Lief's

actions. A reasonable juror could find that Hagen reasonably relied on Lief's promise. Therefore, defendants' Motion For Summary Judgment on the promissory estoppel claim is denied.

### 6. *Tortious interference with prospective business advantage*

In Count Eleven, Hagen asserts a claim for tortious interference with prospective business advantage against all of the defendants.

#### a. *Arguments of the parties*

Defendants analyze the elements of the claim, emphasizing the strict proof required to avoid speculative suits. Defendants combine Hagen's analysis for Counts Ten and Eleven, analyzing the relationships in Sioux City and the Twin Cities/Wisconsin area. First, defendants contend that Hagen cannot prove tortious interference with the ongoing relationship with patients in Siouxland. Defendants point out that Hagen's patients were not his patients, but Siouxland's patients. Defendants assert that Hagen was not cut out of business in Sioux City, but, rather, made no effort to continue practicing in Sioux City. Defendants argue that the application issue is not a proper basis for a tortious interference claim. Defendants point out that Hagen does not prove an actual prospective business relationship. Defendants maintain that Hagen's own problems contributed to his licensure issues. Finally, defendants argue that Hagen has failed to meet the required elements.

In response, Hagen argues that due to defendants' wrongful conduct, he was unable to develop prospective business relationships with patients in Minnesota and Wisconsin. Hagen contends that the prospective relationship can either be with a specific third party or an identifiable class of third persons. *Lamdin v. Aerotek Commercial Staffing*, 2010 WL 3896154 *6 (E.D. Tenn. 2010). Hagen objects to defendants' causation analysis and believes a reasonable jury could conclude defendants triggered his application problems. Regarding defendants' awareness, Hagen contends

that the process of applying for a license to practice in Minnesota and Wisconsin made the intent to serve patients in those states obvious, so Lief knew of the prospective relationship. Finally, for the same reasons set forth above, Hagen argues that Eastman, Hunt, and Aldrich are liable based on their ratification of Lief's actions.

### b.  Analysis

Under Iowa law, the elements of a claim for tortious interference with prospective business advantage are as follows:

> (1) A prospective contractual or business relationship;
>
> (2) the defendant knew of the prospective relationship;
>
> (3) the defendant intentionally and improperly interfered with the relationship;
>
> (4) the defendant's interference caused the relationship to fail to materialize; and
>
> (5) the amount of resulting damages.

*Blumenthal Inv. Trusts v. City of West Des Moines*, 636 N.W.2d 255, 269 (Iowa 2001). "Interference with a prospective business contract is an intentional tort which requires a showing that the sole or predominant purpose of the actor's conduct was to financially injure or destroy the plaintiff." *Lorenzen Steffen Ins. Agency, Inc. v. United Fire & CAs. Co.*, 666 N.W.2d 619 (Iowa App. 2003) (citing *Economy Roofing & Insulating Co. v. Zumaris,* 538 N.W.2d 641, 651–52 (Iowa 1995)).

The parties dispute whether Hagen has provided sufficient evidence of identifiable third parties. While the Iowa Supreme Court has not specifically addressed this element of the cause of action, I find persuasive authority in other jurisdictions. In making a claim for tortious interference with prospective business relationships, it has been held that the prospective relationship may be with an identifiable class of third persons, not just an identified third person. *Hayes, M.D. v. Northern Hills General*

Case 5:11-cv-04047-MWB   Document 74   Filed 03/20/13   Page 37 of 47

*Hospital*, 590 N.W.2d 243, 247–51 (S.D. 1999); *Lamdin v. Aerotek Commercial Staffing*, 2010 WL 3896154 *6 (E.D. Tenn. 2010). In *Hayes*, the Supreme Court of South Dakota concluded that requiring prospective third parties to be identified by name "would render the tort for the most part, a nullity and, in all actuality, never allow a plaintiff to proceed with its claim beyond summary judgment especially if the business enterprise is dependent upon a large pool of clientele." 590 N.W.2d at 250.

A reasonable juror could conclude that Lief knew of Hagen's prospective business relationship with persons seeking medical care in Minnesota and Wisconsin. Hagen has presented an identifiable third party: Vivify's future patients. Regarding Lief's intent to "financially injure or destroy" Hagen, a reasonable juror could conclude that the delay in processing the applications and the submission with invalid signatures and notarization indicates a predominate purpose to financially injure Hagen. As discussed above, there is sufficient evidence for a reasonable juror to believe Eastman, Hunt, and Aldrich ratified Lief's conduct. A reasonable jury could conclude that Lief's interference with the applications prevented Hagen from connecting with Vivify patients and Hagen's damages regarding the applications were proximately caused by the conduct of the defendants.

Therefore, defendants' Motion For Summary Judgment on the tortious interference with prospective business relationships claim is denied.

## C.     The Termination Claims

Hagen's claims for retaliatory discharge (Count Four), breach of fiduciary duty (Count Six), breach of contract (Count Seven), and tortious interference with business relationships (Count Ten) relate to Hagen's termination from Siouxland.

*1.     Retaliatory discharge*

In Count Four, Hagen asserts a claim for retaliatory discharge in violation of public policy against Siouxland, Eastman, Hunt, and Aldrich.

*a.     Arguments of the parties*

Defendants argue that Hagen has not alleged a clearly defined public policy that protects his activities.  First, they argue that Hagen cannot prove that threatening to report another physician to the Iowa Board is a protected activity.  Second, they contend that Hagen's decision to contact an attorney to sue St. Luke's over his suspension and to assist the patient in suing St. Luke's is not a protected activity. Defendants argue that Hagen cannot prove a causal relationship, other than a temporal relationship, between Hagen's purported participation in a protected activity and his termination.  Finally, defendants assert that Hagen can never prove there was a lack of justification for his termination because they had numerous justifications, including his outburst on November 5, 2009, that resulted in his suspension from St. Luke's, his history of behavior issues, and his decision to open a business in Minnesota that angered Eastman, Hunt, and Aldrich.

In response, Hagen argues that he has alleged a clearly defined public policy that protected his activities, his obligation to report the malpractice of Eastman and St. Luke's to the Iowa Board and his duty to the patient.  Hagen relies on Section 653-22.2 of the Iowa Administrative Code to discuss his obligation to report Eastman and St. Luke's to the Iowa Board.  Hagen relies on *Thompto v. Coborn's, Inc.*, 871 F. Supp. 1097 (N.D. Iowa 1994), where the basis of the wrongful discharge claim was the plaintiff's threat to consult an attorney, and argues that an employee's consultation with an attorney constitutes protected activity under Iowa law.  Hagen contends that his consultation with attorneys and advocacy on behalf of a patient is supported by the "inalienable rights" discussed in Article I, Section 1 of the Iowa Constitution, the Iowa

39

Rules of Professional Conduct policy expressed in the preamble, Iowa Constitution, Article 1, Section 1 (rights of persons), Iowa Constitution Section 7 (liberty of speech and press), Iowa Constitution Section 9 (right of trial by jury), the fiduciary duty a physician owes his patient, and Iowa Code section 720.4 that prohibits tampering with witnesses.

Hagen argues that his statement to Eastman, Hunt, and Aldrich that he was going to report Eastman and St. Luke's was protected activity. Hagen asserts that his communications with attorneys constitutes protected activity because he had an obligation to report the malpractice and a duty toward the patient, which outweigh defendants' business interests in terminating employees who seek litigation against business partners. Hagen points out that defendants fail to respond to his argument about whether their actions violate the Iowa public policy preventing witness tampering and promoting truth in the judicial system, so it constitutes a waiver of the issue. Hagen maintains that there is sufficient direct and circumstantial evidence to allow a jury to conclude that he was terminated for engaging in the protected activities. Hagen contends that defendants have raised a litany of old complaints about his personal behavior as an excuse for his termination. As evidence that defendants used the fact that Hagen consulted with attorneys against him, Hagen points out that they discussed his communication with attorneys when they decided to terminate him. Hagen emphasizes the strong temporal proximity between his comments to his colleagues about reporting the malpractice after the event of November 5, 2009 and his termination on November 16, 2009. Hagen maintains that the "atrocious behavior" defendants list in their brief is irrelevant "mud-slinging" and evidence of defendants' desire to retaliate against Hagen. Hagen points out that the defendants do not address the factual discrepancy between their testimony about his statements to them about reporting the malpractice, nor do they address the evidence that Hagen's consultation

with attorneys about the malpractice was considered during their meetings when defendants decided to terminate him.

### b. Analysis

To prevail on a claim of wrongful discharge from employment in violation of public policy, the employee must establish the following elements:

> (1) the existence of a clearly defined and well-recognized public policy that protects the employee's activity;
>
> (2) this public policy would be undermined by the employee's discharge from employment;
>
> (3) the employee engaged in the protected activity, and this conduct was the reason the employer discharged the employee; and
>
> (4) the employer had no overriding business justification for the discharge.

*Berry v. Liberty Holdings, Inc.*, 803 N.W.2d 106 (Iowa 2011) (citing *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 228 (Iowa 2004)).

This claim gives rise to numerous disputed factual issues. Since the parties dispute whether Hagen discussed his intention to report the malpractice, this is a genuine issue of material fact. A reasonable jury could infer that the defendants' motive in denying that Hagen made these statements is to cover up their underlying motive to terminate Hagen because he threatened to report Eastman to the Iowa Board. A reasonable juror could find that Hagen's statements to his colleagues about reporting Eastman and St. Luke's, as well as his consultation with attorneys, constitute a protected activity since he had a professional obligation to report malpractice and a duty to his patient. There is approximately a ten day gap between the protected activity of Hagen's statements to his colleagues and consultation with attorneys and his termination. A reasonable juror could conclude that this strong temporal proximity

41

gives rise to an inference of the necessary causal connection. *See Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 819-20 (8th Cir. 1998). The parties dispute the reasons defendants give for Hagen's termination. A reasonable juror could find that defendants' complaints are inaccurate or irrelevant and were designed to cover up defendants' motive for terminating Hagen.

Therefore, defendants' motion for summary judgment on Hagen's retaliatory discharge claim is denied.

### 2.    *Fiduciary duty*

In Count Six, Hagen asserts a claim of fiduciary duty against Siouxland, Eastman, Hunt, and Aldrich.

#### a.    *Arguments of the parties*

Defendants argue that the decision to terminate one's business associate is not a basis for a breach of fiduciary duty action. Defendants maintain that this case is similar to *Bump v. Stewart, Wimer & Bump, P.C.*, 336 N.W.2d 731, 733-34 (Iowa 1983), where the Iowa Supreme Court determined there was no breach of fiduciary duty when shareholders ousted their colleague. Defendants contend that they properly terminated Hagen because it was in the best interest of Siouxland.

Hagen contends that corporate directors are privileged in their dealings as long as they do not employ improper means and they act in good faith to protect the interests of the corporation. *Bump*, 336 N.W.2d.2d at 738. Hagen argues that there are multiple genuine issues of material fact as to whether defendants employed improper means and whether they acted in good faith.

#### b.    *Analysis*

Under Iowa law, "a fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Weltzin v. Cobank, ACB*, 633 N.W.2d 290 (Iowa

42

2001) (citing *Kurth v. Van Horn*, 380 N.W.2d 693, 694 (Iowa 1986)). Corporate directors must act in good faith and "in a manner the director reasonably believes to be in the best interests of the corporation." Iowa Code § 504.831.

Viewing the facts in the light most favorable to Hagen, I find there is a material question of fact as to whether defendants breached their fiduciary duty to Siouxland. A reasonable juror could conclude that the defendants did not act in good faith when they met in secret after Hagen shared his concerns about the malpractice issue.

Defendants' motion for summary judgment on Hagen's fiduciary duty claim, thus, will be denied.

### 3. *Breach of contract*

In Count Seven, Hagen asserts a claim for breach of contract against Siouxland.[4]

#### a. *Arguments of the parties*

Defendants argue that Hagen has not sufficiently demonstrated how the employment agreement was breached. Defendants assert that in Iowa the tort of breach of implied covenant of good faith and fair dealing is not recognized in the employment context. Defendants argue that Hagen cannot prove that he performed the terms of the contract because of his disruptive behavior and his intention to withhold profits from Siouxland. Defendants contend that Hagen cannot prove his contract was breached in a particular way and that he suffered damage as a result.

In response, Hagen denies that the litany of allegations regarding his personal behavior justifies termination. Hagen also denies that his outside business ventures violated his employment agreement because the other doctors also had outside business interests that were not shared with the corporation. Hagen contends that his pleading

---

[4] Hagen originally asserted the claim for breach of contract against defendants, but, in his reply, agreed that the claim is against the corporation and not the individual defendants.

43

was sufficient since he realleged all prior claims. Also, Hagen argues that he supported this claim with a detailed breakdown of damages in his Statement of Additional Facts at ¶¶ 73, 84.

### b. Analysis

Under Iowa law, to prevail on a breach of contract claim, the plaintiff must prove:

> (1) the existence of a contract, (2) the terms and conditions of the contract, (3) that plaintiff has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of defendant's breach.

*Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010).

The contract for this claim is Hagen's employment agreement. The parties dispute whether Hagen has satisfied the terms and conditions of the agreement. As a result, there is a genuine issue of material fact regarding Hagen's performance of the contract. There also is a genuine issue of material fact on whether the corporation breached the employment agreement. The parties dispute the damages that Hagen alleges. A reasonable jury could conclude that Hagen performed all the terms and conditions required in the employment agreement and that the corporation breached by terminating Hagen against public policy, and Hagen's damages were caused by the termination.

Defendants' motion for summary judgment on Hagen's breach of contract claim, thus, will be denied.

### 4. Tortious interference with business relationships

In Count Ten, Hagen asserts a claim for tortious interference with business relationships against Siouxland, Eastman, Hunt, and Aldrich.

44

### a. *Arguments of the parties*

Defendants argue that Hagen's allegations do not fit the cause of action and his claim of interference with business relationships should be considered as part of the claim for tortious interference with prospective business advantage.

In response, Hagen argues that his claim in Count Ten is properly analyzed under the theory of tortious interference with his contract at Siouxland and his ongoing business relationships with patients at Siouxland. Hagen relies on *Kern v. Palmer College of Chiropractic*, 757 N.W.2d 651 (Iowa 2008), where the Iowa Supreme Court found evidence of improper motive to allow a claim of intentional interference with contractual relations to go forward. Hagen contends that there is sufficient evidence for a jury to find that Eastman, Hunt, and Aldrich tortiously interfered with Hagen's contractual relations with Siouxland and its patients.

### b. *Analysis*

The elements of the tort of intentional interference with business relationship, or existing contract, are:

> (1) the plaintiff had a contract with a third-party; (2) the defendant knew of the contract; (3) the defendant intentionally and improperly interfered with the contract; (4) the interference caused the third-party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted.

*Green v. Racing Ass'n of Cent. Iowa*, 713 N.W.2d 234, 243 (Iowa 2006). Courts consider the following factors to help determine if the challenged conduct was improper:

> (1) The nature of the conduct; (2) the defendant's motive; (3) the interests of the party with which the conduct interferes; (4) the interest sought to be advanced by the defendant; (5) the social interests in protecting the freedom of action of the defendant and the contractual interests of the

45

> other party; (6) the nearness or remoteness of the
> defendant's conduct to the interference; and (7) the relations
> between the parties.

*Id*. at 244.

Hagen has raised a genuine issue of material fact regarding his termination, particularly whether Hagen discussed his intent to report Eastman and St. Luke's with his colleagues. As analyzed above, a reasonable jury could find that there was a retaliatory discharge in violation of Iowa public policy and defendants' conduct would thus be wrongful conduct for the purpose of a tortious interference with contract claim under Iowa law. A rational trier of fact could conclude that defendants improperly interfered with Hagen's employment agreement by terminating Hagen in violation of public policy and causing damage to his career options in Sioux City.

Therefore, Defendants' motion for summary judgment on Hagen's claim of tortious interference with business relationships is denied.

### D.    *Punitive Damages*

Under Iowa law, punitive damages are merely incidental to the main cause of action and they are derived from the underlying cause of action. *Campbell v. Van Roekel*, 347 N.W.2d 406, 410 (Iowa 1984). Thus, punitive damages can only be awarded when the plaintiff prevails on an underlying cause of action, then proves the requirements for punitive damages under Iowa law. *See Holt v. Quality Egg, L.L.C.*, 777 F. Supp. 2d 1160, 1172 (N.D. Iowa 2011) (also concluding that the plaintiff is not required to prove that "willful and wanton conduct" was an element of the underlying claim before punitive damages may be awarded).

From the evidence in the record cited by Hagen, viewed in the light most favorable to Hagen, a rational trier of fact could find that defendants' actions were

willful and wanton, entitling Hagen to punitive damages on appropriate claims. Therefore, defendants' motion for summary judgment on punitive damages is denied.

## IV.  CONCLUSION

A fair reading of the summary judgment record is that Hagen will almost certainly come across to the jury as an arrogant jerk, and that would be on a good day. In my nineteen years of experience as a federal district court judge, I believe it is highly unlikely the recovery, if any, will be worth the trial risks.  Also, going to trial on so many claims is a real dumb idea for many reasons.  All I have ruled is that there are material questions of fact for a jury to decide.  I would be surprised if Hagen wins, and I would be even more shocked if he wins a substantial verdict.

THEREFORE, for the reasons stated above, the defendants' Motion To Strike (docket no. 59) is **denied**, and the defendants' Motion For Partial Summary Judgment (docket no. 27) is **denied**.


**IT IS SO ORDERED**.

**DATED** this 20th day of March, 2013.

_Mark W. Bennett_
_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA