# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

EDWARD P. HAGEN, D.O.,

        Plaintiff,

vs.

SIOUXLAND OBSTETRICS &
GYNECOLOGY, P.C., an IOWA
CORPORATION, PAUL J. EASTMAN,
M.D., TAUHNI T. HUNT, M.D., and
ANGELA J. ALDRICH, M.D.,

        Defendants.

No. C 11-4047-MWB

**ORDER CERTIFYING QUESTIONS
TO THE IOWA SUPREME COURT**

---

## TABLE OF CONTENTS

I.     **INTRODUCTION AND BACKGROUND**............................................... 5
    A.    *Factual Background* ........................................................ 5
         1.    *The parties and their relation to each other*........................... 6
         2.    *The facts surrounding Hagen's firing*................................ 7
    B.    *Procedural Background* .......................................................... 9

II.   **LEGAL ANALYSIS** ...................................................................... 11
    A.    *Authorization and Standards for Certification of Questions* ............. 11
    B.    *Certification Analysis* ......................................................... 13
         1.    *Whether legal issue is unsettled* ....................................... 13
                *a.*    *Question 1:  Whether Iowa law recognizes
                         Protected Conduct 3, 4, or 5 as protected
                         activities that can support claims for wrongful
                         discharge in violation of public policy* ....................... 14
                      *i.*    *Iowa's standards for recognizing
                             protected activities* ....................................... 14
                      *ii.*   *Protected Conduct 3:  A doctor
                             reporting nurses' malpractice to the*

hospital where the malpractice occurred ................................................. 15

    iii.   Protected Conduct 4: A doctor disclosing to a patient's family that the patient was a victim of medical malpractice................................................. 20

    iv.   Protected Conduct 5: A doctor consulting with an attorney about whether that doctor had a legal duty to report another doctor's medical malpractice to the Iowa Board of Medicine................................................. 21

  b.   Question 2: Whether contractual employees can bring claims for wrongful discharge in violation of Iowa public policy ............................... 27

  c.   Question 3: Whether the lack of an "overriding business justification" is an independent element of a claim for wrongful discharge in violation of public policy ....................... 33

2.   Availability of legal resources.......................................... 40

3.   Court's familiarity with state law..................................... 40

4.   Time demands on comparative court dockets ...................... 41

5.   Frequency legal issue is likely to reoccur............................ 42

6.   Age of litigation and prejudice from certification.................. 42

7.   Whether there is a split in authority .................................. 43

  a.   Question 1: Whether other courts recognize Protected Conduct 3, 4, or 5 as protected activities that can support claims for wrongful discharge in violation of public policy ....................... 44

    i.   Protected Conduct 3: A doctor reporting nurses' malpractice to the hospital where the malpractice occurred ................................................. 44

    ii.   Protected Conduct 4: A doctor disclosing to a patient's family that the patient was a victim of medical malpractice................................................. 54

    iii.   Protected Conduct 5: A doctor consulting with an attorney about

whether that doctor had a legal duty to report another doctor's medical malpractice to a state board of medicine ................................................... 59

b.    Question 2: Whether contractual employees can bring claims for wrongful discharge in violation of public policy ....................................... 63

c.    Question 3: Whether the lack of an "overriding business justification" is an independent element of a claim for wrongful discharge in violation of public policy ........................ 68

III.    CONCLUSION ............................................................................ 70

This is an order certifying questions to the Iowa Supreme Court following a jury trial in which a jury found Defendants liable for wrongfully discharging the Plaintiff in violation of Iowa public policy.  On June 6, 2013, I *sua sponte* ordered the parties in this case to provide supplemental briefs on the following issue, among others: "Whether the Court should certify to the Iowa Supreme Court the question of whether Iowa law recognizes the public policy exceptions on which the jury found Defendants liable" (docket no. 124).  The Plaintiff and Defendants filed their supplemental briefs on July 5, 2013 (docket nos. 134 and 137).  The parties presented oral arguments on this issue on August 23, 2013.  Like the eight-day jury trial, the oral arguments were vigorously and zealously presented by highly skilled and exceptionally well-prepared counsel.  Though their clients obviously disliked each other, counsel demonstrated the utmost professionalism and civility toward each other and to me.  It would be wonderful if I could clone these lawyers for other hotly contested federal civil litigation.

I raised this matter *sua sponte* because this case turns on a number of unresolved questions of Iowa law.  The answers to these questions are critical to resolving the Defendants' post-trial motion for judgment as a matter of law (docket no. 119), which

is currently pending before me. Because this case raises issues of first impression under Iowa law that should, under the circumstances, be decided by the Iowa Supreme Court, I conclude that I should certify the following questions to the Iowa Supreme Court:

## Question 1

Does Iowa law recognize any of the following conduct as protected conduct on which a doctor-employee can base a claim for wrongful discharge in violation of Iowa public policy?:

(a) A doctor reporting, stating an intention to report, or stating that he might report, to a hospital, conduct of nurses that the doctor believed may have involved wrongful acts or omissions;

(b) A doctor disclosing to a patient or a patient's family that the patient may have been the victim of negligent care or malpractice; or

(c) A doctor consulting with an attorney, stating an intention to consult with an attorney, or stating that he might consult with an attorney, about whether another doctor or nurses had committed wrongful acts or omissions that the doctor should report to the Iowa Board of Medicine or a hospital.

## Question 2

Does Iowa law allow a contractual employee to bring a claim for wrongful discharge in violation of Iowa public policy, or is the tort available only to at-will employees?

## Question 3

Under Iowa law, is an employer's lack of an "overriding business justification" for firing an employee an independent element of a wrongful discharge claim, or is that element implicit in the element requiring that an employee's

protected activity be the determining factor in the employer's decision to fire the employee?

Whether I grant the Defendants' post-trial motion for judgment as a matter of law or motion for a new trial will depend, in part, on the answers to these questions.

## I.    INTRODUCTION AND BACKGROUND

"A certification order shall set forth . . . a statement of facts relevant to the questions certified, showing fully the nature of the controversy in which the questions arose."   Iowa Code § 684A.3.   Unless I note otherwise, the following facts are presented "in the light most favorable to the jury verdict, assuming all conflicts in the evidence were resolved in [the Plaintiff's] favor, and giving Plaintiff[] the benefit of all reasonable inferences that may be drawn from the evidence . . . ."   *Craig Outdoor Adver., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1013 (8th Cir. 2008).

### A.    Factual Background

In this case, Dr. Edward Hagen (Hagen) sued his former employer, Siouxland Obstetrics & Gynecology, P.C. (Siouxland), and his former partners, Dr. Paul Eastman (Eastman), Dr. Tauhni Hunt (Hunt), and Dr. Angela Aldrich (Aldrich) (collectively "the Siouxland Defendants") for wrongful discharge in violation of Iowa public policy. In particular, Hagen claims that the Siouxland Defendants ousted him from their medical practice because Hagen reported, or threatened to report, to St. Luke's hospital and a patient, that Eastman and two nurses committed medical malpractice causing an unborn baby's death.   Hagen also claims that the Siouxland Defendants ousted him for consulting with attorneys about whether Eastman and the nurses had committed malpractice, and whether Hagen should report Eastman to the Iowa Board of Medicine or St. Luke's.

*1.      The parties and their relation to each other*

Siouxland, an Iowa professional corporation, is located in Sioux City, Iowa, and provides obstetric and gynecologic services to patients.  Siouxland expanded into the area of cosmetic surgery and related services, including the development of The Rejuvenation Centre, which provided client services such as Botox treatment, Juviderm treatment, hair removal, liposuction, massage therapy, and weight loss consultation. Siouxland was formed and organized by three physicians, including Hagen's father, in 1975.  At the time of Hagen's firing, in November 2009, the doctors with an interest in Siouxland were Hagen, Eastman, Hunt, and Aldrich.

Hagen is a doctor of obstetrics and gynecology, presently licensed to practice medicine in Iowa, South Dakota, and Wisconsin.  On January 1, 1993, Hagen entered into an employment agreement with Siouxland.  Hagen has been an equity owner, president, and director at Siouxland.  At the time he was fired, Hagen was the president of Siouxland.

When the doctors joined Siouxland, they agreed not to "engage in the practice of medicine except as an employee of the CORPORATION unless otherwise authorized by the Board of Directors."  The employment agreement states all income generated "for services as a doctor and all activities relating thereto, such as lecturing, writing articles and consulting work, shall belong to the CORPORATION . . . ."  A doctor could be terminated by delivering a written notice of cancellation at least 90 days prior to the effective date of cancellation or "discharged by the CORPORATION in the event of embezzlement or other theft; willful contravention of professional ethics; substantial and willful violation of any other terms or conditions of this employment agreement, all subject to determination by the Board of Directors of the CORPORATION."

## 2.    *The facts surrounding Hagen's firing*

Hagen's claims in this case arise out of an incident that began at St. Luke's hospital in Sioux City, Iowa, on Thursday, November 5, 2009.  On that day, Selvin and Maria Maeda, who were husband and wife, were at St. Luke's because Maria Maeda was dealing with complications related to her pregnancy.  She was 34 weeks pregnant and she was suffering from infections related to a prior liver transplant. Eastman was Maria's consulting physician and had met her during a prior examination, but he was not at the hospital with Maria on the 5th.  In fact, Maria had been admitted to the hospital at around 1:00 pm and Eastman had never gone to St. Luke's to check on her.  Hagen was on call that evening to cover patients at St. Luke's.  At around 4:30 pm, Eastman called Hagen to ask whether Hagen was on call and to explain Maria's complications.  Eastman explained to Hagen that he thought Maria was at a hospital in Omaha, and had only recently learned that she was still at St. Luke's.  Eastman told Hagen that Maria was in labor and going into intensive care based on her complications.

After speaking with Eastman for about 30 minutes, Hagen went to St. Luke's. Hagen arrived at the hospital at 5:30 pm.  He immediately went to see Maria, who was under general anesthesia, and performed an ultrasound, which confirmed that her baby was dead.  Hagen began asking two labor and delivery nurses—Peggy Mace and Holly Duerksen—how long the baby had been dead.  They could not tell him.  Hagen became very upset and asked the nurses:  "How the fuck can this happen at St. Luke's that [nurses] watch a baby die on the monitor, suffocate, and do nothing?"  Hagen went on to say to the nurses:  "You killed this baby.  You watched this baby die on the monitor. I mean, you guys did nothing."  Hagen noted that the nurses had missed the fact that Maria's baby was dead because they had mistaken Maria's elevated heart rate for her baby's and presumed the baby was still alive.

After realizing that Maria's baby was dead, Hagen determined that he needed to perform a C-section to deliver the dead baby. Before doing so, Hagen called Eastman on the telephone. At trial, Hagen testified that the conversation went as follows: "And I told [Eastman] we got a problem here. We've got a mother here that's had no care. The nurses screwed up. You didn't come see her, and this baby is dead, and now I've gotta do a C-section on a mother and deliver a dead baby." Eastman offered to help do the C-section, but Hagen declined, telling Eastman: "I don't need help doing a C-section. I can do that. I needed your help three hours earlier, but I don't need it now."

Before performing the C-section, Hagen spoke with Selvin, Maria's husband. They talked for over an hour in the doctor's lounge. During their conversation, Hagen told Selvin that "things could have been done better" and that Hagen thought "the nurses missed something here." Hagen then performed the surgery to remove Maria's baby.

The next day, Hagen went to one of the hospital's administrators, Dr. Hildebrand (Hildebrand), to report himself for using the F-word to the nurses, and to report the nurses and Eastman for their failure to properly care for Maria. After making these reports to the hospital, Hagen consulted with three different attorneys about various issues, including how Hagen should document what had happened the night before and what Hagen should do personally in response to the incident. During one of these conversations, one of the attorneys reminded Hagen that he had a duty to report malpractice to the Iowa Board of Medicine. Later that day, Hagen told Eastman that "these attorneys are telling me I have to report you to the Iowa state medical board." Hagen also had a conversation with Hunt and Aldrich in which he told them that Hagen had reported the nurses and Eastman to the hospital, and that Hagen had spoken with attorneys who told him that he might have to turn Eastman in to the Iowa Board of Medicine.

Hagen spent the next two days, Saturday and Sunday, in Lincoln, Nebraska, with his children and then returned to Sioux City. The following Monday night, November 9, 2009, Hagen received a 10-day suspension from St. Luke's hospital. On Tuesday, Hagen was noticeably upset at work because of how the hospital handled the suspension, punishing Hagen without also punishing the nurses or Eastman. Hagen told his medical partners that he was going to tell the patient to sue the hospital, and that he was going to tell the patient to get a lawyer and investigate what happened. Then, on Wednesday night, Hagen called Maria Maeda at the hospital and told her: "You were mistreated, this is malpractice, the nurses missed the boat, Dr. Eastman missed the boat, and I think you should get an attorney." Finally, on Thursday, Hagen informed his partners that he had spoken with Maria. That was the last day Hagen worked at Siouxland.

The following Monday, while Hagen was out of town at his cabin in Wisconsin, Hagen received a call from Siouxland's corporate attorney, who told Hagen he needed to be in a meeting at 7:00 pm because he was being fired. Hagen drove back to Sioux City to make the meeting, which was held at Siouxland's attorney's law firm. At the meeting, Siouxland's attorney told Hagen that the partners at Siouxland had decided to fire him. Following his firing, Hagen sued the Siouxland Defendants, claiming a number of causes of action including wrongful discharge in violation of Iowa's public policy.

### B.    Procedural Background

On April 19, 2013, the parties went to trial on Count IV of Hagen's Complaint: Retaliatory Discharge in Violation of Public Policy.[1] The trial lasted eight days and occurred between April 19, 2013, and May 1, 2013.

---

[1] In his complaint, Hagen pleaded thirteen counts against some, or all, of the Siouxland Defendants: fraudulent misrepresentation, conspiracy to defraud, forgery, retaliatory

9

At the trial's conclusion, the jury found the Siouxland Defendants liable for wrongfully discharging Hagen in violation of Iowa's public policy. The verdict form provided five options of protected conduct that the jury could find to support their conclusion that the Siouxland Defendants wrongfully discharged Hagen. The verdict form read, in pertinent part:

> *If you found in favor of Dr. Hagen in **Step 1**, which one or more of the following kinds of conduct do you find were determining factor(s) in Siouxland's decision to terminate Dr. Hagen?*
>
> ____ Dr. Hagen reporting, stating an intention to report, or stating that he might report to the Iowa Board of Medicine conduct of Dr. Eastman that Dr. Hagen believed may have involved wrongful acts, omissions, negligence, or malpractice [Protected Conduct 1]
>
> ____ Dr. Hagen reporting, stating an intention to report, or stating that he might report to a hospital conduct of Dr. Eastman that Dr. Hagen believed may have involved wrongful acts, omissions, negligence, or malpractice [Protected Conduct 2]
>
> __X__ Dr. Hagen reporting, stating an intention to report, or stating that he might report to a hospital conduct of nurses that Dr. Hagen believed may have involved wrongful acts or omissions [Protected Conduct 3]
>
> __X__ Dr. Hagen disclosing to a patient or a patient's family that the patient may have been the victim of negligent care or malpractice [Protected Conduct 4]

discharge in violation of public policy, negligence, breach of fiduciary duty, breach of contract, promissory estoppel, unjust enrichment, tortious interference with business relationships, tortious interference with prospective business advantage, intentional infliction of emotional distress, and punitive damages. All of these claims survived summary judgment, but Hagen voluntarily declined to pursue all but his wrongful discharge claim.

___X___ Dr. Hagen consulting with an attorney, stating an intention to consult with an attorney, or stating that he might consult with an attorney about whether Dr. Eastman or nurses had committed wrongful acts or omissions that Dr. Hagen should report to the Iowa Board of Medicine or a hospital [Protected Conduct 5]

(Docket no. 113). The jury marked the last three options—*i.e.*, Protected Conduct 3, 4, and 5—in support of the verdict in favor of Hagen, and awarded Hagen $1,051,814 for past lost earnings. The jury awarded Hagen no damages for future lost earnings, and it awarded no punitive damages. The Clerk entered judgment for Hagen in the amount of $1,051,814 on May 2, 2013.

Following the verdict, the Siouxland Defendants moved for judgment as a matter of law, or alternatively a new trial. In their post-trial motion, the Siouxland Defendants argue, among other things, that none of the protected activities on which the jury based its verdict are actionable under Iowa law, and that Hagen failed to prove he was an at-will employee and therefore cannot maintain a claim for wrongful discharge in violation of Iowa public policy.

## II.  LEGAL ANALYSIS

### A.  *Authorization and Standards for Certification of Questions*

Both Iowa law and this court's Local Rules permit me, on the motion of a party or *sua sponte*, to certify a question of state law to the Iowa Supreme Court. Iowa's certification statute provides:

> The supreme court may answer questions of law certified to it by the supreme court of the United States, a court of appeals of the United States, a United States district court or the highest appellate court or the intermediate appellate court of another state, when requested by the certifying court, if there are involved in a proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to

the certifying court there is no controlling precedent in the decisions of the appellate courts of this state.

Iowa Code § 684A.1. Local Rule 83 of the Northern District of Iowa provides:

> When a question of state law may be determinative of a cause pending in this court and it appears there may be no controlling precedent in the decisions of the appellate courts of the state, any party may file a motion to certify the question to the highest appellate court of the state. The court may, on such motion or on its own motion, certify the question to the appropriate state court.

N.D. Ia. L.R. 83.

The United States Supreme Court has recognized that:

> Certification procedure . . . allows a federal court faced with a novel state-law question to put the question directly to the State's highest court, reducing the delay, cutting the cost, and increasing the assurance of gaining an authoritative response.

*Arizonans for Official English v. Arizona*, 520 U.S. 43, 76 (1997); *see Lehman Bros. v. Shein,* 416 U.S. 386, 391 (1974) (by certifying a question of state law, the federal court may save "time, energy and resources and hel[p] build a cooperative judicial federalism"). Thus, "[t]aking advantage of certification made available by a State may 'greatly simplif[y]' an ultimate adjudication in federal court." *Arizonans for Official English*, 520 U.S. at 76 (citing *Bellotti v. Baird,* 428 U.S. 132, 151 (1976)).

Whether a federal district court should certify a question of state law to the state's highest court is a matter "committed to the discretion of the district court." *Allstate Ins. Co. v. Steele,* 74 F.3d 878, 881-82 (8th Cir. 1996); *Schein,* 416 U.S. at 391 ("[Certification's] use in a given case rests in the sound discretion of the federal court."); *see Babinski v. American Family Ins. Group*, 569 F.3d 349, 353 (8th Cir. 2009) ("'Whether a federal court should certify a question to a state court is a matter of

discretion.'") (quoting *Johnson v. John Deere Co.,* 935 F.2d 151, 153 (8th Cir. 1991));
*see also Anderson v. Hess Corp.*, 649 F.3d 891, 891 (8th Cir. 2011); *Jung v. General
Cas. Co.*, 651 F.3d 796, 796 (8th Cir. 2011); *Packett v. Stenberg,* 969 F.2d 721, 726
(8th Cir. 1992).

I previously articulated the following factors to be considered in determining
whether to certify a question to a state's highest court:

> (1) the extent to which the legal issue under consideration
> has been left unsettled by the state courts; (2) the availability
> of legal resources which would aid the court in coming to a
> conclusion on the legal issue; (3) the court's familiarity with
> the pertinent state law; (4) the time demands on the court's
> docket and the docket of the state supreme court; (5) the
> frequency that the legal issue in question is likely to recur;
> and (6) the age of the current litigation and the possible
> prejudice to the litigants which may result from certification.

*Leiberkneckt v. Bridgestone/Firestone, Inc.*, 980 F. Supp. 300, 310 (N.D. Iowa 1997);
*accord Erickson-Puttmann v. Gill*, 212 F. Supp.2d 960, 975 n.6 (N.D. Iowa 2002); *see
Olympus Alum. Prod. v. Kehm Enters., Ltd.,* 930 F. Supp. 1295, 1309 n.10 (N.D.
Iowa 1996) (citing *Rowson v. Kawasaki Heavy Indus., Ltd.,* 866 F. Supp. 1221, 1225
& n. 5 (N.D. Iowa 1994)). In *Leiberkneckt,* I also considered a seventh factor;
"whether there is any split of authority among those jurisdictions that have considered
the issues presented in similar or analogous circumstances." *Leiberkneckt,* 980 F.
Supp. at 311. I will address each of these factors in turn below.

### B.    Certification Analysis

#### 1.    Whether legal issue is unsettled

The initial certification factor considers whether the issue is "unsettled" by state
courts. *See Leiberkneckt*, 980 F. Supp. at 310; *see also Erickson-Puttmann*, 212 F.
Supp.2d at 975 n.6; *Olympus Alum. Prod.,* 930 F. Supp. at 1309 n.10. As is discussed

below, both of the questions that I have chosen to certify are unsettled under Iowa law. Thus, I find that the first certification factor weighs in favor of certifying to the Iowa Supreme Court the questions of whether Hagen engaged in protected conduct, and whether a contractual employee can sue for wrongful discharge in violation of public policy.

>    *a.    Question 1:    Whether Iowa law recognizes Protected Conduct 3, 4, or 5 as protected activities that can support claims for wrongful discharge in violation of public policy*

>           *i.    Iowa's standards for recognizing protected activities*

Iowa law recognizes a "public-policy exception to the at-will employment doctrine[,]" which "limits an employer's discretion to discharge an at-will employee when the discharge would undermine a clearly defined and well-recognized public policy of the state." *Berry v. Liberty Holdings, Inc.*, 803 N.W.2d 106, 109 (Iowa 2011) (citing *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 763 (Iowa 2009); *Thompto v. Coborn's Inc.*, 871 F. Supp. 1097, 1112–13 (N.D. Iowa 1994)).  Under this "public-policy exception," an employee can bring "an intentional tort claim of wrongful discharge from employment in violation of public policy" against his or her employer if the employer fired the employee for engaging in certain categories of "protected activity."  *Id.* at 109-10.  At issue in this case is whether the protected activities found by the jury—Protected Conduct 3, 4, and 5—are, or would be, recognized under Iowa law such that Iowa employers could be held liable if they fire employees for engaging in those activities.

Not every "socially desirable conduct" an employee might engage in is actionable under Iowa's public policy exception.  *Jasper*, 764 N.W.2d at 762.  Rather, to be actionable, an employee's purported protected conduct must be "clear and well-defined" under Iowa law such "that it should be understood and accepted in our society as a benchmark" activity for which employers cannot fire employees.  *Id.* at 763.  A

well-defined public policy might be embodied in Iowa's legislatively enacted statutes, Iowa's Constitution, or even Iowa's administrative regulations. *Id*. at 763-74. Whether legislative or administrative, a purported public-policy source "must not only relate to public health, safety, or welfare, but the regulation must also express a substantial public policy in a way that furthers a specific legislative expression of the policy." *Id*. at 764. Based on these principles, Iowa law protects employees in performing at least four broad categories of conduct: "(1) exercising a statutory right or privilege; (2) refusing to commit an unlawful act; (3) performing a statutory obligation; and (4) reporting a statutory violation . . . ." *Id*. at 762 (internal citations omitted).

This case involved three purportedly protected activities—Protected Conduct 3, 4, and 5—that the Iowa courts have yet to explicitly recognize. Based on the discussion below, I would find that Iowa's public policy exception protects employees, like Hagen, who engage in these activities. But because the Iowa courts have not addressed these activities directly, I find that certifying these questions to the Iowa Supreme Court is appropriate.

### ii. *Protected Conduct 3: A doctor reporting nurses' malpractice to the hospital where the malpractice occurred*

In this case, the jury found that Protected Conduct 3 was a determining factor in the Siouxland Defendants' decision to fire Hagen. Specifically, the jury found that the Siouxland Defendants fired Hagen for "reporting, stating an intention to report, or stating that he might report to [St. Luke's] hospital conduct of nurses that Dr. Hagen believed may have involved wrongful acts or omissions" (docket no. 113). The Iowa courts have not yet addressed whether a doctor stating his or her intention to report nurses' malpractice to a hospital constitutes protected conduct.

Though the issue remains undecided, Iowa's comprehensive statutory and regulatory schemes governing medical professionals demonstrate a strong public policy interest in protecting doctors and nurses who openly report malpractice. To start, Iowa law requires that all doctors and nurses be licensed by state licensing boards before they practice medicine or nursing. Iowa Code § 147.2. These state licensing boards—the board of medicine and the board of nursing—must establish rules for revoking and suspending licenses of doctors and nurses who engage in harmful or unprofessional conduct. *Id.* § 272C.10 (mandating that the boards establish revocation and suspension rules); *see also id.* § 147.55 (providing a non-exhaustive list of grounds for revoking or suspending licenses). For example, the board of medicine or nursing must revoke or suspend a doctor's or nurse's license if he or she demonstrates "[p]rofessional incompetence" or "[k]nowingly mak[es] misleading, deceptive, untrue, or fraudulent representations in the practice of a profession or engag[es] in unethical conduct or practice[s] harmful or detrimental to the public," among other things. *Id.* §§ 147.55(2)-(3). The Iowa Code goes on to permit the board of medicine to discipline doctors who are "guilty of a willful or repeated departure from, or the failure to conform to, the minimal standard of acceptable and prevailing practice of medicine and surgery" or who commit "an act contrary to honesty, justice, or good morals . . . ." *Id.* § 148.6(2) (listing other grounds for discipline as well). And the board of nursing may similarly discipline nurses who are "guilty of willful or repeated departure from or the failure to conform to the minimum standard of acceptable and prevailing practice of nursing . . . ." *Id.* § 152.10(2) (listing other grounds for discipline as well).

Additionally, the text of these licensing laws demonstrates that the regulations imposed on doctors and nurses are designed to protect the *public*, not just individual patients. *See, e.g.*, *id.* § 272C.10(3) (requiring revocation or suspension where a doctor or nurse "engag[ed] in unethical conduct or practice harmful or detrimental to

16

the public"); *id.* § 147.55(3) (same). In fact, if a doctor or nurse fails to live up to certain standards in Iowa's licensing laws, "actual injury to a patient need not be established" before a board can discipline that doctor or nurse. *Id.* § 148.6(2)(g) (doctors); *id.* § 152.10(2)(g) (nurses); *id.* § 147.55(3) (noting that "[p]roof of actual injury need not be established" before disciplining both doctors and nurses who "[k]nowingly mak[e] misleading, deceptive, untrue, or fraudulent representations in the practice of a profession or engag[e] in unethical conduct or practice[s] harmful or detrimental to the public").

And Iowa's licensing laws are designed to regulate not only how a doctor or nurse treats a patient, but also how a doctor or nurse responds to other medical professionals who fail to conform to Iowa's licensing standards. Iowa's statutes and administrative regulations impose a duty on doctors and nurses, in certain circumstances, to report other doctors or nurses who fail to meet the standards of care required of medical professionals. Under Iowa law, "[a] licensee has a continuing duty to report to the licensing board by whom the person is licensed those acts or omissions specified by rule of the board pursuant to section 272C.4, subsection 6, when committed by another person licensed by the same licensing board." *Id.* § 272C.9(2). The Iowa Administrative Code further discusses a licensed doctor's mandatory reporting duties, and provides: "A report shall be filed with the board when a licensee has knowledge as defined in this rule that another person licensed by the board may have engaged in reportable conduct." Iowa Admin. Code r. 653-22.2(2). The Administrative Code defines "reportable conduct" as

> wrongful acts or omissions that are grounds for license revocation or suspension under these rules or that otherwise constitute negligence, careless acts or omissions that demonstrate a licensee's inability to practice medicine competently, safely, or within the bounds of medical ethics,

> pursuant to Iowa Code sections 272C.3(2) and 272C.4(6)
> and 653—Chapter 23.

*Id.* r. 653-22.2(1). "Failure to report a wrongful act or omission in accordance with this rule within the required 30-day period shall constitute a basis for disciplinary action against the licensee who failed to report." *Id.* r. 653-22.2(2)(*e*). Similarly, the Administrative Code defines "unethical conduct" for nurses to include "[f]ailing to report suspected wrongful acts or omissions committed by a licensee of the board." *Id.* r. 655-4.6(4)(*r*).

Taken together, Iowa's statutes and regulations governing the conduct of medical professionals express common-sense public policy values: People want to ensure that their doctors and nurses—who have immense control over people's lives and health—are not only highly competent, but also highly accountable. These values benefit the public just as much as they benefit individual patients. After all, "[e]veryone will, at some point, consume health-care . . . services." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2618 (2012) (Ginsburg, J., concurring in part and dissenting in part). And when the public inevitably consumes health-care services, it expects that its medical professionals will be qualified and will not attempt to sweep mistakes under the rug. Thus, Iowa law requires doctors and nurses to disclose malpractice to their governing boards. While Iowa Code § 272C.9(2) only requires a licensee to report malpractice committed by a "person licensed by the *same* licensing board," Iowa's mandatory reporting laws stand for a greater principle: Iowa law encourages medical professionals to disclose medical mistakes, not hide them.

Hagen's open intention to report nurses who committed malpractice to St. Luke's hospital was consistent with the spirit of Iowa's public policy favoring disclosure. True, Iowa's mandatory reporting laws require only that licensees report malpractice to their *board*, rather than to a hospital. But the public policy benefit underlying Iowa's

mandatory reporting requirements—the open disclosure of medical mistakes—is equally served when a doctor reports malpractice to authorities at a hospital where the malpractice happened. It would be strange to protect a doctor from being fired for discharging his or her mandatory duty to report malpractice to the board of medicine, but leave that same doctor exposed to termination for reporting that same malpractice to a different medical authority, like a hospital's management.

In *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751 (Iowa 2009), the Iowa Supreme Court confronted an analogous statutory scheme designed to protect the public. The Court in *Jasper* held that a children's day-care director could sue her employer for wrongful discharge in violation of public policy after the director was fired for refusing to allow the day-care to operate below the proper child-to-staff ratio mandated by Iowa's Administrative Code. *Id.* at 768. The Court in *Jasper* held that Iowa's child-to-staff administrative rules could form the basis of a wrongful discharge claim because these rules were "a means 'to assure the health, safety, and welfare of children' in day-care facilities." *Id.* at 766 (quoting Iowa Code § 237A.12(1)(a)). Based on this regulatory goal, and because "the protection of children is a matter of fundamental public interest," Iowa's child-to-staff regulations "satisfy[ied] the goal that the regulation affect the public interest." *Id.*

Like the regulations at issue in *Jasper*, Iowa's mandatory reporting and licensing regulations for medical professionals protect the health, safety, and welfare of patients. In particular, these regulations were designed, in part, to protect against "unethical conduct or practice[s] harmful or detrimental to the public." Iowa Code § 272C.10(3). Given that Iowa's licensing and reporting laws promote medical competence and open disclosure, I would find that a doctor reporting nurses' malpractice to a hospital constitutes protected activity under Iowa law.

### iii. Protected Conduct 4: A doctor disclosing to a patient's family that the patient was a victim of medical malpractice

In addition to Protected Conduct 3, the jury found that Protected Conduct 4 was a determining factor in the Siouxland Defendants' decision to fire Hagen. Specifically, the jury found that the Siouxland Defendants fired Hagen for "disclosing to a patient or a patient's family that the patient may have been the victim of negligent care or malpractice" (docket no. 113). Like Protected Conduct 3, the Iowa courts have not yet directly addressed whether Iowa law recognizes Protected Conduct 4 as protected activity that can support a wrongful discharge claim. But, again, I would find that Iowa's public policy protects a doctor who engages in this activity. The public policy goals of competence and open disclosure in Iowa's licensing laws equally favor protecting doctors who openly disclose another's malpractice to the very people victimized by the malpractice—the patients. Because I discussed the applicability and goals of Iowa's licensing laws above, I will not repeat that rationale here.

Aside from the statutory policy goals favoring disclosure, Iowa law provides additional support for protecting doctors who disclose malpractice to patients. Under Iowa law, "[t]he close relationship of trust and confidence between patient and physician gives rise to duties of disclosure . . . ." *Koppes v. Pearson*, 384 N.W.2d 381, 386 (Iowa 1986). A number of Iowa regulations and statutes recognize the importance of open and clear disclosure between doctors and their patients. *See, e.g.*, Iowa Admin. Code r. 653-13.7(3) (requiring that patient "[i]nformation shall be divulged by the physician when authorized by law or the patient or when required for patient care"); *id.* r. 653-13.7(7) (requiring doctors to provide a patient with a copy of their medical records upon request); Iowa Code § 147.137 (detailing requirements of a patient's written informed consent, which include a number of disclosures related to the risks of medical procedures). These statutes, combined with *Koppes*'s recognition of a

doctor's duties of disclosure and Iowa's licensing standards favoring disclosing malpractice, would lead me to conclude that Iowa's public policy protects doctors who inform patients that they were the victims of malpractice.

> ### iv. *Protected Conduct 5: A doctor consulting with an attorney about whether that doctor had a legal duty to report another doctor's medical malpractice to the Iowa Board of Medicine*

Finally, the jury found that Protected Conduct 5 was a determining factor in the Siouxland Defendants' decision to fire Hagen. Specifically, the jury found that the Siouxland Defendants fired Hagen for

> consulting with an attorney, stating an intention to consult with an attorney, or stating that he might consult with an attorney about whether Dr. Eastman or nurses had committed wrongful acts or omissions that Dr. Hagen should report to the Iowa Board of Medicine or a hospital.

(Docket no. 113). No Iowa court has ever directly addressed whether consulting with an attorney about whether a doctor has a legal obligation to report another doctor or nurses to the Iowa Board of Medicine constitutes protected activity. Thus, this issue, like those above, appears to be unsettled under Iowa law.

Based on Iowa's public policy principles, I held nearly two decades ago that Iowa's public policy protected an employee who was fired after threatening to consult an attorney about a dispute the employee was having with her employer. *Thompto v. Coborn's Inc.*, 871 F. Supp. 1097, 1116 (N.D. Iowa 1994). I reached that conclusion by relying on a combination of legislative and judicial authorities, all of which recognize the paramount importance of allowing people to consult with lawyers. These authorities fall into two categories: (1) statutes and rules regulating the legal profession, and (2) common-sense judicial and legislative declarations about the necessary role lawyers play in society. *Id.* at 1119-21.

First, I noted in *Thompto* that Iowa's legislature has vested the Iowa Supreme Court with the authority to regulate many aspects of the legal profession, including granting and revoking law licenses, disciplining attorneys, and adopting rules regulating Iowa lawyers. *See* Iowa Code § 602.10101 ("The power to admit persons to practice as attorneys and counselors in the courts of this state, or any of them, is vested exclusively in the supreme court which shall adopt and promulgate rules to carry out the intent and purpose of this article."); *id.* § 602.10121 (granting the court the power to revoke and suspend law licenses); *Thompto*, 871 F. Supp. at 1119. And "[t]he Iowa Supreme Court has always reserved to itself the inherent power to regulate the legal profession in this state[.]" *Thompto*, 871 F. Supp. at 1119 (citing *Matter of Peterson*, 439 N.W.2d 165, 166 (Iowa 1989) (further citations omitted)). Consistent with this authority, in 1994, when I decided *Thompto*, the Iowa Supreme Court enforced the Code of Professional Responsibility, which discussed the important role lawyers played in society. For example, the Code recognized that

> [l]awyers, as guardians of the law, play a vital role in the preservation of society. The fulfillment of this role requires an understanding by lawyers of their relationship with and function in our legal system. A consequent obligation of lawyers is to maintain the highest standards of ethical conduct.

*Id.* (quoting Code of Professional Responsibility, Preamble). The Code also stated "that every person in our society should have ready access to the independent professional services of a lawyer of integrity and competence." *Id.* (quoting Code of Professional Responsibility, EC 1–1). To promote this ideal, the Code provided that

> [t]he need of members of the public for legal services is met only if they recognize their legal problems, appreciate the importance of seeking legal assistance, and are able to obtain the services of acceptable legal counsel. Hence, important functions of the legal profession are to educate laypersons to

> recognize their problems, to facilitate the process of intelligent selection of lawyers, and to assist in making legal services fully available.

*Id.* at 1119-20 (quoting Code of Professional Responsibility, EC 2–1). Based on these rules, I concluded that "the Code of Professional Responsibility embodies a strong public policy favoring access of persons to professional legal services for the purposes of recognizing legal problems." *Id.* at 1120 (footnote omitted).

Then, in 2005, the Iowa Supreme Court adopted a new (though highly similar) set of professional rules—the Iowa Rules of Professional Conduct—which govern Iowa lawyers today. Ia. Ct. R. Ch. 32; *see also Iowa Supreme Court Disciplinary Bd. v. Casey*, 761 N.W.2d 53, 57 (Iowa 2009) (noting that the Iowa Rules of Professional Conduct were adopted in 2005). Though the text and organization of these newer rules differs from the Code of Professional Responsibility, the Rules of Professional Conduct retain much of the same language cited above. *See, e.g.*, Iowa Rules of Prof'l Conduct Preamble [13] ("Lawyers play a vital role in the preservation of society. The fulfillment of this role requires an understanding by lawyers of their relationship to our legal system. The Iowa Rules of Professional Conduct, when properly applied, serve to define that relationship."); *id.* Preamble [6] ("[A] lawyer should seek improvement of the law, access to the legal system, the administration of justice, and the quality of service rendered by the legal profession."); *id.* ("[A]ll lawyers should devote professional time and resources and use civic influence to ensure equal access to our system of justice for all those who because of economic or social barriers cannot afford or secure adequate legal counsel.").

Second, I noted in *Thompto* that, "[p]ractically speaking, attorneys are the key to obtaining relief from violations of individual and group rights in employment and many other contexts." 871 F. Supp. at 1120. "[T]he nature of the judicial system of this country, civil and criminal, itself makes consultation, and often employment, of legal

representatives essential . . . ." *Id.* at 1120. "The importance of consultation and employment of legal counsel to vindicate civil rights has also been recognized by federal statutory provisions awarding attorney fees for parties who succeed in vindicating those rights at trial . . . ." *Id.* For instance, 42 U.S.C. § 1988 allows prevailing parties to collect reasonable attorney fees in federal civil rights litigation. Similarly, Iowa's legislature has passed fee-shifting statutes allowing successful litigants to recover attorney fees under the Iowa Civil Rights Act. *See, e.g.*, Iowa Code § 216.15(9)(a)(8). "These fee-shifting statutes legislate a simple truth: In today's complex legal system, lawyers play a critical role in vindicating important public and private rights." *Thompto*, 871 F. Supp. at 1120.

Based on these observations, I held that an employer violates Iowa's public policy when it deters employees from consulting with an attorney about their legal rights:

> In light of the clear articulations of public policy favoring consultation with attorneys in order to determine whether a person has a legal problem, public policy favoring the availability of competent legal advice, public policy placing on lawyers a duty to counsel only actions that are legal and just, and public policy favoring compensation of legal counsel for individuals who endeavor to vindicate civil rights, the court concludes that acts that impede an individual from seeking legal advice would be injurious to the public, or against the public good, would not be right and just, and could potentially have a deleterious effect on what affects the citizens of the State collectively. Such conduct would therefore be in violation of public policy.

*Id.* at 1121 (internal quotation marks omitted); *accord Chapman v. Adia Servs., Inc.*, 688 N.E.2d 604, 609-10 (Ohio App. 1997) (relying, in part, on *Thompto*'s reasoning in holding "that Ohio public policy encourages individuals to consult an attorney regarding a possible claim").

In the nearly two decades since I decided *Thompto*, the Iowa Supreme Court has never explicitly recognized a public policy protecting an employee's right to consult an attorney, nor has the Iowa Supreme Court rejected such a public policy. The Iowa Supreme Court has, however, held in *Ballalatak v. All Iowa Agriculture Association* that Iowa's public policy does not protect an employee who threatens to contact an attorney on behalf of his or her coworkers. 781 N.W.2d 272, 279 (Iowa 2010). But, contrary to the Siouxland Defendants' assertion that "*Thompto*'s continued validity is questionable" (docket no 119-1, at 20), the Court in *Ballalatak* explicitly left open the possibility of "recogniz[ing] a right to consult or threaten to consult *one's own attorney* . . . ." 781 N.W.2d at 279 (emphasis added). In fact, *Thompto* did not purport to recognize a public policy right to consult an attorney on behalf of third parties; rather, *Thompto* recognized an employee's right not to be fired "for threatening to consult an attorney to vindicate what the employee believes to be *his or her rights* against an employer . . . ." *Thompto*, 871 F. Supp. at 1121 (emphasis added).

The principles outlined in *Thompto* apply with even greater force to this case. In *Thompto*, I held that Iowa's public policy protected an employee who threatened to consult an attorney about her employer's decision to deny her husband cancer insurance coverage, which is merely a *permissible* reason to consult an attorney. *Id.* at 1107-08. In other words, Iowa law did not require the plaintiff in *Thompto* to take any action. By contrast, this case involves a doctor's *mandatory* duty to report malpractice under Iowa law. As discussed above, the Iowa Administrative Code mandates that doctors report other doctors' negligence to the Iowa Board of Medicine. *See* Iowa Admin. Code r. 653-22.2(2) (imposing a duty to report); *id.* r. 653-22.2(1) (defining reportable conduct to include "wrongful acts or omissions"). "Failure to report a wrongful act or omission in accordance with this rule within the required 30-day period shall constitute a basis for disciplinary action against the licensee who failed to report." *Id.* r. 653-

22.2(2)(*e*).  Based on these mandatory reporting regulations, Hagen had a duty to report Eastman's negligence.  If he did not, he exposed himself to discipline. Following *Thompto*'s reasoning, if Hagen would have been protected in consulting an attorney to bring a permissible cause of action, he must have at least as much protection in consulting an attorney to meet a mandatory, legal duty.

In addition to *Thompto*, the Iowa Supreme Court's holding in *Jasper* provides support for protecting an employee who tells his or her employer that he is consulting with an attorney regarding a mandatory legal obligation.  Under *Jasper*, "the tort of wrongful discharge not only protects the reporting of an activity violative of public policy, but also protects the refusal by an employee to engage in activity that is violative of public policy."   764 N.W.2d at 767-68 (citing *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 286 (Iowa 2000)).  In fact, the employee in *Jasper* did not report an administrative violation to anyone; rather, she told her employer that she refused to violate an administrative regulation, which the Iowa Supreme Court held was protected conduct.  *Id.* at 758-59, 768.  Like the employee in *Jasper*, Hagen did not actually report Eastman to the Iowa Board of Medicine before the Siouxland Defendants fired him.  He did, however, tell the Siouxland Defendants that he might have to report Eastman under Iowa's reporting regulations.  Thus, like the employee in *Jasper*, Hagen made clear to his employer his intention to comply with Iowa's administrative rules.

If Iowa law protects complying with, or stating an intention to comply with, certain administrative regulations, it  follows that Iowa law also protects any reasonable steps an employee takes to determine *how* to comply with those regulations, which may include consulting with an attorney.  Applying this logic to the case at hand, if Iowa law would protect Hagen in reporting Eastman to the Board, it must also protect Hagen in determining whether he needed to report Eastman by talking with an attorney. Iowa's public policy would have little force if it only prohibited employers from firing

employees who *actually* complied with Iowa's regulations, but not those who *attempted* to comply with Iowa's regulations. *Cf. Rager v. Boise Cascade Corp.*, No. 88 C 1436, 1989 WL 31469, at *4 (N.D. Ill. Mar. 27, 1989) ("Whether an employer terminates an employee for hiring an attorney to pursue a claim or waits until charges are formally made and a claim is actually filed, the employer is effectively attempting to deter or sabotage the employee's effort to enforce his right to nondiscriminatory treatment."). An employee may need to contact an attorney to determine how to comply with Iowa's laws, and if those laws embody meaningful public policy goals, employers should not be free to thwart those goals by firing employees who consult attorneys.

Iowa's mandatory reporting regulation for doctors benefits the public at large, and allowing employers to fire doctors who attempt to comply with this regulation by contacting an attorney would obstruct that benefit. Thus, if I were deciding this issue, I would find that Hagen informing the Siouxland Defendants that he had consulted with an attorney about reporting Eastman's negligence is protected conduct under Iowa law.

> ### b.    Question 2:   Whether contractual employees can bring claims for wrongful discharge in violation of Iowa public policy

Like the "protected conduct" issues discussed above, Iowa law similarly leaves open the question of whether a contractual employee can sue for wrongful discharge, or if this claim is only available to at-will employees. While "Iowa courts have consistently held that 'an at-will employee has a cause of action for wrongful discharge when the reasons for the discharge violate a clearly defined and well-recognized public policy,'" no Iowa court has ever expressly limited wrongful discharge claims to at-will employees, as opposed to contractual employees. *Berry*, 803 N.W.2d at 109 (citing *Jasper*, 764 N.W.2d at 761). Based on Iowa's law discussing the wrongful discharge cause of action, I find it unlikely that the Iowa Supreme Court would foreclose a wrongful discharge suit to a contractual employee.

At least one court has interpreted Iowa law to support extending the wrongful discharge tort to contractual employees. In *Vails v. United Community Health Center, Inc.*, No. C11-4048-LTS, 2012 WL 6045941, at *10 (N.D. Iowa Dec. 5, 2012), United States Magistrate Judge Strand held that he did "not believe that the Iowa Supreme Court would . . . hold that the tort of wrongful discharge is available only to at-will employees." The court in *Vails* relied primarily on three of the Iowa Supreme Court's earlier cases involving claims for wrongful discharge in violation of public policy. In *Springer v. Weeks & Leo Co., Inc.*, 429 N.W.2d 558, 560-61 (Iowa 1988)—the case that first recognized the wrongful discharge tort in Iowa—the Iowa Supreme Court held that "the public policy of this state [protecting] an employee's right to seek the compensation which is granted by law for work-related injuries should not be interfered with *regardless of the terms of the contract of hire*" (emphasis added). Under *Springer*'s broad language, it does not matter that an employee bargained for additional employment protections in an employment contract; the terms of that contract have no effect on the employee's right to bring a wrongful discharge claim.

Two months after the Iowa Supreme Court decided *Springer*, it had to decide in *Conaway v. Webster City Products Co.*, 431 N.W.2d 795, 796 (Iowa 1988), "whether an employee covered by a collective-bargaining agreement providing a contractual remedy for discharge without just cause may maintain . . . an action [for wrongful discharge in violation of public policy]." The plaintiffs in *Conaway* claimed that they were fired in retaliation for filing worker's compensation claims. *Id*. But because the plaintiffs were employed under a collective bargaining agreement, the district court dismissed their claims as being preempted by section 301 of the Labor Management Relations Act (LMRA). *Id*. The Iowa Supreme Court reversed the dismissal, concluding that "the retaliatory tort actions . . . are independent of the collective-bargaining agreement and are therefore not preempted by section 301 of the LMRA . .

. because resolution of these actions does not require an interpretation of the collective-bargaining agreement." *Id.* at 799. After finding that the plaintiff's claims were not preempted, the Iowa Supreme Court held that "[t]he plaintiffs' actions are recognizable state tort claims" and remanded the case to the district court. *Id.* at 800. Had the Iowa Supreme Court intended to limit the wrongful discharge tort to at-will employees, it could have avoided the preemption issue and simply held that the plaintiffs could not maintain a wrongful discharge claim as contractual employees. But it did not, instead choosing to address the preemption issue on its merits, which suggests that the Iowa Supreme Court did not intend to limit the wrongful discharge tort to at-will employees.

Seven years after *Conaway*, the Iowa Supreme Court confronted a similar case in *Sanford v. Meadow Gold Dairies, Inc.*, 534 N.W.2d 410 (Iowa 1995). In *Sanford*, an employee subject to a collective bargaining agreement claimed that he was fired for seeking worker's compensation benefits. *Id.* at 411, 413. In addressing a number of issues on appeal, the court in *Sanford* noted that the plaintiff's "retaliatory discharge claim rests on our holdings that public policy is violated when an employee, *even an employee at-will*, is discharged as a result of seeking workers' compensation benefits." *Id.* at 412 (emphasis added). Relying on this language, the court in *Vails* reasoned that "[t]he phrase 'even an employee at-will' is extremely inclusive. Instead of holding that 'only' at-will employees are protected from being discharged in violation of public policy, the [Iowa Supreme] Court pointed out that 'even' those employees enjoy that protection." 2012 WL 6045941, at *9. Again, this inclusive language seems to presume that the wrongful discharge tort applies to contractual employees.

While the court in *Vails* relied on these early Iowa cases describing the wrongful discharge claim, more recent decisions further support the conclusion that wrongful discharge claims are not limited to at-will employees. For example, in *Jasper*, the Iowa Supreme Court noted that "[w]e have used public policy to constrain legal

principles in many areas of the law, *especially contracts*." 764 N.W.2d at 761 (emphasis added). In fact, the Court in *Jasper* noted that public policy considerations lead the Iowa Supreme Court to invalidate a contract for slavery in one of its first cases. *Id.* (citing *In re Ralph*, 1 Morris 1 (Iowa 1839)). And the Court also recognized that "[w]hen a contract violates public policy, including a contract of employment, the entire community is damaged." *Id.* These statement suggest that Iowa's public policy considerations apply to contractual—not just at-will—employment relationships.

Moreover, Iowa courts have long recognized that public policy considerations can limit the effect of contracts outside the employment context. *See, e.g.*, *Rogers v. Webb*, 558 N.W.2d 155, 156 (Iowa 1997) ("Contracts that contravene public policy will not be enforced." (citations omitted)); *Skyline Harvestore Sys., Inc. v. Centennial Ins. Co.*, 331 N.W.2d 106, 109 (Iowa 1983) (noting that Iowa courts "do not hesitate to invalidate a contract which contravenes public policy," but should do so sparingly); *Wunschel Law Firm, P.C. v. Clabaugh*, 291 N.W.2d 331, 335 (Iowa 1980) ("A contract which contravenes public policy will not be enforced by the courts."); *Liggett v. Shriver*, 164 N.W. 611, 612 (Iowa 1917) ("In general, however, it may be said that any contract which conflicts with the morals of the times or contravenes any established interest of society is contrary to public policy."). Thus, contracts have never been beyond the reach of Iowa's public policy.

In addition to the Iowa Supreme Court's language, the purpose behind the wrongful discharge tort is best served by applying the tort to both contractual and at-will employees. Iowa's wrongful discharge claim enforces "the communal conscience and common sense of our state in matters of public health, safety, morals, and general welfare." *Jasper*, 764 N.W.2d at 761 (citing *Truax v. Ellett*, 15 N.W.2d 361, 367 (Iowa 1944)). Whether an employer's choice to fire an employee violates Iowa's "communal conscience" is completely independent of whether the fired employee was

at-will or contractual. The firing in either case harms "the entire community"—*i.e.*, the public—which has an interest in discouraging employers from firing employees in violation of Iowa's public policy.

Still, in their post-trial brief, the Siouxland Defendants argue—without citation to any authority—that a contractual "employee does not need the protections of the public policy exception . . . [because] he has already negotiated the terms for termination in the Employment Agreement" (docket no. 119-1, at 23). Their argument seems to be that, when an employee negotiates an employment contract, the protections embodied in Iowa's public policy suddenly no longer apply to that employee because the employee has separately bargained for protection in an employment agreement. Stated differently, their argument is that an employee with contractual protections no longer needs public policy protections.

But the Siouxland Defendants' argument incorrectly assumes that, by bargaining for particular employment protections, an employee implicitly relinquishes all other employment protections not explicitly stated in the employment agreement. An employee may explicitly relinquish some legal protections by entering into an employment contract. *See, e.g.*, *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 273-74 (2009) (employment agreement may limit employee's right to pursue AEDA claim in federal court by requiring the employee to arbitrate the claim). But the idea that a contractual employee forgoes certain common-law tort protections—especially those intended to protect the public interest—is absurd. "For more than twenty-five years, [Iowa courts] have considered a claim for wrongful discharge in violation of public policy to be an intentional tort claim." *Rivera v. Woodward Res. Ctr.*, 830 N.W.2d 724, 732 (Iowa 2013). An employee who bargains for an employment contract does not consent to being tortuously fired in violation of public policy any more than that employee consents to other intentional torts.

Additionally, even if a contractual employee has bargained for contractual remedies for wrongful termination, nothing prevents that employee from suing his or her employer in both contract and tort. Iowa law holds that "where a duty recognized by the law of torts exists between the plaintiff and defendant distinct from a duty imposed by the contract . . . a tort action [will] lie for conduct in breach of the contract." *Haupt v. Miller*, 514 N.W.2d 905, 910 (Iowa 1994) (quoting *Preferred Mktg. Associates Co. v. Hawkeye Nat. Life Ins. Co.*, 452 N.W.2d 389, 397 (Iowa 1990)). An employer's duty not to fire an employee in violation of public policy is obviously independent of whether the employee has an employment contract. After all, at-will employees can assert the tort even though they have no formal employment contract. Thus, even if an employee's tortious discharge is also prohibited by contract, Iowa law does not force the employee to choose a contract claim instead of a tort claim. *Cf. Barske v. Rockwell Int'l Corp.*, 514 N.W.2d 917, 925 (Iowa 1994) (holding that an employee can maintain a tort action for negligent misrepresentation independent of any rights established in his collective bargaining agreement).

I recognize that there are at least two federal district courts that have suggested that Iowa's wrongful discharge tort is limited to at-will employees. *See Gries v. AKAL Sec., Inc.*, No. 06-CV-33-LRR, 2007 WL 2710034, at *35 n.14 (S.D. Iowa Aug. 27, 2007) (noting in a footnote that being "an at-will employee, [is] an obvious requirement for . . . [a wrongful discharge in violation of] public policy claim"); *Clark v. Eagle Ottawa, LLC*, No. 06-CV-2028-LRR, 2007 WL 581650, at *5 (N.D. Iowa Feb. 20, 2007) ("In order to state a claim for wrongful discharge in violation of public policy, Plaintiff must show that he is an at-will employee."). But Iowa law supports neither court's finding that wrongful discharge claims are limited to at-will employees. For example, the court in *Gries v. AKAL Securities, Inc.* cites only *Clark v. Eagle Ottawa, LLC* in support of its suggestion that only at-will employees can sue for wrongful

discharge. *Gries*, 2007 WL 2710034, at *35 n.14. And the court in *Clark* relies on two Iowa cases—*Lloyd v. Drake Univ.*, 686 N.W.2d 225, 228 (Iowa 2004) and *Fitzgerald v. Salsbury Chemical, Inc.*, 613 N.W.2d 275, 280-81 (Iowa 2000)—neither of which hold that only at-will employees can bring claims for wrongful discharge. *Clark*, 2007 WL 581650, at *5. Because *Gries* and *Clark* do not consider the history and language of Iowa's wrongful discharge decisions discussed above, I do not find them persuasive.

Simply put, the fact that an employee has an employment contract should not make it any easier for an employer to fire the employee for reasons that the public policy of Iowa deem reprehensible. Thus, I would find that both contractual and at-will employees can sue for wrongful discharge in violation of Iowa's public policy. But, again, because Iowa law is undecided on this issue, I find that it would be more appropriate to certify the issue to the Iowa Supreme Court.

    *c.*     ***Question 3: Whether the lack of an "overriding business justification" is an independent element of a claim for wrongful discharge in violation of public policy***

Iowa law appears to be unsettled as to how a jury should be instructed on the elements of a wrongful discharge claim. In particular, it is unclear under Iowa law whether an employer's lack of an overriding business justification for firing an employee is an independent element of a wrongful discharge claim, or if that element is implicit in the requirement that an employee's protected conduct be the determining factor in an employer's decision to fire the employee. In instructing the jury in this case, I did not separately list the lack of an overriding business justification as an element of the wrongful discharge tort. Rather, Jury Instruction No. 5 outlined the elements for Hagen's wrongful discharge as follows:

    ***One***, **Dr. Hagen was employed by Siouxland.**

    . . . .

***Two***, **Dr. Hagen engaged in conduct protected by public policy.**

. . . .

***Three***, **Siouxland discharged Dr. Hagen from his employment.**

. . . .

***Four***, **Dr. Hagen's conduct protected by public policy was the determining factor in Siouxland's decision to discharge him.**

A determining factor

> need not be the main reason behind the decision, ***but***
>
> must be the reason that tips the scales decisively one way or the other

Siouxland must have known of the protected activity before it made the decision to discharge Dr. Hagen.

A short time between Dr. Hagen engaging in the protected activity and his discharge

> is not enough, by itself, to find that the protected activity was the determining factor in the discharge, ***but***
>
> may be suspicious, in light of other evidence that the discharge was for engaging in protected activity

You should consider whether or not there are other legitimate reasons or motives for the discharge.

> If the defendants offer other reasons for the discharge, you must determine whether those other reasons are merely pretexts for a discharge for engaging in protected activity

You may find that a reason is a pretext if it was not the real reason, but is a reason given to hide a discharge for engaging in protected activity

If the reasons offered by Siouxland are legitimate and not pretexts, you must determine whether any protected conduct by Dr. Hagen was nevertheless the determining factor in his discharge

*Five*, the wrongful discharge caused injury to Dr. Hagen.

(Docket no. 110, at 9-11).

These instructions appear to be consistent with Iowa's model civil jury instructions, which similarly omit any reference to an overriding business justification. Iowa's model instructions list the following elements as comprising a wrongful discharge claim:

1. (Plaintiff) was an employee of (defendant).

2. (Defendant) discharged (plaintiff) from employment.

3. (Plaintiff)'s (describe act protected by public policy, i.e., filing of worker's compensation claim, etc.) was the determining factor in (defendant)'s decision to discharge (plaintiff).

4. The discharge was a cause of damage to (plaintiff).

5. The nature and extent of the damage.

Iowa Civil Jury Instruction 3100.1 (updated March 2012).

Despite the language in the model instructions, the Siouxland Defendants argue that Jury Instruction No. 5 does not accurately reflect the elements of an Iowa wrongful discharge claim. Specifically, the Siouxland Defendants claim that I should have required the jury to find that the Siouxland Defendants had no "overriding business justification" for firing Hagen in order to find that Hagen was wrongfully discharged.

The Siouxland Defendants cite the elements of a wrongful discharge claim listed in *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 761 (Iowa 2009), in support of their argument that I should have instructed the jury on "an overriding business justification." The court in *Jasper* noted that the

> elements [of a wrongful discharge claim] are: (1) existence of a clearly defined public policy that protects employee activity; (2) the public policy would be jeopardized by the discharge from employment; (3) the employee engaged in the protected activity, and this conduct was the reason for the employee's discharge; and (4) *there was no overriding business justification for the termination.*

*Id.* (citing *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 228 (Iowa 2004); *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 282 n.2 (Iowa 2000)) (emphasis added). But, while the court in *Jasper* listed "no overriding business justification" as an element, it provided no guidance as to how that element should be applied.

Based on the elements in *Jasper*, the Siouxland Defendants argue that the instructions in this case allowed the jury to find for Hagen without ever considering whether the Siouxland Defendants had an overriding business justification for firing him. I omitted any reference to an overriding business justification because I found that the business justification element was implicit in the determining factor instruction. Specifically, Instruction No. 5 required the jury to find that Hagen's protected activity was the "determining factor" in the Siouxland Defendants' decision to fire him. The instructions defined a determining factor as "the reason that tips the scales decisively one way or the other." Thus, in order to find the Siouxland Defendants liable, the jury had to conclude that, out of all the potential reasons for firing Hagen, the reason that ultimately tipped the scale was Hagen's protected activity.

In my view, the instructions did not prevent the jury from considering other, potentially legitimate reasons for firing Hagen. I instructed the jury to "consider

whether or not there are other legitimate reasons or motives for the discharge." If the Siouxland Defendants proffered legitimate reasons for firing Hagen, I instructed the jury to (1) determine if those proffered reasons were real (*i.e.*, not pretextual) and (2) if they were real, to resolve whether those reasons were the determining factors in firing Hagen, or if Hagen's protected activity was nevertheless still the determining factor. Under these instructions, if the Siouxland Defendants had a legitimate business justification for firing Hagen, the jury could have considered that and found in favor of the Siouxland Defendants, assuming that the business justification was not pretextual and was the reason that ultimately persuaded the Siouxland Defendants to fire Hagen. Thus, while the instructions did not use the phrase "overriding business justification," they provided ample room for the jury to consider such justifications.

The instructions did not, however, allow the jury to find for the Siouxland Defendants based on the mere possibility that the Siouxland Defendants could have fired Hagen for a legitimate business reason. Nothing in Iowa law supports the proposition that merely having an alternative business reason for firing an employee can insulate an employer from a wrongful discharge claim where the evidence shows that the reason that *actually* tipped the scales toward firing that employee violates public policy. Instead, if the Siouxland Defendants had a mixture of legitimate and illegitimate reasons for firing Hagen, the jury could have found for the Siouxland Defendants only if the *legitimate* reasons ultimately tipped the scale in favor of firing Hagen. *See Fitzgerald*, 613 N.W.2d at 289 ("The protected conduct must be the determinative factor in the decision to terminate the employee."); *Teachout v. Forest City Cmty. Sch. Dist.*, 584 N.W.2d 296, 302 (Iowa 1998) ("A factor is determinative if it is the reason that 'tips the scales decisively one way or the other,' even if it is not the predominant reason behind the employer's decision." (footnote omitted)). In other

words, the causation element focuses on what *actually* moved the employer to fire an employee, rather than what *could have* moved the employer.

Still, the Siouxland Defendants argue that treating the overriding business justification element together with the causation element—*Jasper*'s element 3—renders the business justification element superfluous. Posed differently: Why would the court in *Jasper* list the overriding business justification element separately if it was supposed to be implicit in the causation element? This apparent tension may arise from the fact that Iowa's four-element wrongful discharge test derives from a similar four-element test that applies a different causation element than *Jasper*. Following *Jasper*'s citation trail, *Jasper* relies on *Fitzgerald*, which in turn cites two non-Iowa cases—*Gardner v. Loomis Armoured, Inc.*, 913 P.2d 377, 382 (Wash. 1996), and *Collins v. Rizkana*, 652 N.E.2d 653, 657 (Ohio 1995)—for the elements of a wrongful discharge claim. *Fitzgerald*, 613 N.W.2d at 282 n.2. Both *Gardner* and *Collins* adopt a four-element wrongful discharge test from two writings authored by Henry H. Perritt, Jr. *See Gardner*, 913 P.2d at 382 (citing Henry H. Perritt Jr., *Workplace Torts: Rights and Liabilities* (1991)); *Collins*, 652 N.E.2d at 658 (citing Henry H. Perritt, Jr., *The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?*, 58 U. Cin. L. Rev. 397, 398-99 (1989)). Thus, tracing *Jasper*'s elements to their root, Iowa's wrongful discharge elements may derive from the following four-element test:

> 1. That a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).

> 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).

> 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).

4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

Perritt, 58 U. Cin. L. Rev. at 398-99. Upon first glance, these elements appear the same as those in *Jasper*.

But the language in element 3—the causation element—transformed somewhere between Perritt and *Jasper*. Perritt's test—at least the one quoted above—requires only that a "plaintiff's dismissal was *motivated* by conduct related to the public policy," whereas *Jasper*'s test requires that a plaintiff's protected "conduct was *the reason* for the [plaintiff's] discharge." In fact, despite the fact that all of the cases mentioned above ostensibly derive from the same author, they phrase the causation element differently. *See Gardner*, 913 P.2d at 382 ("The plaintiffs must prove that the public-policy-linked conduct caused the dismissal (the *causation* element)" (quoting Perritt, *Workplace Torts: Rights and Liabilities* § 3.19)); *Collins*, 652 N.E.2d at 658 ("The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element)." (quoting Perritt, 58 U. Cin. L. Rev. at 399)); *Fitzgerald*, 613 N.W.2d at 282 n.2 ("The plaintiff engaged in public policy conduct and this conduct was the reason for the dismissal (the causation element)." (citing *Gardner*, 913 P.2d at 382; *Collins*, 652 N.E.2d at 658)); *Lloyd*, 686 N.W.2d at 228 ("The challenged discharge was the result of participating in the protected activity." (citations omitted)).

Listing a separate business justification element makes more sense where the attendant causation element requires only that a "plaintiff's dismissal was motivated by conduct" violating public policy. If an employer was motivated by both legitimate and illegitimate reasons in firing an employee, a causation element requiring only that illegitimate reasons *motivated* the employer would allow a jury to find for the employee even if the employer's legitimate reasons were the determining factors in the firing decision. In that case, the overriding business justification element clarifies the

causation element to ensure that the employer can escape liability based on the overriding business reasons. Listing a separate business justification element makes less sense where the attendant causation element requires that the illegitimate reason is *the* reason—interpreted to mean the determinative reason—that an employee was fired. In that case, as in this one, the business justification element appears to be implicit in the causation element.

While I would find that the overriding business justification element is implicit in Instruction No. 5's causation element, I recognize that Iowa law does not clearly resolve the issue. Thus, I find that, because this issue is unsettled under Iowa law, the first certification factor weighs in favor of certifying Question 3 to the Iowa Supreme Court.

### 2. *Availability of legal resources*

The second factor to consider before certification is the availability of legal resources which would aid the court in coming to a conclusion on the legal issue. *See Leiberkneckt*, 980 F. Supp. at 310; *see also Erickson-Puttmann*, 212 F. Supp.2d at 975 n.6. Both the Iowa Supreme Court and I often resolve cases involving wrongful discharge claims. I believe that the Iowa Supreme Court and I have roughly equal resources at our disposal to resolve questions of law, like those certified in this opinion. Thus, I conclude this factor weighs neither in favor of, nor against, certification.

### 3. *Court's familiarity with state law*

The third factor concerns my familiarity with pertinent state law. *See Leiberkneckt*, 980 F. Supp. at 310; *see also Erickson-Puttmann*, 212 F. Supp. 2d at 975 n.6; *Olympus Alum. Prod.,* 930 F. Supp. at 1309 n.10. Sitting in diversity, I am frequently called upon to consider, construe, and apply Iowa law. *See Hiatt v. Mazda Motor Corp.*, 75 F.3d 1252, 1255 (8th Cir. 1996) ("[I]n a suit based on diversity of citizenship jurisdiction the federal courts apply . . . the substantive law of the relevant

state." (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)); *Northland Cas. Co. v. Meeks*, 540 F.3d 869, 874 (8th Cir. 2008) (noting that, if a state-law issue is undecided, the federal courts must try to predict how the state supreme court would rule on the issue). I have also resolved numerous cases involving claims for wrongful discharge in violation of Iowa's public policy. *See, e.g.*, *Johnson v. Dollar Gen.*, 880 F. Supp. 2d 967, 997 (N.D. Iowa 2012), *aff'd*, 508 F. App'x 587 (8th Cir. 2013); *Campbell v. Iowa Third Judicial Dist. Dep't of Corr.*, No. C09-4087-MWB, 2011 WL 5866244, at *1 (N.D. Iowa Nov. 22, 2011); *Truckenmiller v. Burgess Health Ctr.*, 814 F. Supp. 2d 894, 912 (N.D. Iowa 2011); *Hussaini v. Gelita USA, Inc.*, 749 F. Supp. 2d 909, 919 (N.D. Iowa 2010); *Dollar v. Smithway Motor Xpress, Inc.*, No. C09-3043-MWB, 2010 WL 3723900, at *4 (N.D. Iowa Sept. 15, 2010); *Beekman v. Nestle Purina Petcare Co.*, 635 F. Supp. 2d 893, 921 (N.D. Iowa 2009); *Raymond v. U.S.A. Healthcare Ctr.-Fort Dodge, L.L.C.*, 468 F. Supp. 2d 1047, 1058-59 (N.D. Iowa 2006). Given my familiarity with the state-law wrongful discharge claim at issue in this case, I find that this factor weighs slightly against certification.

### 4. Time demands on comparative court dockets

The fourth factor addresses the relative docket load of the courts. *See Leiberkneckt*, 980 F. Supp. at 310; *see also Erickson-Puttmann*, 212 F. Supp.2d at 975 n.6; *Olympus Alum. Prod.,* 930 F. Supp. at 1309 n.10. I recognize that both myself and the Iowa Supreme Court are pressed for time to consider the cases before us. I further recognize that requests to respond to certified questions should not be made lightly. Given that both the Iowa Supreme Court and I have similar resources and busy dockets, I conclude that this factor is neutral, weighing nether in favor of, nor against, certification.

### 5. Frequency legal issue is likely to reoccur

The fifth factor concerns the frequency that the legal issue in question is likely to reoccur. *See Leiberkneckt*, 980 F. Supp. at 310; *see also Erickson-Puttmann*, 212 F. Supp.2d at 975 n.6; *Olympus Alum. Prod.*, 930 F. Supp. at 1309 n.10. In my experience, employment discrimination and wrongful termination claims are causes of action that plaintiff-employees assert relatively frequently. A quick Westlaw search reveals that the Iowa Supreme Court and Iowa Court of Appeals have decided at least eighteen cases involving claims for wrongful discharge in violation of Iowa public policy in the last three years alone. Because the questions I propose for certification affect not only what types of wrongful discharge claims are cognizable under Iowa law, but also what types of employees can assert such claims, I find that the legal issues raised in this case are likely to reoccur, which weighs in favor of certification.

### 6. Age of litigation and prejudice from certification

The sixth factor concerns the age of the current litigation and the possible prejudice to the litigants which may result from certification. *See Leiberkneckt*, 980 F. Supp. at 311; *see also Erickson-Puttmann*, 212 F. Supp.2d at 975 n.6; *Olympus Alum. Prod.*, 930 F. Supp. at 1309 n.10. This case has been pending for over three years, but the parties only recently went to trial and received a jury award in May 2013. Thus, the disputed award is only a few months old. It has been my experience that certification delays a case approximately one year. While I generally do not prefer to delay judgment for any amount of time, I note that the parties in this case are relatively well-to-do doctors who would likely not be prejudiced by delaying a final award in the same way other litigants might be.

There are also countervailing concerns here: There is a risk that the parties in the case could be prejudiced if I do *not* certify the questions discussed above. The validity of the jury's award depends on the controlling questions of Iowa law that I

propose to certify to the Iowa Supreme Court. If I were to affirm the jury's award to Hagen based on my interpretation of Iowa law, only to have the Iowa courts later decide that my interpretation is incorrect, my decision would effectively prejudice the Siouxland Defendants by sticking them with a judgment based on an erroneous interpretation of Iowa law.

Additionally, no matter which way I rule on the parties' post-trial motions, this case is likely to be appealed, and thus delayed. Given the inevitability of delay, the question becomes: Which court should decide the issues presented in this case, the Iowa Supreme Court or the Eighth Circuit Court of Appeals? While the Eighth Circuit Court of Appeals could appropriately decide a number of issues raised in the post-trial motions—like the Siouxland Defendants' evidentiary objections—the questions of first impression under Iowa law presented in this order are more appropriate for the Iowa Supreme Court.

Given the relatively minor delay caused by certification, the prejudice that may result without certification, the inevitability of delay, and the fact that this case involves questions of first impression most appropriately resolved by the Iowa Supreme Court, I find that this factor weighs slightly in favor of certification.

### 7. *Whether there is a split in authority*

Finally, the seventh factor requires me to consider "whether there is any split of authority among those jurisdictions that have considered the issues presented in similar or analogous circumstances." *Leiberkneckt,* 980 F. Supp. at 311. There is relatively little case law addressing the precise issues underlying Question 1, but other jurisdictions appear split as to how strictly to apply the wrongful discharge tort under similar circumstances. Other jurisdictions are decidedly split on Question 2. Because other authorities are split on these issues, I find that this factor weighs in favor of certification.

### a. Question 1: Whether other courts recognize Protected Conduct 3, 4, or 5 as protected activities that can support claims for wrongful discharge in violation of public policy

#### i. Protected Conduct 3: A doctor reporting nurses' malpractice to the hospital where the malpractice occurred

Iowa courts have not yet decided whether a doctor stating an intention to report nurses' malpractice to a hospital—*i.e.*, Protected Conduct 3—constitutes protected activity supporting a wrongful discharge claim. Very few cases from other jurisdictions address this issue, even indirectly. To further complicate matters, Protected Conduct 3 involves two unusual wrinkles: (1) Hagen threatened to report *nurses'* malpractice when Iowa's mandatory reporting laws required only that he report *doctors'* malpractice, *see* Iowa Code § 272C.9(2) (requiring licensee to report misconduct "committed by another person licensed by the same licensing board"); and (2) Hagen threatened to report the nurses to St. Luke's hospital when Iowa's mandatory reporting law required only that licensees report malpractice to their board, which in this case would be the Board of Medicine, *see id*. Despite these wrinkles, cases from other jurisdictions provide guidance as to whether Protected Conduct 3 is protected activity for the purpose of maintaining a wrongful discharge claim.

A number of other jurisdictions would likely find that Hagen's open intention to report other medical professionals' malpractice to a hospital constitutes protected activity, regardless of whether the law obliged Hagen to make such a report. For example, in *Taimoorazy v. Bloomington Anesthesiology Serv., Ltd.*, 122 F. Supp. 2d 967, 975 (C.D. Ill. 2000), a plaintiff anesthesiologist "claim[ed] that he was discharged from his employment because he reported quality of care issues concerning [his medical partners] to the administration at [a hospital] instead of handling those issues discreetly within [his medical partnership]." In particular, the plaintiff complained to the hospital

where he worked that some of his colleagues were falling asleep or leaving the room during medical procedures involving unconscious patients. *Id.* The court held that the plaintiff could maintain a claim for wrongful discharge. *Id.* at 976. In allowing the plaintiff's claim to proceed, the court recognized that

> this type of allegation is clearly related to the fundamental public policy favoring the effective protection of the lives of citizens. This is particularly so in situations like those involved in this case, where the physician's duties arise from instances *where the patients are unconscious at the time of the alleged wrongdoing and are especially vulnerable to risk of harm or death resulting from neglect by the attending anesthesiologist.*

*Id.* at 975 (emphasis added). Thus, the court held that "a reasonable jury could conclude that [the plaintiff's] termination was motivated by a desire to punish him for airing [his partners'] dirty laundry, so to speak, to the hospital administration instead of handling it quietly among the members of the group." *Id.* at 975-76. The court held so without relying on, or even referencing, any statute requiring the plaintiff to report his colleagues' misconduct.

The circumstances in *Taimoorazy* are strikingly similar to this case. While *Taimoorazy* involved a doctor complaining about other doctors, rather than nurses, both the plaintiff in *Taimoorazy* and Hagen reported (or threatened to report) to a hospital medical malpractice committed against vulnerable patients. And both were allegedly fired for going to (or threatening to go to) a hospital with their reports, rather than to any board of medicine. The court's holding in *Taimoorazy* suggests that a doctor's decision to report malpractice enforces the "public policy favoring the effective protection of the lives of citizens," which, in *Taimoorazy*, was independent of any statutory reporting obligation. *Id.* at 975. Thus, under *Taimoorazy*, it is irrelevant that Hagen had no statutory obligation to report nurses or to report to a hospital; the fact

that he threatened to inform a hospital of malpractice committed against vulnerable patients was sufficient to invoke public policy protections.

Similarly, in *Shores v. Senior Manor Nursing Center, Inc.*, 518 N.E.2d 471, 474 (Ill. Ct. App. 1988), the Illinois Appellate Court noted that "[Illinois courts] have held that even when there is no statutory duty to report an apparent violation of the law, a person states a cause of action for retaliatory discharge by alleging he was discharged for reporting the apparent violation." In *Shores*, a plaintiff nurse claimed that she was fired from a nursing home "for complying with her statutory duty to report abuse and neglect" of nursing home residents. *Id.* at 474. The plaintiff reported alleged neglect to the nursing home's administrator, but not to the Department of Public Health (the Department), though Illinois law required her to report to both. *Id.* at 472, 475. In its defense, the nursing home argued that Illinois's

> Nursing Home Care Reform Act expressly prohibits the discharge of an employee who reports abuse or neglect to the Department, but does not expressly prohibit the discharge of an employee who reports only to the facility administrator, and that consequently the legislature intended to recognize a cause of action for retaliatory discharge for employees who report to the Department but not for employees who report only to the facility administrator.

*Id.* at 474. The court rejected the nursing home's argument, noting that, while the Nursing Care Reform Act only expressly prohibited firing a nurse who reported to the Department, the Act still "impose[d] a duty on employees to report abuse and neglect to not only the Department, *but also to the facility administrator*." *Id.* at 475. The court reasoned that "[t]he protection of residents . . . often may be better served if a report is first made to the administrator who likely can more quickly remedy the situation than can the Department." *Id.* "Under the [nursing home's] argument . . . a nursing home would have an incentive to immediately discharge employees who have reported abuse

and neglect to the administrator but have not yet had the opportunity to notify the Department" despite the fact that, "in many instances, an employee would have good reason to report abuse or neglect first to the administrator." *Id.* at 475-76. Given that the plaintiff had a duty to report to the administrator and the Department, the court concluded that

> [i]f a person under no duty to report violations of the law possesses a cause of action for retaliatory discharge when he is discharged for reporting a violation, surely a person who does have such a duty [like the plaintiff] must also possess a cause of action when discharged in retaliation for complying with this duty.

*Id.* at 474.

*Shores* illustrates two points applicable to this case. First, reporting patient neglect may be protected by public policy "even when there is no statutory duty to report an apparent violation of the law." *Id.* at 474; *see also Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 880 (Ill. 1981) (holding that public policy protects employees who report crime even when they have no obligation to do so); *Johnson v. World Color Press, Inc.*, 498 N.E.2d 575, 580 (Ill. Ct. App. 1986) ("Public policy favors employees attempting to ensure management's compliance with the requirements of the law and public policy."); *cf. Young v. Ferrellgas, L.P.*, 21 P.3d 334, 337 (Wash. Ct. App. 2001) (finding that an employee stated a wrongful discharge claim based, in part, on his claim that he was fired for reporting his employer's safety regulation violations, even though the employee cited no statutory duty to report). Thus, as was the case in *Taimoorazy*, the limits on Hagen's statutory duty to report malpractice may be irrelevant. Second, even where a statute explicitly protects reports made to one entity but not another, a state's public policy may still protect reports made to both entities if those reports serve to benefit medical patients. Admittedly, the plaintiff in *Shores* had a statutory duty to report to both her facility administrator and

the Department, whereas Hagen only had a duty to report to the Board of Medicine. But like the plaintiff in *Shores*, Hagen may have had "good reason to report abuse or neglect first to the [hospital]"—for instance, reporting to the hospital first may have been faster or more likely to affect a change in Maria Maedas's care. Thus, public policy protections may attach to Hagen's threatened, extra-statutory reporting.

The Siouxland Defendants argue in their Reply brief that the standards in Iowa's licensing laws do not "relate in any way to the conduct at issue in this case except at the very highest levels of generality," and therefore these laws cannot form the basis for a wrongful discharge claim (docket no. 133, at 1-2). As is discussed below, a number of cases support this argument. But other cases suggest that licensing statutes that broadly prescribe the "minimum standards" of competency for medical licensees *can* support a wrongful discharge claim. For instance, in *Deerman v. Beverly California Corp.*, 518 S.E.2d 804, 805 (N.C. Ct. App. 1999), a nurse brought a wrongful discharge claim against a nursing center after the center fired her for advising one of her patient's families that they should switch physicians because the current physician was not providing appropriate treatment. To support her claim that her termination violated public policy, the nurse relied on North Carolina's Nursing Practice Act (NPA), which sets forth the "minimum standards of nursing care" in terms similar to those in Iowa's licensing statutes. *Id.* at 807. For example, the NPA states "that mandatory licensure of all who engage in the practice of nursing is *necessary to ensure minimum standards of competency and to provide the public safe nursing care*." *Id.* (quoting N.C.G.S. § 90-171.19). The NPA also creates a nursing board, N.C.G.S. § 90-171.21, which is authorized to revoke or suspend any nurse's license who "[e]ngages in conduct that endangers the public health" or "[i]s unfit or incompetent to practice nursing by reason of deliberate or negligent acts or omissions regardless of whether actual injury to the patient is established," among other reasons. *Id.* (quoting N.C.G.S. §§ 90-171.37(4)-

48

(5)).  And "the NPA and regulations of the Board of Nursing describe the practice of nursing as 'assessing,' a patient's health, which entails a 'responsibility' to communicate, 'counsel,' and 'provid[e] accurate . . . guidance to clients [and] their families.'"  *Id.* at 808 (quoting N.C.G.S. § 90-171.20(7); N.C. Admin. Code Tit. 21, r. 36.0224(h)) (internal citations omitted).

Based on these broad standards, the nurse claimed that she was "fulfilling her responsibilities as a practicing nurse" by telling her patient's family to see another physician, and therefore her firing violated public policy.  *Id.*  The court in *Deerman* agreed, holding that "[t]he NPA and attendant administrative regulations . . . evidence a clear public policy in North Carolina to protect public safety and health by maintaining minimum standards of nursing care."  *Id.* at 807.  The court also noted that the NPA's "broad language" did not prevent it from supporting a wrongful discharge claim:  "While the language of the NPA and attendant regulations is broad and frequently expressed with a definitional bias, we are not persuaded by defendant's contention that neither the statutes nor regulations issued thereunder impose any requirements or express any prohibitions relevant to plaintiff's cause herein."  *Id.* at 808 (internal quotation marks omitted).  In short, the court "conclude[d] that the allegations of plaintiff's complaint, taken as true and liberally construed, support her contention that the statements which led to her termination were proffered in fulfillment of her 'teaching and counseling' obligations as a licensed nurse."  *Id.* at 809; *see also Kirk v. Mercy Hosp. Tri-Cnty.*, 851 S.W.2d 617, 622 (Mo. Ct. App. 1993) (holding "that [Missouri's Nursing Practice Act] and regulations thereunder constitutes a clear mandate of law on which a cause of action for wrongful discharge in violation of public policy can be based"); *cf. Aviles v. McKenzie*, No. C-91-2013-DLJ, 1992 WL 715248, at *9-10 (N.D. Cal. Mar. 17, 1992) (medical lab employee stated a wrongful discharge claim after claiming he was fired for reporting to his supervisor "violations of specific

statutes that ensure that medical laboratories engage in safe and accurate practices so that medical patients may be properly diagnosed and treated"); *Thomas v. Med. Ctr. Physicians, P.A.*, 61 P.3d 557, 565 (Idaho 2002) ("Employees are protected under the public policy exception to the at-will doctrine for reporting [to a medical center] the falsification of medical records and the performance of unnecessary operations to bolster a physician's income.").

Still, other jurisdictions apply stricter limits to wrongful discharge claims. In fact, some courts refuse to extend public policy protections to reports of patient abuse if those reports are not made to the correct entity as defined by statute. For example, in *Boyd v. Ohio Dept. of Mental Health*, No. 10AP-906, 2011 WL 2905583, at *1-2 (Ohio Ct. App. July 21, 2011), a plaintiff police officer who worked at a mental health facility claimed that he was wrongfully fired for reporting patient neglect to the facility's supervisor. To support his claim, the officer pointed to two statutes, which he claimed protected him from being fired for his report:

> Pursuant to R.C. 5101.61(B), "[a]ny person having reasonable cause to believe that an adult has suffered abuse, neglect, or exploitation may report, or cause reports to be made of such belief[,] to the [county] department" of job and family services. R.C. 5101.61(E) prohibits an employer from "discharg[ing], demot[ing], transfer[ring], prepar[ing] a negative work performance evaluation, or reduc[ing] benefits, pay, or work privileges, or tak[ing] any other action detrimental to an employee or in any way retaliat[ing] against an employee as a result of the employee's having filed a report under this section."

*Id.* at *8 (alterations in original). "Based on R.C. 5101.61, [the court] conclude[d] [that] the General Assembly has set forth a clear public policy which forbids an employer from discharging an employee for reporting adult abuse, neglect, or exploitation *to the county department of job and family services.*" *Id.* at *9 (emphasis

50

added). But the officer never reported neglect to the county department, only to his supervisor. *Id.*

Because the officer had not reported to the entity required by statute, he argued that the court should "expand the protection afforded by R.C. 5101.61(E) to employees who report adult abuse, neglect, or exploitation to *any person* with the authority to proceed on the issues of neglect and abuse." *Id.* (internal quotations omitted and emphasis added). But the court "decline[d] to broaden the scope of the public policy instituted by the General Assembly," because doing so "would, in effect, create new public policy." *Id.* Thus, because the officer reported neglect to his supervisor, rather than to the court department, public policy did not protect his report. *Id.*; *see also Diberardinis-Mason v. Super Fresh*, 94 F. Supp. 2d 626, 630 (E.D. Pa. 2000) (noting that "Pennsylvania courts have held that *internal* company reports will not support a wrongful discharge claim" (emphasis added)); *Wright v. Shriners Hosp. for Crippled Children*, 589 N.E.2d 1241, 1244-45 (Mass. 1992) (holding that even when statutes impose reporting duties on nurses to report certain types of patient neglect to particular state departments, no public policy protected a nurse's "internal report" criticizing the hospital where she worked).

Other courts refuse to extend public policy protections to employees who report medical misconduct but do not have a statutory duty to do so. For example, in *Diberardinis-Mason v. Super Fresh*, a plaintiff grocery-store pharmacist attempted to invoke public policy protections after she reported other pharmacists' dispensing "irregularities" to her store manager, the store doctor, and a security guard. 94 F. Supp. 2d at 629. The reporting pharmacist relied on Pennsylvania's Pharmacy Act, which provides

> that the Board of Pharmacy may revoke or suspend the license of a pharmacist who has "acted in such a manner as to present an immediate and clear danger to the public health

> or safety" or is "guilty of incompetence, gross negligence or
> other malpractice, or the departure from, or failure to
> conform to, the standards of acceptable and prevailing
> pharmacy practice."

*Id.* (quoting 63 Pa. Stat. Ann. §§ 390-5(a)(11)-(12)). But the court noted that "the alleged sources of public policy are, in fact, *general guidelines* for pharmacists' conduct" and that "[i]t is not at all apparent from the face of the statute that [the pharmacist] had an affirmative duty to report suspicious behavior to the authorities . . . ." *Id.* at 630 (emphasis added). "Thus, while her desire to ferret out illegal activity may be laudable," the court held that the Pharmacy Act "[would] not form the basis of a wrongful discharge claim." *Id.* (footnote omitted); *see also Thompson v. Mem'l Hosp. at Easton, Maryland, Inc.*, 925 F. Supp. 400, 407-08 (D. Md. 1996) (noting that a plaintiff radiation physicist "may have felt morally obligated to report [his hospital's] misadministrations . . . . [But] plaintiff was under no legal duty to act as he did, and therefore any public policy embodied in [the statute imposing a duty to report on the *hospital*] does not protect plaintiff from discharge"); *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 112 (3d Cir. 2003) (noting that "Pennsylvania courts 'have repeatedly rejected claims that a private employer [as opposed to a public employer] violated public policy by firing an employee for whistleblowing, when the employee was under no legal duty to report the acts at issue'" (quoting *Donahue v. Fed. Express Corp.*, 753 A.2d 238, 244 (Pa. Super. 2000))); *Mullins v. Int'l Union of Operating Engineers Local No. 77 AFL--CIO of Washington, D.C.*, 214 F. Supp. 2d 655, 667 (E.D. Va. 2002), *aff'd*, 60 F. App'x 510 (4th Cir. 2003) ("Only if Maryland law compelled Mullins to report drug use would she have a legally cognizable claim under Maryland law for wrongful discharge.").

Finally, a number of courts hold that statutes, and other professional regulations, articulating general standards for medical licensees' conduct are not sufficiently specific

to embody an actionable public policy exception. *See Thompson*, 925 F. Supp. at 409 ("[T]he Court would agree that the overall regulatory scheme of the Maryland Radiation Act indeed places an emphasis on health and safety. However, such a general policy does not constitute a mandate of public policy which is sufficiently clear that it will support plaintiff's claim for wrongful discharge asserted under Maryland law."); *Diberardinis-Mason*, 94 F. Supp. 2d at 630 (Here, the alleged sources of public policy are, in fact, general guidelines for pharmacists' conduct . . . . [I]t will not form the basis of a wrongful discharge claim." (footnote omitted)); *Goodman v. Wesley Med. Ctr., L.L.C.*, 78 P.3d 817, 823 (Kan. 2003) ("Because the [Kansas Nurse Practice Act] does not provide definite or specific rules, regulations, or laws, it cannot be the basis for a retaliatory discharge claim."); *Eusterman v. Nw. Permanente, P.C.*, 129 P.3d 213, 219 (Or. Ct. App. 2006) (holding that statutes providing "that a doctor 'has the duty to use that degree of care, skill and diligence that is used by ordinarily careful physicians' in comparable circumstances [;] . . . [and] that the Board of Medical Examiners may suspend or revoke the license of a doctor for unprofessional or dishonorable conduct, which . . . include[s] conduct or practices that violate ethical standards or that might endanger patients or impair a physician's ability to practice medicine safely and skillfully . . . are too general to create a public duty applicable under these particular circumstances"); *Pierce v. Ortho Pharm. Corp.*, 417 A.2d 505, 514 (N.J. 1980) (holding that "the Hippocratic oath does not contain a clear mandate of public policy" that can support a wrongful discharge claim); *Aiken v. Bus. & Indus. Health Grp., Inc.*, 886 F. Supp. 1565, 1571 (D. Kan. 1995), *aff'd sub nom. Aiken v. Employer Health Servs., Inc.*, 81 F.3d 172 (10th Cir. 1996) (holding that "very general statutory provisions and ethical rules" governing physicians cannot support a claim for wrongful discharge).

Because courts in other jurisdictions are spilt as to how broadly (or narrowly) medical licensing and reporting statutes should be construed to support (or reject) a public policy underlying a wrongful discharge claim, I find that the seventh certification factor weighs in favor of certifying the issue of whether Protected Conduct 3 is a protected activity under Iowa law.

> ii.     *Protected Conduct 4:   A doctor disclosing to a patient's family that the patient was a victim of medical malpractice*

There appear to be very few cases discussing whether Protected Conduct 4—a doctor disclosing to a patient's family that the patient was a victim of medical malpractice—constitutes protected activity.   But two cases in particular suggest that public policy protects a doctor who discloses this information to a patient or the patient's family.   First, in *Deerman*—introduced above—a plaintiff nurse claimed she was wrongfully fired for advising a patient's family that they should "reconsider [their] choice of physicians" because "appropriate treatment had not been provided for [the patient] buy her physician."   518 S.E.2d at 805.   The nurse claimed that North Carolina public policy—embodied in the state's Nursing Practice Act and its attendant regulations—prevented her employer, a nursing center, from firing her for "teaching and counseling" the patient's family to seek another physician.   *Id.* at 807-08.

The nurse relied on a number of broad provisions of "the Nursing Practice Act (NPA), N.C.G.S. §§ 90-171.19 [through] 90-171.47 (1993), and the administrative regulations promulgated thereunder."   *Id.* at 807 (footnote omitted).   Those provisions included the following:

> G.S. § 90-171.19 expressly provides:
>
>> The General Assembly of North Carolina finds that mandatory licensure of all who engage in the practice of nursing is *necessary to ensure minimum standards*

> *of competency and to provide the public safe nursing care.*

(emphasis added). Further, G.S. § 90-171.21 creates a "Board of Nursing" (the Board) charged, *inter alia*, with setting minimum standards for educational programs preparing persons for licensure under the Act, and with licensing qualified applicants, G.S. § 90-171.23(b)(6), (8). In addition, the Board oversees disciplinary action under the NPA, "caus[ing] the prosecution of all persons violating [provisions of the Act]," G.S. § 90-171.23(b)(7), and is authorized to revoke or suspend the license of a registered nurse or applicant who:

> (4) Engages in conduct that endangers the public health;
>
> (5) Is unfit or incompetent to practice nursing by reason of deliberate or negligent acts or omissions regardless of whether actual injury to the patient is established; [or]
>
> . . . .
>
> (7) Has violated any provision of [the NPA].

N.C.G.S. § 90-171.37 (Supp. 1995).

*Id.* The nurse also cited several statutory and regulatory provisions defining the practice of "nursing":

> Plaintiff specifically references G.S. § 90-171.20(4) which defines "Nursing" as:
>
> > a dynamic discipline which includes the caring, counseling, teaching, referring and implementing of prescribed treatment in the prevention and management of illness . . . .
>
> Plaintiff also points to G.S. § 90-171.20(7) which provides:
>
> > The "practice of nursing by a registered nurse" consists of . . .

a. Assessing the patient's physical and mental health, including the patient's reaction to illnesses and treatment regimens; [and]

. . . .

g. Providing teaching and counseling about the patient's health care . . . .

Lastly, plaintiff cites administrative regulations concerning teaching and counseling about the patient's health care. In pertinent portion, these regulations provide:

(h) *Teaching and Counseling clients is the responsibility of the registered nurse*, consistent with G.S. 90-171.20(7) g.

(1) teaching and counseling consist of providing accurate and consistent information, demonstrations and guidance to clients, *their families or significant others* regarding the client's health status and health care for the purpose of:

(A) *increasing knowledge*;

(B) *assisting the client to reach an optimum level of health functioning and participation in self care*; and

(C) promoting the client's ability to make informed decisions.

(2) teaching and counseling include, but are not limited to:

(A) *assessing the client's needs and abilities*;

(B) adapting teaching content and methods to the identified needs and abilities of the client(s);

(C) evaluating effectiveness of teaching and counseling; and

(D) *making referrals to appropriate resources*.

56

> N.C. Admin. Code Tit. 21, r. 36.0224(h) (Dec. 1994)
> (emphasis added).

*Id.* at 807-08 (footnote omitted and emphasis in original). Based on these relatively general provisions, the court in *Deerman* held that "[t]he NPA and attendant administrative regulations thus evidence a clear public policy in North Carolina to protect public safety and health by maintaining minimum standards of nursing care." *Id.* at 807. Because the state "intended by law to require of licensed nurses a measure of 'teaching and counseling,' so as to 'ensure minimum standards of competency and to provide the public safe nursing care,'" the court held that the nurse had a valid claim for wrongful discharge: "We therefore conclude that the allegations of plaintiff's complaint . . . support her contention that the statements [to the patient's family] which led to her termination were proffered in fulfillment of her 'teaching and counseling' obligations as a licensed nurse." *Id.* at 809 (internal citations omitted).

Second, in *Kirk v. Mercy Hospital Tri-County*, a plaintiff nurse sued a hospital for wrongful discharge for firing her, in part, because she "had offered to obtain [a patient's] medical records for [the patient's] family" after the patient died from, what the nurse considered to be, a lack of proper care from the doctor. 851 S.W.2d at 618. No law expressly prohibited the hospital from firing the nurse under these circumstances. *Id.* at 620. But the court held that "[a] finding that no such law or regulation exist[s] does not preclude Plaintiff from asserting her claim for wrongful discharge based on the public policy exception to the employment-at-will doctrine." *Id.* Instead, the court implied public policy protections from Missouri's Nursing Practice Act (NPA) and its attendant regulations, which prescribe general standards of care and competency for nurses:

> That Act and the regulations reveal a clear mandate of
> public policy. The purpose is to train and license a person to
> engage in the safe and competent practice of nursing. By

definition, a professional registered nurse applies her specialized skills to (1) the prevention of illness to her patient, (2) care and counsel of ill persons, (3) administration of prescribed treatment and medication, and (4) assisting in the delivery of a health care plan. Such duties reflect the public policy of this state that registered nurses licensed in this state have an obligation to faithfully serve the best interests of their patients.

*Id.* at 622 (internal citations omitted). Despite the hospital's arguments that the nurse's purported public policy was "vague and ambiguous," the court noted that the nurse "could clearly risk discipline and prosecution by the State Board of Nursing if she ignored improper treatment of a patient under her care." *Id.* Thus, the court held that "the NPA and regulations thereunder sets forth a clear mandate of public policy that [nurses] not 'stay out' of a dying patient's improper treatment." *Id.*

While the plaintiffs in both *Deerman* and *Kirk* were nurses, rather than doctors, both cases held that a medical professional stated a cognizable claim for wrongful discharge based on allegations that they were fired for giving (or offering to give) to a patient (or a patient's family) information that may have revealed that the patients were victims of malpractice. Importantly, neither case involved a statute explicitly requiring nurses to divulge to patients information adverse to their employer's interests. Rather, the courts in *Deerman* and *Kirk* implied public policy protections from general statutes discussing broad standards of care for medical professionals. If this same public policy implication exists under Iowa law, it would suggest that Hagen was protected in his decision to inform the Maedas family that Maria Maedas was the victim of medical malpractice.

Other courts are less willing to recognize a public policy exception for hospital employees who alert patients to potential malpractice claims. For example, in *Strodtbeck v. Lake Hospital System, Inc.*, No. 2010-L-053, 2011 WL 1944187, at *1

58

(Ohio Ct. App. May 13, 2011), a hospital paramedic was fired after he photographed what he believed to be a patient's improper catheterization. The paramedic claimed that he was fired for "bringing [] mistreatment to the patient's attention and documenting the mistreatment," and therefore his firing violated public policy. *Id.* The court disagreed, finding that the paramedic "failed to assert a specific and clear public policy preventing an employer from discharging an employee for alerting a patient to potential mistakes a hospital may have made when providing treatment." *Id.* at *5; *see also Hays v. Beverly Enters., Inc.*, 766 F. Supp. 350, 355 (W.D. Pa. 1991), *aff'd*, 952 F.2d 1392 (3d Cir. 1991) (holding that public policy did not protect a nurse from being fired by a nursing home after the nurse told a patient's family that the nursing home had had problems with providing timely treatment to patients in the past).

Again, it appears that some courts would extend public policy protections to medical employees who alert patients and their families to shortcomings in the patient's care, while other courts would not. This split in authority weighs in favor of certifying the issue of whether Iowa law recognizes Protected Conduct 4.

> iii. **Protected Conduct 5: A doctor consulting with an attorney about whether that doctor had a legal duty to report another doctor's medical malpractice to a state board of medicine**

Like Protected Conduct 3 and 4, other courts are similarly split on whether Protected Conduct 5—an employee consulting an attorney about an issue regarding his or her employer—constitutes protected activity. Some courts recognize strong public policy protections for employees who consult with attorneys. For example, Ohio courts have followed *Thompto*'s lead and have recognized that public policy prohibits employers from firing employees who consult attorneys. In *Chapman v. Adia Services, Inc.*, the Ohio Court of Appeals "found persuasive the reasoning . . . in *Thompto* . . . ." 688 N.E.2d at 610 (citing *Simonelli v. Anderson Concrete Co.*, 650 N.E.2d 488,

491-92 (Ohio Ct. App. 1994) (originally relying on *Thompto*)).  The court in *Chapman* "identif[ied] at least three sources of public policy that encourage employees to consult an attorney about possible claims that would affect the employer's business interests— the Ohio Constitution, the Code of Professional Responsibility ("CPR") as adopted by the Ohio Supreme Court, and common law." *Id.* at 609.

> First, Section 16, Article I of the Ohio Constitution provides: "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law * * *." The framers of the Ohio Constitution inserted that provision, and we believe that they meant what they wrote. A remedy would be illusory if citizens could lose their jobs for seeking it.

> In addition, the Ohio Constitution gave the Ohio Supreme Court the authority to adopt the CPR in 1970. The CPR contains two provisions which help to convince us that encouraging individuals to consult an attorney is a clear public policy in Ohio. EC 1-1 states that "every person in our society should have ready access to the independent professional services of a lawyer of integrity and competence." EC 2-1 states:

>> "The need of members of the public for legal services is met only if they recognize their legal problems, appreciate the importance of seeking legal assistance, and are able to obtain the services of acceptable legal counsel. Hence, important functions of the legal profession are to educate laymen to recognize their legal problems, to facilitate the process of intelligent selection of lawyers, and to assist in making legal services fully available."

> We refuse to engraft upon the CPR the caveat "however, if a claim is against the potential client's employer, the attorney must advise the client that she might lose her livelihood simply for consulting the attorney."

> The third identifiable source of public policy that encourages
> employees to consult an attorney about possible claims that
> would affect their employer's business interests is the
> common law. The United States Supreme Court has
> concluded that, in order for a private citizen to obtain
> redress, the claimant must be able to obtain adequate legal
> representation. [*Riverside v. Rivera*, 477 U.S. 561 (1986)].
> Although the court's focus was on an individual obtaining
> counsel to file claims under the Civil Rights Act, the
> rationale is applicable to all claims. Consulting with an
> attorney is the first step toward gaining access to the courts.

*Id.* The court even recognized that these factors had "exact parallels" to the factors relied on in *Thompto*. *Id.* at 610. Based on these factors, the court in *Chapman* recognized that "Ohio public policy encourages individuals to consult an attorney regarding a possible claim," and also noted "that the public policy would be jeopardized if an employee were dismissed for consulting an attorney." *Id.* at 609-10 (citation omitted); *see also Simonelli*, 650 N.E.2d at 492 ("We find persuasive the *Thompto* court's reasoning, and we conclude that the act of firing an employee for consulting an attorney could serve as the basis for a public policy exception to the common-law employment-at-will doctrine."); *but see Taylor v. Volunteers of Am.*, 795 N.E.2d 716, 718 (Ohio Ct. App. 2003) (recognizing that Ohio public policy protects an employee's right to *consult* with an attorney, but not an employee's right to *file suit* against his or her employer). Ohio is not alone in recognizing the importance of protecting employees who consult attorneys; other jurisdictions have similarly extended protection to employees who contact lawyers. *See Fulford v. Burndy Corp.*, 623 F. Supp. 78, 81 (D.N.H. 1985) (holding that an employee could maintain a claim for breach of employment contract against his employer who fired him after he hired an attorney to pursue a tort claim against his supervisor, whose dog bit the employee's son); *Bennett v. Hardy*, 784 P.2d 1258, 1264 (Wash. 1990) ("We conclude therefore

that the alleged employer wrongdoing, unlawful discrimination, together with the reasonableness of the employee's response, the hiring of legal counsel, are sufficient to state a tort claim for wrongful discharge under the public policy exception.").

On the other hand, a number of courts have held that employees have no public policy right to contact an attorney, either because such a right would require employers to retain employees who were acting adversely to the employer, or because an employee's general right to access the courts was not interpreted to restrict private employers. *See Douglas v. Rucci*, No. CV 960153231S, 1998 WL 470588, at *3 (Conn. Super. Ct. July 27, 1998) ("[T]here is no appellate authority recognizing a judicially cognizable public policy regarding the retention of an attorney."); *Porterfield v. Mascari II, Inc.*, 823 A.2d 590, 593, 609 (Md. 2003) (holding it is not "a violation of public policy sufficient to support a wrongful discharge action in Maryland when an employer fires an at-will employee for stating her intent to seek advice from legal counsel before responding to an adverse employment evaluation" because such termination does "not implicate the public good"); *Deiters v. Home Depot U.S.A., Inc.*, 842 F. Supp. 1023, 1029 (M.D. Tenn. 1993) (holding that because "[l]itigation between an employer and employee tends to result in an acrimonious and noncooperative working relationship," Tennessee recognizes no public policy right to sue one's employer); *Kavanagh v. KLM Royal Dutch Airlines*, 566 F. Supp. 242, 244 (N.D. Ill. 1983) ("Plaintiff cannot stake his claim on the allegation that KLM by discharging him violated general public policies in favor of the right to counsel and the right to free access to the courts."); *Beam v. IPCO Corp.*, 838 F.2d 242, 247 (7th Cir. 1988) ("[W]e do not believe that any of the provisions identified by Beam reflect a clear and compelling policy against an employer's firing an employee for consulting an attorney about an employment dispute."); *Whitman v. Schlumberger Ltd.*, 793 F. Supp. 228, 232 (N.D. Cal. 1992) ("Plaintiff has cited numerous constitutional and statutory

provisions, but none serve to clearly identify and support a public policy favoring free access to the courts without fear of reaction by the defendant."); *Groce v. Foster*, 880 P.2d 902, 911-12 (Okla. 1994) (collecting cases that have held "that discharge of an at-will employee for bringing or threatening to bring a lawsuit against the employer did not violate any public policy"); *Milazzo v. O'Connell*, 925 F. Supp. 1331, 1345 (N.D. Ill. 1996), *aff'd*, 108 F.3d 129 (7th Cir. 1997) (dismissing an employee's wrongful discharge claim based on the employee consulting an attorney because "there is no basis in the complaint from which to infer that Milazzo's consultation with an attorney involved any public concerns.").

Again, this split in authority weighs in favor of certifying the issue of whether Iowa law recognizes Protected Conduct 5.

### b. Question 2: Whether contractual employees can bring claims for wrongful discharge in violation of public policy

There is also a split in authorities as to whether contractual employees can sue for wrongful discharge in violation of public policy. A number of jurisdictions allow both at-will and contractual employees to sue their employers for wrongful discharge in violation of public policy. Most recently, in *Keveney v. Missouri Military Academy*, 304 S.W.3d 98, 102 (Mo. 2010), the Missouri Supreme Court held that "[t]here are at least three compelling reasons for allowing contract employees to pursue an action for wrongful discharge in violation of public policy." "First, limiting the wrongful discharge cause of action to at-will employees fails to recognize the distinct underlying purpose of the wrongful discharge cause of action." *Id.* An employer's decision to wrongfully fire an employee is "wrong" because it violates a state's "public policy expressed in applicable constitutional, statutory or regulatory provisions," not because it violates any terms in an employment contract. *Id.* And courts that limit wrongful discharge claims to at-will employees often rest on the "incorrect assumption that the

constitutional, statutory or regulatory interests at issue can be limited through private contracts," even though "[a]n employer's obligation to refrain from [wrongfully] discharging an employee . . . does not depend on the terms and conditions of the employment contract." *Id.*

Second, the court in *Kiveney* noted that "[w]hen an employer's actions violate not only the employment contract but also clear and substantial public policy, the 'employer is liable for two breaches, one in contract and one in tort.'" 304 S.W.3d at 103 (quoting *Retherford v. AT & T Communications of Mt. States, Inc.*, 844 P.2d 949, 960 (Utah 1992)). While "a breach of contract action satisfies private contractual interests[,] [it] fails to vindicate the violated public interest or to provide a deterrent against future violations." 304 S.W.3d at 103. Thus, in order to vindicate an employee's tort-based interests, an employee's contract should not prevent him or her from bringing suit in tort. *Id.* And the Illinois Supreme Court has similarly noted that an employee's contract and tort remedies may give rise to different damages:

> [T]here is no reason to afford a tort remedy to at-will employees but to limit union members to contractual remedies under their collective-bargaining agreements. Generally, if a union employee's grievance goes to arbitration and the arbitrator does not find just cause for the employee's discharge, the remedy will be simply job reinstatement and full back pay. If there is no possibility that an employer can be liable in punitive damages, not only has the employee been afforded an incomplete remedy, but there is no available sanction against a violator of an important public policy of this State. It would be unreasonable to immunize from punitive damages an employer who unjustly discharges a union employee, while allowing the imposition of punitive damages against an employer who unfairly terminates a nonunion employee. The public policy against retaliatory discharges applies with equal force in both situations.

*Midgett v. Sackett-Chicago, Inc.*, 473 N.E.2d 1280, 1283-84 (Ill. 1984) (internal citations omitted).

Finally, the court in *Kivieny* held that "[a]llowing an at-will employee to pursue an action for wrongful discharge 'illogically grants at will employees greater protection from these tortious terminations due to an erroneous presumption that the contractual employee does not need such protection.'" *Id.* (quoting *Smith v. Bates Technical Coll.*, 991 P.2d 1135, 1141 (Wash. 2000)); *see also Ewing v. Koppers Co., Inc.*, 537 A.2d 1173, 1175 (Md. 1988) (holding that "it would be illogical to deny [a contractual employee] access to the courts equal to that afforded [an] at will employee"). While a contractual employee may have more employment protections than an at-will employee, they are not necessarily protected from being fired in violation of public policy. For example, the Washington Supreme Court has noted that contractual employees may have contractual remedies, but "these remedies do not protect an employee who is fired not only 'for cause' but also in violation of public policy." *Smith*, 991 P.2d at 1141.

In addition to the Missouri, Illinois, and Washington supreme courts, a number of other courts have extended the wrongful discharge tort to contractual employees. For example, the California Supreme Court has noted that allowing contractual employees to sue for wrongful discharge serves the tort's purpose by protecting the *public's* interests, not just the employee's:

> What is vindicated through the [wrongful discharge in violation of public policy] cause of action is not the terms or promises arising out of the particular employment relationship involved, but rather the public interest in not permitting employers to impose as a condition of employment a requirement that an employee act in a manner contrary to fundamental public policy.

*Foley v. Interactive Data Corp.*, 765 P.2d 373, 377 n.7 (Cal. 1988). Similarly, the Maryland Supreme Court has recognized that the State, rather than just the employee,

has an interest in recognizing "the availability of this cause of action to all employees, at will and contractual," because such recognition "will foster the State's interest in deterring particularly reprehensible conduct." *Ewing*, 537 A.2d at 1175. And the Washington Court of Appeals has held that, because the wrongful discharge tort partially protects the public's interest, the tort cannot be limited to at-will employees:

> The right to be free from wrongful termination is independent of any contractual agreement between [an employee and employer]. Because this is true, we reject the argument that the tort cause of action for wrongful discharge in contravention of public policy, established in *Thompson v. St. Regis Paper Co.*, applies only to at-will employees.
>
> . . . .
>
> The wrongful discharge tort emerged as an exception to the at-will employment doctrine, and arguably was aimed at providing added job security, similar to that already held by for-cause employees. Although the cause of action continues to be analytically framed as an exception to the at-will employment doctrine, Washington case law does not explicitly declare that the tort is available only to at-will employees. We focus on the public policy aspect of the wrongful discharge tort in holding that the cause of action does not depend on the contractual status of the employment relationship. We agree with the conclusion that "[a] primary purpose behind giving employees a right to sue for discharges in violation of public policy is to protect the vital state interests embodied in such policies."
>
> . . . .
>
> Providing at-will employees a greater remedy than that available to for-cause employees for an employer's violation of public policy is illogical and based on an unjustified distinction.
>
> We hold that the tort of wrongful discharge in contravention of public policy is available to for-cause employees like

> Wilson. Therefore, we must next consider whether Wilson
> may bring the common law cause of action notwithstanding
> the existence of other remedies available to him.

*Wilson v. City of Monroe*, 943 P.2d 1134, 1137-38 (Wash. Ct. App. 1997) (footnotes omitted); *id.* at 1140 (holding that an employee's right to bring suit for wrongful discharge in violation of public policy "is nonnegotiable, and adjudication of a claim based on the right does not depend on interpretation or application of [an employment agreement]"); *see also Rackley v. Fairview Care Centers, Inc.*, 23 P.3d 1022, 1027 (Utah 2001) (noting that the public policies vindicated in a wrongful discharge claim are "beyond the reach of contract, thereby constituting a bar to discharge that parties cannot modify, even when freely willing and of equal bargaining power" (quoting *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 405 (Utah 1998) (further quotations omitted))); *Smith*, 991 P.2d at 1142 ("[W]e now find it unnecessary to distinguish between at-will and for cause employees as the [wrongful discharge] tort is equally applicable to all."); *McArn v. Allied Bruce-Terminix Co., Inc.*, 626 So. 2d 603, 607 (Miss. 1993) (holding that public policy exceptions to at-will employment "apply even where there is 'privately made law' governing the employment relationship").

Still, a number of other jurisdictions limit claims for wrongful discharge in violation of public policy to at-will employees. Most of these jurisdictions simply rely on blanket statements that public policy exceptions only apply to at-will employees, without examining the rationale behind claims for wrongful discharge in violation of public policy. *See, e.g.*, *Oklahoma Dep't of Pub. Safety v. McCrady*, 176 P.3d 1194, 1198 (Okla. 2007) ("[A] classified employee . . . may not bring a tort claim for wrongful discharge based on the public-policy exception to the employment-at-will rule."); *Forgue v. Bd. of Educ. of Town of Ledyard*, No. CV030566463, 2003 WL 24163362, at *5 (Conn. Super. Ct. Mar. 3, 2003) (holding that the public policy "exception did not contemplate tenured teachers protected by a collective bargaining

agreement"); *Haynes v. Zoological Soc. of Cincinnati*, 652 N.E.2d 948, 951 (Neb. 1995) (holding that an "employee must have been an employee at will" in order to bring a wrongful discharge claim based on public policy); *Darlington v. Gen. Elec.*, 504 A.2d 306, 318 (Pa. Super. 1986), *overruled on other grounds by Krajsa v. Keypunch, Inc.*, 622 A.2d 355, 360 (Pa. Super. 1993) ("Pennsylvania courts recognize this [wrongful discharge] cause of action only when the employment is at-will."). But the rule these jurisdictions follow is likely a byproduct of the fact that "[t]he wrongful discharge tort emerged as an exception to the at-will employment doctrine," rather than any inherent difference between at-will and contractual employees. *Wilson*, 943 P.2d at 1137; *see also Reninger v. Dep't of Corr.*, 901 P.2d 325, 331 (Wash. Ct. App. 1995), *aff'd sub nom. Reninger v. State Dep't of Corr.*, 951 P.2d 782 (Wash. 1998) ("The tort of wrongful discharge developed as a narrow exception to the terminable-at-will doctrine to prevent private employers from contravening clear mandates of public policy. It is generally, if not exclusively, applied to employment at will situations." (internal citations and quotation marks omitted)).

While I find more persuasive the cases holding that both contractual and at-will employees can sue for wrongful discharge, I recognize that other jurisdictions are split on the issue. Because other jurisdictions are split, I find that the seventh factor in the certification analysis weighs in favor of certification.

> **c.     Question 3:  Whether the lack of an "overriding business justification" is an independent element of a claim for wrongful discharge in violation of public policy**

Finally, the law in other jurisdictions matters less in resolving Question 3 because other jurisdictions apply very different elements to wrongful discharge claims. Question 3 deals with how *Iowa's* wrongful discharge elements should be applied, even if those elements differ from those used by courts in other states. Thus, whether other jurisdictions are split on the application of the overriding business justification element

seems less important given that many other states do not recognize such an element. Question 3 relates to how Iowa juries should be instructed under Iowa law.

Still, I note that other jurisdictions are split in the sense that they apply varying elements to wrongful discharge claims. Some jurisdictions recognize the overriding business justification element. *See Swears v. R.M. Roach & Sons, Inc.*, 696 S.E.2d 1, 6 (W. Va. 2010); *Gardner v. Loomis Armoured, Inc.*, 913 P.2d 377, 382 (Wash. 1996); *Collins v. Rizkana*, 652 N.E.2d 653, 657 (Ohio 1995); *see also Cisco v. United Parcel Servs., Inc.*, 476 A.2d 1340, 1343 (Pa. Super. 1984) (noting that "an employer may discharge an employee if he has separate, plausible and legitimate reasons for doing so"). Other jurisdictions do not recognize the overriding business justification element. *See Bonidy v. Vail Valley Ctr. for Aesthetic Dentistry, P.C.*, 232 P.3d 277, 281 (Colo. Ct. App. 2010); *Reynolds v. Advance Alarms, Inc.*, 232 P.3d 907, 909 (Okla. 2009); *King v. Marriott Inter. Inc.*, 866 A.2d 895, 901 (Md. Ct. App. 2005); *Goggins v. Rogers Mem'l Hosp. Inc.*, 683 N.W.2d 510, 514 (Wisc. Ct. App. 2004); *LoPresti v. Rutland Reg'l Health Servs., Inc.*, 865 A.2d 1102, 1112-13 (Vt. 2004); *Dillard Dep't Stores, Inc. v. Beckwith*, 989 P.2d 882, 885 (Nev. 1999); *Short v. Sch. Admin. Unit No. 16*, 612 A.2d 364, 370 (N.H. 1992); *Clifford v. Cactus Drilling Corp.*, 353 N.W.2d 469, 474 (Mich. 1984). Still other jurisdictions apply a burden shifting framework to wrongful discharge claims. *See Li Li v. Canberra Indus.*, 39 A.3d 789, 793-94 (Conn. Ct. App. 2012); *Loggins v. Kaiser Permanente Int'l*, 60 Cal. Rptr. 3d 45, 50-51 (Ct. App. 2007); *Dahl v. Combined Ins. Co.*, 621 N.W.2d 163, 168 (S.D. 2001); *Phipps v. Clark Oil & Ref. Corp.*, 396 N.W.2d 588, 592 (Minn. Ct. App. 1986), *aff'd*, 408 N.W.2d 569 (Minn. 1987).

Because Question 3 relates to Iowa's application of its existing law, rather than the potential adoption of new law, I find that the final certification factor is of less importance in my decision to certify Question 3 to the Iowa Supreme Court. For

Question 3, the lack of clarity under Iowa law is alone sufficient to justify certification. *See* Part II.B.1.c (noting that Question 3 is unsettled under Iowa law).

### III.    CONCLUSION

Having considered the authorizations to do so under both this district's local rules and an Iowa authorizing statute, and the various pertinent factors regarding the propriety of certification, I find that most of the factors weigh in favor of certification. Given the number of unsettled questions of Iowa law, their importance to a more thorough understanding of public policy exceptions in Iowa employment law for both employers and employees, the likelihood that these questions will recur, the special expertise of the Iowa Supreme Court Justices, the simple truth that seven brilliant minds with often differing perspectives are far superior to one modest one, and at bottom, the fact that it is far better for the Iowa Supreme Court to decide what Iowa law is than for federal judges to engage in educated guessing, I find that certification is far and away the best path towards a just result in this case and in future cases.  Therefore, I find certification is appropriate in this case, even post-judgment.  I hereby certify the questions stated earlier to the Iowa Supreme Court.  The Clerk shall forward this order to the Iowa Supreme Court under official seal as required under Iowa Code § 684A.4.

**IT IS SO ORDERED**.

**DATED** this 29th day of August, 2013.

_Mark W. Bennett_
_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA