**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

EDWARD P. HAGEN, D.O.,

                Plaintiff,

vs.

SIOUXLAND OBSTETRICS &
GYNECOLOGY, P.C., an IOWA
CORPORATION, PAUL J. EASTMAN,
M.D., TAUHNI T. HUNT, M.D., and
ANGELA J. ALDRICH, M.D.,

                Defendants.

No. C 11-4047-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING PARTIES'
POST-TRIAL MOTIONS**

---

**TABLE OF CONTENTS**

I.     **INTRODUCTION**............................................................................ 3
    A.    *Factual Background* ............................................................. 3
        1.    *The parties and their relation to each other*........................ 4
        2.    *The facts surrounding Hagen's firing*................................ 5
    B.    *Procedural Background* ......................................................... 8

II.    **LEGAL ANALYSIS** ................................................................... 11
    A.    *Defendants' Motion for Judgment as a Matter of Law* ................... 11
        1.    *Standard for granting judgment as a matter of law* ............... 11
        2.    *The challenged public policy exceptions* ........................... 12
            a.    *Whether Iowa law recognizes Protected
               Conduct 3, 4, or 5 as protected activity that
               can support a claim for wrongful discharge in
               violation of Iowa public policy* ............................. 13
            b.    *Whether the trial evidence was sufficient to
               support the jury's findings that Hagen was
               fired for engaging in Protected Conduct 3 or
               5*................................................................. 13

     i.  *Sufficiency of evidence for Protected*
       *Conduct 3* ................................................. 14
     ii.  *Sufficiency of evidence for Protected*
       *Conduct 5* ................................................. 16
   3. *Hagen's status as an at-will vs. contractual employee* ............ 18
  B. *Defendants' Motion for a New Trial* .......................... 19
   1. *Standard for granting a new trial* ..................................... 19
   2. *The challenged jury instructions* ...................................... 21
    a. *An overriding business justification* ......................... 22
    b. *Calculating past lost earnings based on when*
     *Hagen would have "voluntarily" left*
     *Siouxland* ......................................................... 28
   3. *Whether the verdict is against the great weight of the*
    *evidence* .................................................................. 30
   4. *Defendants' evidentiary objections* ................................... 32
  C. *Plaintiff's Motion for Judgment as a Matter of Law,*
   *Motion for Judgment, and Motion to Alter or Amend*
   *Judgment* .................................................................. 34
   1. *Plaintiff's request for an additur* ..................................... 34
    a. *Is Hagen's additur request procedurally*
     *barred?* ............................................................ 35
    b. *Would Hagen's proposed additur be*
     *unconstitutional?* ............................................... 36
   2. *Plaintiff's request for pre- and post-judgment*
    *interest* ................................................................... 38
III. *CONCLUSION* ......................................................... 41

In this memorandum opinion, I must resolve a number of post-trial motions from both Plaintiff and Defendants following a jury trial in which a jury found Defendants liable for wrongfully discharging Plaintiff in violation of Iowa public policy. On May 22, 2013, Defendants filed a post-trial motion requesting judgment as a matter of law, or alternatively a new trial (docket no. 119). On May 24, 2013, Plaintiff filed a post-trial motion requesting that I award Plaintiff additional damages as well as pre- and post-judgment interest on the damages the jury awarded (docket no. 121). On July 5,

2013, both Plaintiff and Defendants filed supplemental briefs, at my request, covering a number of issues discussed below (docket nos. 134 and 137). The parties presented oral arguments on their motions on August 23, 2013.

After hearing from the parties, I decided to stay this case while I certified to the Iowa Supreme Court three questions related to the parties' post-trial motions. On May 9, 2014, the Iowa Supreme Court declined to answer any of the certified questions. Now that the Iowa Supreme Court has returned the certified questions to me, I lift the stay and I address the parties' motions. For the reasons discussed below, Defendants' motion for judgment as a matter of law and motion for a new trial are denied. Plaintiff's motion for an additur is denied and Plaintiff's motion for pre- and post-judgment interest is granted.

## I. INTRODUCTION

Unless I note otherwise, the following facts are presented "in the light most favorable to the jury verdict, assuming all conflicts in the evidence were resolved in [the Plaintiff's] favor, and giving Plaintiff[] the benefit of all reasonable inferences that may be drawn from the evidence . . . ." *Craig Outdoor Adver., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1013 (8th Cir. 2008).

### A. Factual Background

In this case, Dr. Edward Hagen (Hagen) sued his former employer, Siouxland Obstetrics & Gynecology, P.C. (Siouxland), and his former partners, Dr. Paul Eastman (Eastman), Dr. Tauhni Hunt (Hunt), and Dr. Angela Aldrich (Aldrich) (collectively "the Siouxland Defendants") for wrongful discharge in violation of Iowa public policy. In particular, Hagen claims that the Siouxland Defendants ousted him from their medical practice because Hagen reported, or threatened to report, to St. Luke's hospital and a patient, that Eastman and two nurses committed medical malpractice causing an unborn baby's death. Hagen also claims that the Siouxland Defendants ousted him for

3

consulting with attorneys about whether Eastman and the nurses had committed malpractice and whether Hagen should report Eastman to the Iowa Board of Medicine or St. Luke's.

### 1. *The parties and their relation to each other*

Siouxland, an Iowa professional corporation, is located in Sioux City, Iowa, and provides obstetric and gynecologic services to patients. Siouxland expanded into the area of cosmetic surgery and related services, including the development of The Rejuvenation Centre, which provided client services such as Botox treatment, Juviderm treatment, hair removal, liposuction, massage therapy, and weight loss consultation. Siouxland was formed and organized by three physicians, including Hagen's father, in 1975. At the time of Hagen's firing, in November 2009, the doctors with an interest in Siouxland were Hagen, Eastman, Hunt, and Aldrich.

Hagen is a doctor of obstetrics and gynecology, presently licensed to practice medicine in Iowa, South Dakota, and Wisconsin. On January 1, 1993, Hagen entered into an employment agreement with Siouxland. Hagen has been an equity owner, president, and director at Siouxland. At the time he was fired, Hagen was the president of Siouxland.

When the doctors joined Siouxland, they agreed not to "engage in the practice of medicine except as an employee of the CORPORATION unless otherwise authorized by the Board of Directors." The employment agreement states all income generated "for services as a doctor and all activities relating thereto, such as lecturing, writing articles and consulting work, shall belong to the CORPORATION . . . ." A doctor could be terminated by delivering a written notice of cancellation at least 90 days prior to the effective date of cancellation or "discharged by the CORPORATION in the event of embezzlement or other theft; willful contravention of professional ethics; substantial

and willful violation of any other terms or conditions of this employment agreement, all subject to determination by the Board of Directors of the CORPORATION."

## 2. The facts surrounding Hagen's firing

Hagen's claims in this case arise out of an incident that began at St. Luke's hospital in Sioux City, Iowa, on Thursday, November 5, 2009. On that day, Selvin and Maria Maeda, who were husband and wife, were at St. Luke's because Maria Maeda was dealing with complications related to her pregnancy. She was 34 weeks pregnant and suffering from infections related to a prior liver transplant. Eastman was Maria's consulting physician and had met her during a prior examination, but he was not at the hospital with Maria on the 5th. In fact, Maria had been admitted to the hospital at around 1:00 pm and Eastman had never gone to St. Luke's to check on her. Hagen was on call that evening to cover patients at St. Luke's. At around 4:30 pm, Eastman called Hagen to ask whether Hagen was on call and to explain Maria's complications. Eastman explained to Hagen that he thought Maria was at a hospital in Omaha, and had only recently learned that she was still at St. Luke's. Eastman told Hagen that Maria was in labor and going into intensive care based on her complications.

After speaking with Eastman for about 30 minutes, Hagen went to St. Luke's. Hagen arrived at the hospital at 5:30 pm. He immediately went to see Maria, who was under general anesthesia, and performed an ultrasound, which confirmed that her baby was dead. Hagen began asking two labor and delivery nurses—Peggy Mace and Holley Duerksen—how long the baby had been dead. They could not tell him. Hagen became very upset and asked the nurses: "How the fuck can this happen at St. Luke's that [nurses] watch a baby die on the monitor, suffocate, and do nothing?" Hagen went on to say to the nurses: "You killed this baby. You watched this baby die on the monitor. I mean, you guys did nothing." Hagen noted that the nurses had missed the fact that

5

Maria's baby was dead because they had mistaken Maria's elevated heart rate for her baby's and presumed the baby was still alive.

After realizing that Maria's baby was dead, Hagen determined that he needed to perform a C-section to deliver the dead baby. Before doing so, Hagen called Eastman on the telephone. At trial, Hagen testified that the conversation went as follows: "And I told [Eastman] we got a problem here. We've got a mother here that's had no care. The nurses screwed up. You didn't come see her, and this baby is dead, and now I've gotta do a C-section on a mother and deliver a dead baby." Eastman offered to help do the C-section, but Hagen declined, telling Eastman: "I don't need help doing a C-section. I can do that. I needed your help three hours earlier, but I don't need it now."

Before performing the C-section, Hagen spoke with Selvin, Maria's husband. They talked for over an hour in the doctor's lounge. During their conversation, Hagen told Selvin that "things could have been done better" and that Hagen thought "the nurses missed something here." Hagen then performed the surgery to remove Maria's baby.

The next day, Hagen went to one of the hospital's administrators, Dr. Hildebrand (Hildebrand), to report himself for using the F-word to the nurses, and to report the nurses and Eastman for their failure to properly care for Maria. After making these reports to the hospital, Hagen consulted with three different attorneys about various issues, including how Hagen should document what had happened the night before and what Hagen should do personally in response to the incident. During one of these conversations, one of the attorneys reminded Hagen that he had a duty to report malpractice to the Iowa state medical board. Later that day, Hagen told Eastman that "these attorneys are telling me I have to report you to the Iowa state medical board." Hagen also had a conversation with Hunt and Aldrich in which he told them that Hagen had reported the nurses and Eastman to the hospital, and that Hagen had

spoken with attorneys who told him that he might have to turn Eastman in to the medical board.

Hagen spent the next two days, Saturday and Sunday, in Lincoln, Nebraska, with his children and then returned to Sioux City. The following Monday night, November 9, 2009, Hagen received a 10-day suspension from St. Luke's hospital. On Tuesday, Hagen was noticeably upset at work because of how the hospital handled the suspension, punishing Hagen without also punishing the nurses or Eastman. Hagen told his medical partners that he was going to tell the patient to sue the hospital, and that he was going to tell the patient to get a lawyer and investigate what happened. Then, on Wednesday night, Hagen called Maria Maeda at the hospital and told her: "You were mistreated, this is malpractice, the nurses missed the boat, Dr. Eastman missed the boat, and I think you should get an attorney." Finally, on Thursday, Hagen informed his partners that he had spoken with Maria. That was the last day Hagen worked at Siouxland.

The following Monday, while Hagen was out of town at his cabin in Wisconsin, Hagen received a call from Siouxland's corporate attorney, who told Hagen he needed to be in a meeting at 7:00 pm because he was being fired. Hagen drove back to Sioux City to make the meeting, which was held at Siouxland's attorney's law firm. At the meeting, Siouxland's attorney told Hagen that the partners at Siouxland had decided to fire him. Following his firing, Hagen sued the Siouxland Defendants, claiming a number of causes of action including wrongful discharge in violation of Iowa's public policy.

I will discuss additional facts as they become relevant to analyzing the parties' post-trial motions below.

## B.    Procedural Background

On April 19, 2013, the parties went to trial on Count IV of Hagen's Complaint: Retaliatory Discharge in Violation of Public Policy.   The trial lasted eight days and occurred between April 19, 2013, and May 1, 2013.

At the trial's conclusion, the jury found the Siouxland Defendants liable for wrongfully discharging Hagen in violation of Iowa's public policy.   The verdict form provided five options of protected conduct that the jury could find to support their conclusion that the Siouxland Defendants wrongfully discharged Hagen.   The verdict form read, in pertinent part:

> *If you found in favor of Dr. Hagen in **Step 1**, which one or more of the following kinds of conduct do you find were determining factor(s) in Siouxland's decision to terminate Dr. Hagen?*
>
> ____ Dr. Hagen reporting, stating an intention to report, or stating that he might report to the Iowa Board of Medicine conduct of Dr. Eastman that Dr. Hagen believed may have involved wrongful acts, omissions, negligence, or malpractice [Protected Conduct 1]
>
> ____ Dr. Hagen reporting, stating an intention to report, or stating that he might report to a hospital conduct of Dr. Eastman that Dr. Hagen believed may have involved wrongful acts, omissions, negligence, or malpractice [Protected Conduct 2]
>
> __X__ Dr. Hagen reporting, stating an intention to report, or stating that he might report to a hospital conduct of nurses that Dr. Hagen believed may have involved wrongful acts or omissions [Protected Conduct 3]
>
> __X__ Dr. Hagen disclosing to a patient or a patient's family that the patient may have been the victim of negligent care or malpractice [Protected Conduct 4]

    __X__  Dr. Hagen consulting with an attorney, stating an intention to consult with an attorney, or stating that he might consult with an attorney about whether Dr. Eastman or nurses had committed wrongful acts or omissions that Dr. Hagen should report to the Iowa Board of Medicine or a hospital [Protected Conduct 5]

(Docket no. 113). The jury marked the last three options—*i.e.*, Protected Conduct 3, 4, and 5—in support of the verdict in favor of Hagen.

On the issue of damages, the jury awarded Hagen $1,051,814 for past lost earnings. The jury awarded Hagen no damages for future lost earnings, and it awarded no punitive damages. The Clerk entered judgment for Hagen in the amount of $1,051,814 on May 2, 2013.

Following the jury's verdict, both the Siouxland Defendants and Hagen filed post-trial motions. The Siouxland Defendants move for judgment as a matter of law, or alternatively a new trial. Hagen moves for an additur—including $112,727 in additional damages for past lost earnings, and $4,406,870 in additional damages for future lost earnings—plus pre- and post-judgment interest.

Before ruling on the parties' post-trial motions, I certified to the Iowa Supreme Court three questions, which are central to the parties' arguments here (docket no. 140). *See Hagen v. Siouxland Obstetrics & Gynecology, P.C.*, 964 F. Supp. 2d 951 (N.D. Iowa 2013) (presenting the certified questions for the Iowa Supreme Court to review). I certified the questions because many of the issues in the parties' post-trial motions turn on unresolved questions of Iowa law, and I felt that the Iowa Supreme Court—rather than myself or the Eighth Circuit Court of Appeals—should have the opportunity to decide such questions in the first instance. The certified questions were as follows:

**Question 1**

Does Iowa law recognize any of the following conduct as protected conduct on which a doctor-employee can base a claim for wrongful discharge in violation of Iowa public policy?:

> (a) A doctor reporting, stating an intention to report, or stating that he might report, to a hospital, conduct of nurses that the doctor believed may have involved wrongful acts or omissions;

> (b) A doctor disclosing to a patient or a patient's family that the patient may have been the victim of negligent care or malpractice; or

> (c) A doctor consulting with an attorney, stating an intention to consult with an attorney, or stating that he might consult with an attorney, about whether another doctor or nurses had committed wrongful acts or omissions that the doctor should report to the Iowa Board of Medicine or a hospital.

**Question 2**

Does Iowa law allow a contractual employee to bring a claim for wrongful discharge in violation of Iowa public policy, or is the tort available only to at-will employees?

**Question 3**

Under Iowa law, is an employer's lack of an "overriding business justification" for firing an employee an independent element of a wrongful discharge claim, or is that element implicit in the element requiring that an employee's protected activity be the determining factor in the employer's decision to fire the employee?

On May 9, 2014, the Iowa Supreme Court, in a *per curiam* opinion, declined to answer any of these questions. The Court noted that it was equally split on the answer to the first question. Because the answer to the first question could be dispositive of this case,

the Court declined to even address the other two questions. The Court returned all three questions to me without answers. Now that the Iowa Supreme Court has passed on answering the certified questions in this case, I can address the parties' post-trial motions.

## II.     LEGAL ANALYSIS

### A.     Defendants' Motion for Judgment as a Matter of Law

In their post-trial motion, the Siouxland Defendants move for judgment as a matter of law on a number of grounds. In particular, the Siouxland Defendants argue that Iowa law does not recognize any of the three protected activities on which the jury found them liable. They also argue that the evidence admitted at trial is insufficient to support the jury's findings that the Siouxland Defendants violated the public policies marked on the verdict form. The Siouxland Defendants also claim that Hagen failed to prove that he was an at-will employee, which they argue is a necessary element of a wrongful-termination claim based on public policy.

### 1.     Standard for granting judgment as a matter of law

The Siouxland Defendants move for judgment as a matter of law under Federal Rule of Civil Procedure 50. I may only grant a Rule 50 motion for judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). The standard for judgment as a matter of law is exacting, as "[a] jury verdict is entitled to extreme deference . . . ." *Craig Outdoor Adver., Inc.*, 528 F.3d at 1009. The Eighth Circuit Court of Appeals has explained that "'[t]his demanding standard reflects our concern that, if misused, judgment as a matter of law can invade the jury's rightful province.'" *Penford Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 662 F.3d 497, 503 (8th Cir. 2011) (quoting *Gardner v. Buerger*, 82 F.3d 248, 251 (8th Cir. 1996)). I may not

11

disturb the jury's verdict "unless, after viewing the evidence in the light most favorable to [the non-movant], [I] conclude that no reasonable jury could have found in [the non-movant's] favor." *Heaton v. The Weitz Co., Inc.*, 534 F.3d 882, 887 (8th Cir. 2008) (citation and internal quotation marks omitted). In other words, I "will not set aside a jury verdict unless there is a complete absence of probative facts to support the verdict." *Id.* (citation and internal quotation marks omitted). In evaluating whether the evidence was sufficient to support a verdict in Hagen's favor, I must:

> (1) resolve direct factual conflicts in favor of [Hagen], (2) assume as true all facts supporting [Hagen] which the evidence tended to prove, (3) give [Hagen] the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.

*See United Fire & Cas. Ins. Co. v. Garvey*, 419 F.3d 743, 746 (8th Cir. 2005) (quoting *Pumps and Power Co. v. S. States Indus.*, 787 F.2d 1252, 1258 (8th Cir. 1986)). I may not, however, "give [Hagen] 'the benefit of unreasonable inferences, or those at war with the undisputed facts.'" *Id.* (quoting *City of Omaha Employees Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 651 (8th Cir. 1989)).

## 2. *The challenged public policy exceptions*

The Siouxland Defendants challenge the public policy exceptions found by the jury on both legal and factual grounds. First, the Siouxland Defendants argue that Iowa law does not recognize any of the protected activities that the jury found in support of the verdict—Protected Conduct 3, 4, and 5—and that the Siouxland Defendants are therefore entitled to judgment as a matter of law. Second, the Siouxland Defendants alternatively argue that the trial evidence was insufficient to find that the Siouxland Defendants fired Hagen for engaging in Protected Conduct 3 or 5. I will address these arguments in turn.

### a. Whether Iowa law recognizes Protected Conduct 3, 4, or 5 as protected activity that can support a claim for wrongful discharge in violation of Iowa public policy

Because there is no Iowa case law explicitly holding that Protected Conduct 3, 4, or 5 constitutes protected activity for the purpose of wrongful discharge claims under Iowa law, I certified to the Iowa Supreme Court the question of whether any of Protected Conduct 3, 4, or 5 could support a wrongful discharge claim. *Hagen*, 964 F. Supp. 2d at 956. The Iowa Supreme Court declined to answer the certified question. But, in certifying the question to the Court, I thoroughly discussed the reasons why I would find that each of Protected Conduct 3, 4, and 5 is actionable under Iowa law. *Id.* at 961-69. I rely on that discussion and reasoning from my certification order— which I will not reproduce here—and reiterate my opinion that Protected Conduct 3, 4, and 5 are all protected activities for the purpose of wrongful discharge claims under Iowa law. I note, however, that only one of Protected Conduct 3, 4, and 5 need be actionable to uphold the jury's verdict. *Cf. Dahlgren v. First Nat. Bank of Holdrege*, 533 F.3d 681, 692 (8th Cir. 2008) ("As the district court submitted a single damage question for the multiple claims, we must affirm the jury's award to a plaintiff if the evidence supports the award on any one of the claims."). I therefore reject the Siouxland Defendants' argument that none of Protected Conduct 3, 4, or 5 is actionable under Iowa law.

### b. Whether the trial evidence was sufficient to support the jury's findings that Hagen was fired for engaging in Protected Conduct 3 or 5

Given my finding that Protected Conduct 3 and 5 are actionable under Iowa law, I find that the evidence at trial was sufficient for a reasonable jury to conclude that the Siouxland Defendants fired Hagen for engaging in Protected Conduct 3 and 5. The Siouxland Defendants' motion is, therefore, denied to the extent it depends on

evidentiary sufficiency arguments. The sufficiency of the evidence on Protected Conduct 3 and 5 is discussed below.

### i. *Sufficiency of evidence for Protected Conduct 3*

This is not a case in which "there is a complete absence of probative facts" establishing Protected Conduct 3. *Heaton*, 534 F.3d at 887 (citation and internal quotation marks omitted). Rather, the trial record contains ample evidence on which a reasonable jury could conclude that the Siouxland Defendants fired Hagen for "reporting, stating an intention to report, or stating that he might report to [St. Luke's] conduct of nurses that Dr. Hagen believed may have involved wrongful acts or omissions" (docket no. 113). Hagen's testimony alone provides substantial evidence proving Protected Conduct 3. Hagen testified that he reported the labor and delivery nurses, as well as Eastman, to the administration at St. Luke's hospital the day after Maria Maeda's baby died. Hagen also testified that, on the same day he reported to the hospital administration, he also had a conversation with Eastman, Hunt, and Aldrich in which Hagen told the other Siouxland doctors that he had reported the nurses and Eastman to the hospital. Exhibit 45—Siouxland's attorney's notes taken during a conversation with the Siouxland Defendants—shows that, in the days leading up to Hagen's firing, the Siouxland doctors knew that Hagen was "blaming labor [and] delivery nurses" for the Maeda baby's death, which supports Hagen's testimony that he discussed his concerns with the Siouxland Defendants (docket no. 115-5, at 1). A little over a week later, the Siouxland Defendants fired Hagen. Hagen testified that "the only issue" that came up recently at his medical practice before he was fired was "that [Hagen] would turn in a hospital, turn in Dr. Eastman, and turn in nurses, report them for malpractice. And the timing is just too coincidental. I mean, it was immediate."

In their brief, the Siouxland Defendants acknowledge much of this evidence, but argue that it is insufficient because "[n]o witness or documentary evidence corroborated

Dr. Hagen's testimony about" his conversations with the other Siouxland doctors (docket no. 119-1, at 24). This argument is unavailing for two reasons. First, the Siouxland Defendants acknowledge in their brief that Exhibit 45 "arguably support[s]" Hagen's testimony (docket no. 119-1, at 24). Thus, the Siouxland Defendants apparently concede that at least one piece of documentary evidence corroborates Hagen's testimony. But second, and more importantly, even if Hagen's testimony were uncorroborated, the law does not require that Hagen produce other documents or witnesses to back-up his story. Hagen testified, based on his firsthand knowledge, that he informed Eastman, Hunt, and Aldrich that he had reported Eastman and the nurses to St. Luke's. Like any other testimony, the jury was free to believe or disbelieve Hagen's account. If the jury believed Hagen's testimony about his conversation with the other Siouxland doctors, there is no legal requirement—and the Siouxland Defendants cite none—that his conversation be corroborated.

The Siouxland Defendants also argue that there is no evidence that the defendant doctors had the intent to fire Hagen because he reported the nurses and Eastman to St. Luke's. As is usually the case in employment discrimination claims, there is no direct evidence of the Siouxland Defendant's discriminatory intent. *See E.E.O.C. v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001) (en banc) (noting that "discrimination cases often turn on inferences rather than on direct evidence" (citations omitted)). But the record contains sufficient evidence for a jury to *infer* that Hagen was fired in violation of public policy. Hagen testified that he informed the Siouxland Defendants that he reported Eastman and the nurses to St. Luke's. About a week later, Hagen was fired. Siouxland's attorney's notes suggest that the defendant doctors knew at the time they fired Hagen that Hagen blamed the St. Luke's nurses for the Maeda baby's death. In addition, Hagen testified that there were no other recent issues that had arisen at work, other than Hagen's complaints about the Maeda case. This

evidence, taken together, is sufficient to allow a reasonable jury to infer that Hagen's reports to St. Luke's were a determining factor in the Siouxland Defendants' decision to fire him.

### ii. *Sufficiency of evidence for Protected Conduct 5*

Like Protected Conduct 3, the trial record contains sufficient evidence for a reasonable jury to conclude that the Siouxland Defendants fired Hagen for Protected Conduct 5—"consulting with an attorney, stating an intention to consult with an attorney, or stating that he might consult with an attorney about whether Dr. Eastman or nurses had committed wrongful acts or omissions that Dr. Hagen should report to the Iowa Board of Medicine or [St. Luke's]" (docket no. 113). Hagen testified that, on the same day Hagen told his colleagues that he reported Eastman and the nurses to St. Luke's, Hagen had a conversation with Eastman in Eastman's office. Hagen told Eastman that "attorneys are telling me I have to report you to the Iowa state medical board." Later that day, Hagen told Hunt and Aldrich: "I've talked to attorneys and the attorneys are telling me that, you know, one of the things you might have to do is turn Dr. Eastman in." Hagen also testified that Eastman was walking in and out of Hagen's office while Hagen was on the phone consulting with attorneys. And, again, Exhibit 45—Siouxland's attorney's notes—show that the Siouxland Defendants were well aware that Hagen was consulting with attorneys. Specifically, Siouxland's attorney's notes reflect that the Siouxland Defendants knew that Hagen had "called 3 lawyers . . . who like to sue [h]ospital[s]" (docket no. 115-5, at 3), and that one of those attorneys, Mo Sadden, had called the Siouxland office (docket no. 115-5, at 2).

The Siouxland Defendants argue that Hagen's subjective intent in contacting attorneys after the Maeda incident disqualifies his conduct from public policy protection. The Siouxland Defendants argue that Hagen did not initially call attorneys to determine whether he had to report Eastman. Rather, the Siouxland Defendants

claim that Hagen called attorneys to "solicit their interest in a potential malpractice claim" (docket no. 119-1, at 25). Because the reason for Hagen's consultations was not to determine Hagen's personal obligations, the Siouxland Defendants claim there is insufficient evidence to find that Hagen engaged in Protected Conduct 5.

Again, there are two problems with the Siouxland Defendants' argument. First, a reasonable jury could conclude from the evidence that Hagen contacted attorneys for reasons other than soliciting their interest in malpractice claims. Hagen testified that, when he decided to contact attorneys, he was concerned that he did not know how to properly dictate the Maeda incident in his records. He therefore asked the first attorney he called, Mike Ellwanger, how to dictate what had happened. Hagen then called two other attorneys, Mo Sadden and Leif Erickson, and "told them the same situation." Thus, a reasonable jury could conclude that Hagen contacted attorneys not to solicit malpractice claims, but rather to determine how *Hagen* should respond to the Maeda incident.

Second, even if Hagen did not initially contact the attorneys about whether he needed to report Eastman to the board of medicine, Hagen's subjective intent in consulting the attorneys is irrelevant here. Because this is an employment discrimination case, it is the Siouxland Defendants' intent, not Hagen's, that is relevant. Regardless of Hagen's intent in contacting attorneys, the question remains: What was the Siouxland Defendants' intent in firing him? "[T]he [wrongful discharge] tort is directed at the *reasons behind the discharge*" of an employee. *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 776 (Iowa 2009) (emphasis added). "[T]he very purpose of the tort is designed to alter the dynamics of the management of personnel by encouraging management to make decisions consistent with fundamental principles of public policy . . . ." *Id.* The Siouxland Defendants were the decision-makers in this case. Thus, the focus should be on their subjective intent.

A reasonable jury could find that, regardless of Hagen's intent in calling attorneys, the Siouxland Defendants fired Hagen because they subjectively believed he was consulting attorneys about whether to report Eastman to the board of medicine. As I discussed above, Hagen told the Siouxland Defendants a week before they fired him that he had consulted attorneys about whether he needed to turn Eastman in to the board of medicine. Exhibit 45 independently shows that the Siouxland Defendants knew of these consultations. It is not as though Hagen made these consultations up; he testified that he *had* indeed spoken with at least one attorney about his duty to report Eastman, although the attorney raised the issue rather than Hagen. Based on these facts, I find that there was sufficient evidence for a reasonable jury to conclude that the Siouxland Defendants fired Hagen for consulting with attorneys about whether Hagen had a duty to report Eastman.

### 3. Hagen's status as an at-will vs. contractual employee

The Siouxland Defendants also argue that Hagen failed to prove that he was an at-will employee, which the Siouxland Defendants assert is a necessary element in a claim for wrongful discharge in violation of public policy. Again, the Iowa courts have not expressly decided whether contractual employees can sue their employers for wrongful discharge in violation of public policy. Again, I certified the question to the Iowa Supreme Court, but the Court declined to answer. The question, therefore, falls to me. As I discussed in my certification order, I find Iowa's wrongful discharge tort applies to both at-will and contractual employees. *Hagen*, 964 F. Supp. 2d at 969-72.

But, even if wrongful discharge claims were limited to at-will employees, it would not help the Siouxland Defendants here because the Siouxland Defendants waived any argument about Hagen's employment status. The Siouxland Defendants raise the argument that Hagan failed to prove he was an at-will employee for the first time in their post-trial motion under Rule 50(b). They did not raise the issue in any

previous motion for judgment as a matter of law. "Under Rule 50(b), a litigant who fails to move for judgment as a matter of law at the close of the evidence cannot later argue—either in a post-trial Rule 50 motion or on appeal—that the verdict was supported by insufficient evidence." *Pulla v. Amoco Oil Co.*, 72 F.3d 648, 655 (8th Cir. 1995) (citing *Catlett v. Local 7370 of the United Paper Workers Int'l Union*, 69 F.3d 254, 258-59 (8th Cir. 1995); *Smith v. Ferrel*, 852 F.2d 1074, 1075 (8th Cir. 1988); *Myers v. Norfolk Livestock Market, Inc.*, 696 F.2d 555, 558 (8th Cir. 1982)) (footnotes omitted). And a party similarly waives an "*argument* under Rule 50(b) by failing previously to raise it" before a post-trial motion. *Id.* at 654 (emphasis added); *see also Conseco Fin. Servicing Corp. v. N. Am. Mortgage Co.*, 381 F.3d 811, 821 (8th Cir. 2004) ("[T]he movant cannot use a Rule 50(b) motion as a vehicle to introduce a legal theory not distinctly articulated in its close-of-evidence motion for a directed verdict." (citations and internal quotation marks omitted). Because the Siouxland Defendants raised their argument that Hagen was not an at-will employee too late, I find that they waived it.

## B.    *Defendants' Motion for a New Trial*

The Siouxland Defendants alternatively argue that, if I do not grant their motion for judgment as a matter of law, I should grant a new trial. Specifically, the Siouxland Defendants argue for a new trial on the grounds that two of the jury instructions were erroneous, that the jury's verdict was against the great weight of the evidence, and that a handful of erroneous evidentiary rulings prejudiced the Siouxland Defendants. I will address each argument in turn.

### 1.    *Standard for granting a new trial*

The Siouxland Defendants move for a new trial under Federal Rule of Civil Procedure 59. Rule 59(a) provides: "The court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for

which a new trial has heretofore been granted in an action at law in federal court . . . ."
Fed. R. Civ. P. 59(a)(1)(A). Rule 59(a) has been explained as follows:

> In evaluating a motion for a new trial pursuant to Rule 59(a), "[t]he key question is whether a new trial should [be] granted to avoid a miscarriage of justice." *McKnight v. Johnson Controls, Inc.,* 36 F.3d 1396, 1400 (8th Cir. 1994). A new trial is appropriate when the trial, through a verdict against the weight of the evidence or legal errors at trial, resulted in a miscarriage of justice. *White v. Pence,* 961 F.2d 776, 780 (8th Cir. 1992). However, legal errors must adversely and substantially impact the moving party's substantial rights to warrant relief. Fed. R. Civ. P. 61.

> Consistent with the plain language of Rule 59(a), the court may grant a partial new trial solely on the issue of damages. Fed. R. Civ. P. 59(a)(1)(A); *see, e.g., Powell v. TPI Petro., Inc.,* 510 F.3d 818, 824–25 (8th Cir. 2007) (remanding for partial new trial on damages). For example, a partial new trial on the issue of damages is appropriate when the jury's verdict is so grossly inadequate as to shock the conscience or to constitute a plain injustice. *Taylor v. Howe,* 280 F.3d 1210, 1211 (8th Cir.2002); *First State Bank of Floodwood v. Jubie,* 86 F.3d 755, 759 (8th Cir. 1996). "Each case must be reviewed within the framework of its distinctive facts." *Wilmington v. J.I. Case Co.,* 793 F.2d 909, 922 (8th Cir. 1986) (citing *Hollins v. Powell,* 773 F.2d 191, 197 (8th Cir. 1985)).

> "In determining whether or not to grant a new trial, a district judge is not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *King v. Davis,* 980 F.2d 1236, 1237 (8th Cir. 1992) (citing *White,* 961 F.2d at 780). "[T]he 'trial judge may not usurp the function of a jury . . . [which] weighs the evidence and credibility of witnesses.'" *White,* 961 F.2d at 780 (quoting *McGee v. S. Pemiscot Sch. Dist.,* 712 F.2d 339, 344 (8th Cir. 1983)). "Instead, a district judge must carefully weigh and balance

the evidence and articulate reasons supporting the judge's view that a miscarriage of justice has occurred." *King,* 980 F.2d at 1237.

"The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon, Inc.,* 449 U.S. 33, 36, 101 S. Ct. 188, 66 L.Ed.2d 193 (1980). On the issue of damages, the propriety of the amount of a verdict "is basically, and should be, a matter for the trial court which has had the benefit of hearing the testimony and of observing the demeanor of witnesses and which knows the community and its standards . . . ." *Wilmington,* 793 F.2d at 922 (quoting *Solomon Dehydrating Co. v. Guyton,* 294 F.2d 439, 447–48 (8th Cir. 1961)). "[T]he assessment of damages is especially within the jury's sound discretion when the jury must determine how to compensate an individual for an injury not easily calculable in economic terms." *Stafford [v. Neurological Med., Inc.],* 811 F.2d [470,] 475 [(8th Cir. 1987)]; *see also EEOC v. Convergys Customer Mgmt. Group, Inc.,* 491 F.3d 790, 798 (8th Cir. 2007) (same).

*McCabe v. Mais,* 602 F. Supp. 2d 1025, 1029-30 (N.D. Iowa 2008) (Reade, C.J.). I will discuss other new-trial standards as they apply to the parties' specific arguments below.

### 2. *The challenged jury instructions*

The Siouxland Defendants argue that they are entitled to a new trial because of two allegedly erroneous jury instructions. First, they argue that the instructions should have required the jury to find that "there was no overriding business justification for [Hagen's] termination" (docket no. 119-1, at 29). Second, they argue that I improperly instructed the jury that, if they found that the Siouxland Defendants wrongfully discharged Hagen, they may award past lost earnings "from the date of [Hagen's] discharge . . . to the date that . . . Hagen would have *voluntarily* left employment with

21

Siouxland or the date of your verdict, whichever comes first" (docket no. 110, at 15) (emphasis added). The Siouxland Defendants argue I should not have used the word "voluntarily" because "Hagen may not have remained employed with Siouxland through the date of the verdict even without wrongful termination" (docket no 119-1, at 32). In other words, the Siouxland Defendants claim that Hagen may have been *involuntarily*—but not wrongfully—fired prior to the date of the verdict.

"When [a] motion for a new trial is premised on a challenged jury instruction, '[I] . . . must determine simply whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury.'" *Phillips v. Collings*, 256 F.3d 843, 851 (8th Cir. 2001) (quoting *Martin v. Wal-Mart Stores, Inc.*, 183 F.3d 770, 773 (8th Cir. 1999) (quoting *Kramer v. Logan County Sch. Dist.*, 157 F.3d 620, 625 (8th Cir. 1998)). In making this determination, I apply the harmless-error rule, which holds that "any error by the trial court in a proceeding must be disregarded unless it affects the 'substantial rights of the parties.'" *E. F. Hutton & Co., Inc. v. Berns*, 682 F.2d 173, 177 (8th Cir. 1982) (citations omitted). I will address each of the challenged instructions below.

### a.    An overriding business justification

The Siouxland Defendants argue that I should have required the jury to find that the Siouxland Defendants had no "overriding business justification" for firing Hagen in order to find that Hagen was wrongfully discharged. Jury Instruction No. 5 outlined the elements for Hagen's wrongful discharge as follows:

> *One*, **Dr. Hagen was employed by Siouxland.**
>
> . . . .
>
> *Two*, **Dr. Hagen engaged in conduct protected by public policy.**
>
> . . . .

**Three**, Siouxland discharged Dr. Hagen from his employment.

. . . .

**Four**, Dr. Hagen's conduct protected by public policy was the determining factor in Siouxland's decision to discharge him.

A determining factor

> need not be the main reason behind the decision, **but**

> must be the reason that tips the scales decisively one way or the other

Siouxland must have known of the protected activity before it made the decision to discharge Dr. Hagen.

A short time between Dr. Hagen engaging in the protected activity and his discharge

> is not enough, by itself, to find that the protected activity was the determining factor in the discharge, **but**

> may be suspicious, in light of other evidence that the discharge was for engaging in protected activity

You should consider whether or not there are other legitimate reasons or motives for the discharge.

> If the defendants offer other reasons for the discharge, you must determine whether those other reasons are merely pretexts for a discharge for engaging in protected activity

> You may find that a reason is a pretext if it was not the real reason, but is a reason given to hide a discharge for engaging in protected activity

> If the reasons offered by Siouxland are legitimate and not pretexts, you must determine whether any protected conduct by Dr. Hagen was nevertheless the determining factor in his discharge

**Five, the wrongful discharge caused injury to Dr. Hagen.**

(Docket no. 110, at 9-11).

The Siouxland Defendants argue that Jury Instruction No. 5 does not accurately reflect the elements of an Iowa wrongful discharge claim. The Siouxland Defendants cite the elements of a wrongful discharge claim listed in *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 761 (Iowa 2009), in support of their argument that I should have instructed the jury on "an overriding business justification." The court in *Jasper* noted that the

> elements [of a wrongful discharge claim] are: (1) existence of a clearly defined public policy that protects employee activity; (2) the public policy would be jeopardized by the discharge from employment; (3) the employee engaged in the protected activity, and this conduct was the reason for the employee's discharge; and (4) *there was no overriding business justification for the termination*.

*Id.* (citing *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 228 (Iowa 2004); *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 282 n.2 (Iowa 2000)) (emphasis added). But, while the court in *Jasper* listed "no overriding business justification" as an element, it provided no guidance as to how that element should be applied.

In the absence of specific guidance on how to apply the "overriding business justification" element, I omitted a specific reference to the element from the jury instructions, noting that the business justification element was implicit in the causation element. I instructed the jury to "consider whether or not there are other legitimate reasons or motives for the discharge." If the Siouxland Defendants proffered legitimate

reasons for firing Hagen, I instructed the jury to (1) determine if those proffered reasons were real (*i.e.*, not pretextual) and (2) if they were real, to resolve whether those reasons were the determining factors in firing Hagen, or if Hagen's protected activity was nevertheless still the determining factor. Under these instructions, if the Siouxland Defendants had a legitimate business justification for firing Hagen, the jury could have considered that and found in favor of the Siouxland Defendants, assuming that the business justification was not pretextual and was the reason that ultimately persuaded the Siouxland Defendants to fire Hagen. Thus, while the instructions did not use the phrase "overriding business justification," they provided ample room for the jury to consider such justifications.

Still, the Siouxland Defendants argue that treating the overriding business justification element together with the causation element—*Jasper*'s element 3—renders the business justification element superfluous. Posed differently: Why would the court in *Jasper* list the overriding business justification element separately if it was supposed to be implicit in the causation element? This apparent tension may arise from the fact that Iowa's four-element wrongful discharge test derives from a similar four-element test that applies a different causation element than *Jasper*. Following *Jasper*'s citation trail, *Jasper* relies on *Fitzgerald*, which in turn cites two non-Iowa cases—*Gardner v. Loomis Armoured, Inc.*, 913 P.2d 377, 382 (Wash. 1996), and *Collins v. Rizkana*, 652 N.E.2d 653, 657 (Ohio 1995)—for the elements of a wrongful discharge claim. *Fitzgerald*, 613 N.W.2d at 282 n.2. Both *Gardner* and *Collins* adopt a four-element wrongful discharge test from two writings authored by Henry H. Perritt, Jr. *See Gardner*, 913 P.2d at 382 (citing Henry H. Perritt Jr., *Workplace Torts: Rights and Liabilities* (1991)); *Collins*, 652 N.E.2d at 658 (citing Henry H. Perritt, Jr., *The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?*, 58 U. Cin. L.

Rev. 397, 398-99 (1989)). Thus, tracing *Jasper*'s elements to their root, Iowa's wrongful discharge elements may derive from the following four-element test:

> 1. That a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).
>
> 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).
>
> 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).
>
> 4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

Perritt, 58 U. Cin. L. Rev. at 398-99. Upon first glance, these elements appear the same as those in *Jasper*.

But the language in element 3—the causation element—transformed somewhere between Perritt and *Jasper*. Perritt's test—at least the one quoted above—requires only that a "plaintiff's dismissal was *motivated* by conduct related to the public policy," whereas *Jasper*'s test requires that a plaintiff's protected "conduct was *the reason* for the [plaintiff's] discharge." In fact, despite the fact that all of the cases mentioned above ostensibly derive from the same author, they phrase the causation element differently. *See Gardner*, 913 P.2d at 382 ("The plaintiffs must prove that the public-policy-linked conduct caused the dismissal (the *causation* element)" (quoting Perritt, *Workplace Torts: Rights and Liabilities* § 3.19)); *Collins*, 652 N.E.2d at 658 ("The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element)." (quoting Perritt, 58 U. Cin. L. Rev. at 399)); *Fitzgerald*, 613 N.W.2d at 282 n.2 ("The plaintiff engaged in public policy conduct and this conduct was the reason for the dismissal (the causation element)." (citing *Gardner*, 913 P.2d at 382;

*Collins*, 652 N.E.2d at 658)); *Lloyd*, 686 N.W.2d at 228 ("The challenged discharge was the result of participating in the protected activity." (citations omitted)).

The oscillating language in the causation element may create confusion over how to apply the overriding business justification element. Listing a separate business justification element makes more sense where the attendant causation element requires only that a "plaintiff's dismissal was motivated by conduct" violating public policy. If an employer was motivated by both legitimate and illegitimate reasons in firing an employee, a causation element requiring only that illegitimate reasons *motivated* the employer would allow a jury to find for the employee even if the employer's legitimate reasons were the determining factors in the firing decision. In that case, the overriding business justification element clarifies the causation element to ensure that the employer can escape liability based on the overriding business reasons. Listing a separate business justification element makes less sense where the attendant causation element requires that the illegitimate reason is *the* reason—interpreted to mean the determinative reason—that an employee was fired. In that case, as in this one, the business justification element is implicit in the causation element.

I note, however, that regardless of whether the overriding business justification element is superfluous, the Siouxland Defendants cannot point to any evidence or argument that they were precluded from offering or making because of the jury instructions. The Siouxland Defendants claim that they "clearly did have a compelling business justification for terminating Dr. Hagen"—the fact that "Hagen was causing turmoil and chaos within the office and threatening to create an extraordinarily hostile and adversar[ial] relationship with St. Luke's" (docket 119-1, at 31). The jury instructions did not prevent the Siouxland Defendants from arguing that this was the reason they fired Hagen. I allowed the jury to "consider whether or not there are other legitimate reasons or motives for [Hagen's] discharge." The instructions required only

that the jury conclude that this proffered reason was the determining factor in the Siouxland Defendants' decision to fire Hagen. Thus, even if I should have issued a separate business justification instruction, the instructions likely still "fairly and adequately submitted the [wrongful discharge] issues in the case to the jury." *Phillips*, 256 F.3d at 851 (quotations omitted). The Siouxland Defendants' motion for a new trial based on Instruction No. 5 is therefore denied.

### b. Calculating past lost earnings based on when Hagen would have "voluntarily" left Siouxland

The Siouxland Defendants also argue that the instruction on past lost earnings was erroneous. Instruction No. 7 discussed past lost earnings, and read in pertinent part:

> You may award the reasonable value of earnings that Dr. Hagen lost because Siouxland wrongfully discharged him, from the date of his discharge on November 16, 2009, to the date that you find Dr. Hagen would have *voluntarily* left employment with Siouxland or the date of your verdict, whichever comes first.

(Docket no. 110, at 15) (emphasis added). The Siouxland Defendants claim I should have deleted the word "voluntarily" because it prevented the jury from considering whether Hagen would have been *involuntarily*—but not wrongfully—fired sometime after November 16, 2009, the day Hagen was actually fired. I rejected the same argument during the trial because, based on the evidence, it was purely speculative that Hagen would have been fired after November 16, 2009. *See Keenan v. Computer Associates Int'l, Inc.*, 13 F.3d 1266, 1274 (8th Cir. 1994) (noting the district court correctly instructed the jury "that [d]amages must be proven by a preponderance of the evidence and must not be based on speculation or guess" (internal quotation marks omitted)).

28

The Siouxland Defendants argue that the trial evidence was sufficient to allow the jury to conclude that Hagen would have been fired after November 16, 2009, which would cut off the amount of damages Hagen could receive. But the Siouxland Defendants point to no evidence that Hagen would have been fired after November 16, 2009, or fired at all for that matter absent his response to the Maeda incident. Rather, they rely on testimony from Aldrich, Eastman, and Hunt, who claimed that they would have left Siouxland if Hagen had not been fired. Specifically, Aldrich testified that, after the Maeda incident, she was not going to work with Hagen anymore. She claimed that she was either going to leave Siouxland, or if Hunt and Eastman wanted to keep working together with her, she would stay and practice with them, though Aldrich made it clear that she "wasn't putting up an ultimatum for Dr. Hunt and Dr. Eastman." Eastman testified that he spoke with Aldrich and Hunt about the three of them leaving Siouxland to separate from Hagen. Hunt testified that she agreed to leave with Aldrich if Aldrich left Siouxland, and that Eastman agreed to do the same.

This testimony from the Siouxland Defendants establishes no facts on which the jury could have found that Hagen would have been fired for some legitimate reason after November 16, 2009. In fact, this testimony has nothing to do with firing Hagen; it has to do with the *other* Siouxland doctors' plans to leave. The Siouxland Defendants claim that "Hunt also testified that if Siouxland had not terminated Dr. Hagen over [the Maeda] incident, it would have done so for some other event shortly thereafter as the tension within the office and among the shareholders was reaching a breaking point" (docket no. 119-1, at 33). After reviewing the record, I do not agree that Hunt's testimony supports the Siouxland Defendants' claim. But, even if Hunt did testify in the way the Siouxland Defendants claim, there is no evidence as to *when* the defendant doctors would have fired Hagen, and more importantly, how the defendant doctors

could possibly predict that they were going to fire Hagen in the future without simply speculating to that possibility.

Hunt did testify to the following:

> November 5 is just the incident that created [Hagen's] last meltdown, and it's only his last meltdown because we didn't allow him to have another one. *There would have been another one*, and it's the event that made Dr. Aldrich decide to leave. But there were events behind it that could have been his last, and *there could have been another one in the future if we'd let it go to the next*. There's always going to be a last.

That is naked speculation. It provides no basis for a jury to conclude that Hagen would have been fired in the future for reasons unrelated to the Maeda incident. To the extent the defendant doctors claimed that Hagen could have been fired for legitimate reasons arising out of the Maeda incident, the jury obviously found that those reasons were not the determining factor in Hagen's firing. In short, there is simply no evidence, other than the Siouxland Defendants' speculation, that the defendant doctors would have fired Hagen in the future. Thus, I find that the instruction on past lost earnings was correct, and the Siouxland Defendants' motion for a new trial based on that instruction is denied.

### 3.    *Whether the verdict is against the great weight of the evidence*

Alternatively, the Siouxland Defendants argue that I should grant them a new trial because the jury's verdict was against the great weight of the evidence and was a miscarriage of justice. I wholeheartedly agree that the jury's verdict was against the great weight of the evidence and was a miscarriage of justice, but not for any reasons argued by, or that would benefit, the Siouxland Defendants. *See* Part II.C.1.b, *infra* (noting the great weight of the evidence would have supported a verdict *more* favorable to Hagen). The Siouxland Defendants' argument rests on two core claims: (1) that

Hagen's testimony was not credible because it involved "several material inconsistencies"; and (2) that no witnesses corroborated Hagen's testimony. Neither of these claims warrants a new trial. This case involved only one cause of action: wrongful discharge in violation of public policy. Thus, the liability issues in this case were not complicated. "Where the subject matter of the litigation is simple; where there exists no complicated evidence or where the legal principles presented are such that they would not confuse the jury, the court should be reluctant to grant a new trial." *Fireman's Fund Ins. Co. v. Aalco Wrecking Co., Inc.*, 466 F.2d 179, 187 (8th Cir. 1972).

Both of the Siouxland Defendants' claims supporting their request for a new trial—that Hagen's testimony was inconsistent and uncorroborated—relate to Hagen's credibility. In my twenty years as a trial judge, I have almost always refrained from calling frivolous arguments "frivolous"; instead, I usually say that they "lack merit." But in this case, arguing that the verdict is against the great weight of the evidence based solely on Hagen's credibility is beyond frivolous. Unfortunately, it is consistent with the Siouxland Defendants' apparent post-trial strategy to throw everything, including the kitchen sink, at this case and hope something constitutes error.

The jury members had to choose between two accounts of Hagen's firing: Hagen's and the Siouxland Defendants'. That choice, like most jury choices, necessarily required the jury to make credibility determinations. "The choice between the two stories [is] essentially a credibility determination for a jury rather than a weight of the evidence issue." *Goldsmith v. Diamond Shamrock Corp.*, 767 F.2d 411, 416 (8th Cir. 1985). Thus, I will not grant a new trial simply because the jury chose to believe a witness that the opposing party thought lacked credibility. I also note that the credibility issues in this trial were not one-sided; the evidence called both parties'

credibility into question.[1]  Given the credibility issues on both sides, the jury did what juries do—they weighed the evidence and made a decision.  In light of the evidence discussed above supporting the jury's verdict, I decline to grant a new trial based solely on claims related to Hagen's credibility.  The Siouxland Defendants' motion for a new trial based on the great weight of the evidence is therefore denied.

### 4.    *Defendants' evidentiary objections*

Finally, the Siouxland Defendants argue that Magistrate Judge Strand and I collectively issued five erroneous evidentiary rulings that entitle the Siouxland Defendants to a new trial.  The Siouxland Defendants allege the following rulings were erroneous:

- Allowing Kelly Hagen, Hagen's ex-wife, to testify that she visited Hagen's home the day after Hagen was fired because she had received a call from her son, who expressed concerns that Hagen may have attempted suicide because Hagen could not be located.  The Siouxland Defendants claim this evidence was not relevant and "improperly arouse[d] the passion of the jury."

- Refusing to allow the Siouxland Defendants to offer testimony from a list of witnesses that allegedly would have corroborated the defendant doctors' testimony that Hagen displayed a pattern of inappropriate and disruptive behavior.

---

[1] For a small, yet representative example, when Hunt was asked under cross-examination whether she made more money after Hagen's firing, she testified that she did not know, that she never looked at her W-2s, that she did not know how much money she made in 2009 or 2010, and that she did not even know whether she had ever made less than $700,000 in the past five years. That a highly successful doctor is so utterly in the dark as to her finances year after year strikes me as lacking credibility.

- Allowing Hagen to present rebuttal testimony from nurse Jody Bazzell regarding her observations of physician-nurse interactions at St. Luke's hospital. The Siouxland Defendants claim this evidence was not relevant and mislead the jury.

- Refusing to allow Eastman to testify as to whether he had ever been sued for malpractice arising from the death of the Maeda baby. The Siouxland Defendants argue this testimony was relevant.

- Judge Strand granting St. Luke's motion to quash the Siouxland Defendants' subpoena seeking Hagen's credentials and his medical staff file. The Siouxland Defendants claim that this evidence was not privileged, and even if some of it was privileged, not all of the requested documents were covered by privilege laws.

Federal Rule of Civil Procedure 61 governs whether I must grant a new trial based on allegedly erroneous evidentiary rulings. Rule 61 provides:

> Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.

Fed. R. Civ. P. 61. "Under the 'harmless error' rule any error by the trial court in a proceeding must be disregarded unless it affects the 'substantial rights of the parties.'" *Berns*, 682 F.2d at 177 (citations omitted). "Stated another way, [an] error is harmless . . . if 'the error did not influence or had only a slight influence on the verdict.'" *McKnight By & Through Ludwig v. Johnson Controls, Inc.*, 36 F.3d 1396, 1405 (8th Cir. 1994) (quoting *United States v. DeAngelo,* 13 F.3d 1228, 1233 (8th Cir. 1994) (quotation omitted)). And the harmless error rule applies to erroneous jury instructions as well as erroneous evidentiary rulings. *Berns*, 682 F.2d at 177.

Based on these standards, I find that the rulings the Siouxland Defendants challenge were not erroneous. But even if they were, the error was harmless. The challenged rulings related to relatively minor, collateral issues that were not likely to meaningfully influence the jury's verdict. And there is no evidence that any of the challenged rulings actually affected the outcome of the trial. Thus, the Siouxland Defendants' motion for a new trial based on these evidentiary challenges is denied.

## C.    Plaintiff's Motion for Judgment as a Matter of Law, Motion for Judgment, and Motion to Alter or Amend Judgment

In Hagen's post-trial motion, he requests an additur of $4,519,597, which consists of an additional $112,727 in past lost earnings and an additional $4,406,870 in future lost earnings. Hagen also asks that I award him pre- and post-judgment interest on the jury's award. For the reasons discussed below, Hagen's request for an additur is denied, and Hagen's request for pre- and post-judgment interest is granted.

### 1.    Plaintiff's request for an additur

In Hagen's post-trial motion, he requests a rather extraordinary remedy. He asks that I award him an additional $112,727 in past lost earnings and an additional $4,406,870 in future damages as a matter of law, despite the fact that the jury awarded Hagen $0 in future damages. Given that the jury awarded Hagen $1,051,814 in past lost earnings, if I granted Hagen's request, it would increase his award by over 430%, all as a matter of law.

Hagen argues that he is entitled to the additur because the Siouxland Defendants "did not create any questions of fact as to Dr. Hagen's damages through their own witnesses or through cross-examination of [Hagen's expert economist] or Dr. Hagen" (docket no. 121-1, at 4). According to Hagen, "[i]t is clear that the jury accepted the methodology used by Dr. Hagen's expert economist . . . as they awarded Dr. Hagen the exact amount of damages calculated by [Hagen's economist] through the end of

2012" (docket no. 121-1, at 3). But Hagen claims that the jury should not have cut off his damages at 2012, but instead should have calculated his damages out to 2029, when Hagen would have retired. By Hagen's measure, the jury should have awarded him "an additional $112,727 in past lost earnings for 2013, and at least an additional $4,406,870 in future earnings" (docket no. 121-1, at 4). Hagen's argument rests on the premise that the Siouxland Defendants "offered no admissible evidence to contradict the numbers submitted by [Hagen's economist], and no evidence to contradict the underlying factual basis for those numbers" (docket no. 121-1, at 4).

The Siouxland Defendants challenge Hagen's request on both procedural and constitutional grounds.

### a. Is Hagen's additur request procedurally barred?

Hagen filed his post-trial motions under Federal Rules of Civil Procedure 50, 54(c), and 59(e). The Siouxland Defendants argue that Hagen's request is barred by Rule 50 because Hagen's post-trial request does not renew any request made before I submitted this case to the jury. The Siouxland Defendants also argue that Hagen's additur would be improper under Rule 54(c). I need not address these arguments because Hagen's request is proper under Rule 59(e).

The Eighth Circuit Court of Appeals recently noted that "a Rule 59 motion is the appropriate vehicle" for a party seeking to amend a judgment with an additur. *Am. Bank of St. Paul v. TD Bank, N.A.*, 713 F.3d 455, 468 (8th Cir. 2013). In *American Bank of St. Paul*, the plaintiff moved under Rule 59(e) for an additur after a jury awarded the plaintiff only one-half of the damages it requested. *Id.* The defendant argued that the plaintiff waived its additur request "because it did not present it in a Rule 50 motion for judgment as a matter of law." *Id.* But the court noted that, because the plaintiff's argument was simply that the jury instructions "were misapplied by the jury and the court, resulting in an incorrect judgment[,]" a motion to amend that

judgment under Rule 59(e) was appropriate. *Id.* Like the plaintiff in *American Bank of St. Paul*, Hagen does not claim that I should have taken the case away from the jury; rather, Hagen argues that the jury misapplied its instructions and awarded too little in damages. Thus, Hagen's motion is not procedurally barred because it was proper under Rule 59(e).

### b. Would Hagen's proposed additur be unconstitutional?

While Hagen's motion for an additur survives the Siouxland Defendants' procedural challenge, it cannot survive the Siouxland Defendants' constitutional challenge. The Siouxland Defendants argue that, under the circumstances in this case, Hagen's additur would violate the Siouxland Defendants' Seventh Amendment right to a jury trial. The Seventh Amendment provides:

> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.

In the Eighth Circuit, "the general rule [is] that in a case where the amount of damages is in dispute, a grant of additur violates the [S]eventh [A]mendment jury trial rights of the party against whom the addition is granted." *Novak v. Gramm*, 469 F.2d 430, 432 (8th Cir. 1972) (citing *Dimick v. Schiedt*, 293 U.S. 474 (1935)). Under *Novak v. Gramm*, the key question is whether "the amount of damages is in dispute." *Id.* I judge whether the damages are disputed based on whether the damages were a jury question. In this case, they were. "If . . . the issue of damages was an issue of fact for the jury, as the parties and the court obviously thought it was when the case was submitted, the court [is] unquestionably without power to increase the judgment entered on the jury's verdict." *Am. Bank of St. Paul*, 713 F.3d at 469 (quoting *Milprint, Inc. v. Donaldson Chocolate Co.*, 222 F.2d 898, 901 (8th Cir. 1955)).

It is not enough for Hagen to argue that the Siouxland Defendants did not present any evidence contradicting the damages calculations offered by Hagen's expert economist. First, the Eighth Circuit Court of Appeals held in *Novak v. Gramm* that the fact that a plaintiff's damages expert was not contradicted at trial does not place the amount of damages beyond dispute because "[t]he jury was not bound to accept the assumptions upon which [the expert's] computations were based." 469 F.2d at 433.

Second, there were material questions of fact in this case as to whether Hagen would have voluntarily left Siouxland were he not fired and, if so, when he would have done so. The answers to those questions would directly affect the amount of Hagen's damages. Thus, the issue of damages remained disputed, and was properly before the jury in this case. If Hagen thought that the jury's verdict was against the great weight of the evidence, he would have been better served moving for a new trial under Rule 59(a). As I alluded to earlier, the jury's damages verdict was against the great weight of the evidence. There was no evidence (aside from the Siouxland Defendants' self-serving conjecture) that the Siouxland Defendants would have fired Hagen sometime after November 16, 2009, and only scant evidence suggesting that Hagen would have voluntarily left Siouxland before retirement. Thus, the great weight of evidence supported Hagen's claim for future lost earnings, which the jury did not award. Had Hagen moved for a new trial on damages, I may have granted his request. But, for reasons known only to Hagen, he did not, opting instead to pursue an additur. Because Hagen's damages were in dispute, I cannot constitutionally grant Hagen's additur.

Hagen alternatively argues that I should grant an additur under Iowa law. Because I find that Hagen's request, if granted, would violate the federal Constitution, the fact that Iowa law may allow an additur is of no help to Hagen. A request for an additur (or remittitur) appears to be a procedural request for *Erie* purposes. Thus, even though my subject matter jurisdiction over this case is premised on diversity

jurisdiction, I follow federal law governing additurs. *See Mayer v. Gary Partners & Co., Ltd.*, 29 F.3d 330, 334 (7th Cir. 1994) ("When deciding whether verdicts in diversity cases are excessive—and whether the remedies of remittitur and additur are available in the first place—federal courts use their own rules." (citations omitted)); *cf. Am. Bus. Interiors, Inc. v. Haworth, Inc.*, 798 F.2d 1135, 1146 (8th Cir. 1986) ("[T]he proper role of the federal courts in reviewing the size of jury verdicts is a matter of federal law. Despite the apparent abolition of remittitur in the Missouri state courts, remittitur is still available in federal court." (internal citations omitted)). Under federal law, I cannot constitutionally grant Hagen's additur. Thus, Hagen's request for additional damages is denied.

### 2.    *Plaintiff's request for pre- and post-judgment interest*

In addition to an additur, Hagen requests pre- and post-judgment interest on the jury's award of past lost earnings. "In a diversity case, the question of prejudgment interest is controlled by state law." *Trinity Products, Inc. v. Burgess Steel, L.L.C.*, 486 F.3d 325, 335 (8th Cir. 2007) (citing *Emmenegger v. Bull Moose Tube Co.*, 324 F.3d 616, 623-24 (8th Cir. 2003)). Under Iowa law, "[i]nterest shall be allowed on all money due on judgments and decrees of courts at a rate calculated according to section 668.13 . . . ." Iowa Code § 535.3(1). "Interest, except interest awarded for future damages, shall accrue from the date of the commencement of the action." Iowa Code § 668.13(1). None of the damages awarded in this case were future damages. Thus, Hagen's request for pre-judgment interest is granted, and such interest shall accrue from May 19, 2011, the day Hagen commenced this case (docket no. 1), and at the rate identified in Iowa Code § 668.13(3).

The Siouxland Defendants argue that portions of Hagen's past lost earnings would have been earned *after* the date Hagen filed his complaint, and, therefore, pre-judgment interest on those earnings should not accrue from the date this case

commenced, but instead from the date that Hagen would have received those earnings. I reject this argument for a number of reasons. First, the Siouxland Defendants cite no Iowa case in which a court has awarded interest on past lost earnings in the manner they suggest. Second, a number of cases suggest that a plaintiff's entire past lost earnings award should "accrue from the date of the commencement of the action," consistent with the plain language in Iowa Code § 668.13(1). *See Gilster v. Primebank*, 884 F. Supp. 2d 811, 884 (N.D. Iowa 2012) (awarding pre-judgment interest under Iowa law on a plaintiff's entire back pay award accruing from the date the plaintiff filed the case); *Baker v. John Morrell & Co.*, 266 F. Supp. 2d 909, 948-49 (N.D. Iowa 2003), *aff'd*, 382 F.3d 816 (8th Cir. 2004) (same); *Flockhart v. Iowa Beef Processors, Inc.*, 192 F. Supp. 2d 947, 978 (N.D. Iowa 2001) (same).

Finally, even if the Siouxland Defendants were correct that I should calculate Hagen's past lost earnings interest based on when Hagen would have received those earnings, the Siouxland Defendants failed to provide me with sufficient facts to properly apportion Hagen's interest. The Siouxland Defendants claim that only $251,435.42 of Hagen's award is eligible for interest accruing from the date Hagen filed his complaint. The rest, says the Siouxland Defendants, "needs to be separately calculated for each month that Dr. Hagen would have been paid . . . ." (docket no. 123, at 15). But the Siouxland Defendants do not propose a "separately calculated" payment schedule, let alone cite to any actionable evidence from the record conclusively establishing the amount and timing of Hagen's "separately calculated" post-complaint earnings. Rather, they propose that I separately calculate interest on different portions of Hagen's award based on one paragraph of dense, largely uncited, mathematical assumptions. After reading the Siouxland Defendants' argument, I am left to wonder: How do I use this argument to apportion interest? Am I supposed to rely on Hagen's economist's calculations? If so, which ones? How, and during which

months, should I allocate Hagen's bonuses? Where in the record is any of the evidence supporting the Siouxland Defendants' arguments? How do I know how often Hagen was paid at Amery? Given these questions, it would have been more helpful for the Siouxland Defendants to present a detailed schedule of proposed interest payments to me, coupled with citations to the trial transcript or record supporting the assumptions used in making the schedule.

But instead of presenting a detailed payment schedule, the Siouxland Defendants offer arguments that depend on a number of assumptions: "assuming [Hagen's] bonus was paid out equally" (docket no. 123, at 14); "[a]ssuming [Hagen] was paid in equal installments at Amery" (docket no. 123, at 14); assuming that Hagen was paid on the first of each month at Amery (docket no. 123, at 14 n.4); and assuming that Hagen's bonus would be "evenly divided and applied in August and December of 2011 and 2012" (docket no. 123, at 15). I decline to deviate from the clear language in Iowa Code § 668.13(1) based on the Siouxland Defendants' assumptions. Thus, interest on Hagen's entire past lost earnings award "shall accrue from the date of the commencement of the action." Iowa Code § 668.13(1).

The Siouxland Defendants do not contest Hagen's claim for post-judgment interest. I therefore grant Hagen's request for post-judgment interest. "[U]nless a case is expressly exempt from the scope of [28 U.S.C. § 1961], the federal postjudgment interest rate applies to cases adjudicated in federal court, regardless of whether the basis for jurisdiction was federal question or diversity." *Maddox v. Am. Airlines, Inc.*, 298 F.3d 694, 699-700 (8th Cir. 2002). This case is not expressly exempt under 28 U.S.C. § 1961, so I will apply the federal post-judgment interest rate to this case. 28 U.S.C. § 1961(a) provides:

> Interest shall be allowed on any money judgment in a civil case recovered in a district court. . . . . Such interest shall be calculated from the date of the entry of the judgment, at a

> rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.

Because the Clerk entered judgment in this case on May 2, 2013, post-judgment interest shall be calculated from that date, and at the rate identified in 28 U.S.C. § 1961.

### III. CONCLUSION

For the reasons discussed above, I order as follows:

(1) The stay previously imposed in this case (docket no. 141) is lifted.

(2) The Siouxland Defendants' post-trial motions for judgment as a matter of law and for a new trial (docket no. 119) are denied.

(3) Hagen's motion for an additur (docket no. 121) is denied and Hagen's motion for pre- and post-judgment interest (docket no. 121) is granted. Pre-judgment interest shall accrue from May 19, 2011, at the rate identified in Iowa Code § 668.13(3). Post-judgment interest shall be calculated from May 2, 2013, at the rate identified in 28 U.S.C. § 1961.

The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED**.

**DATED** this 30th day of May, 2014.

MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA